**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HOMELAND CENTRAL INSURANCE COMPANY F/K/A HAWKEYE SECURITY INSURANCE COMPANY (IA) AS TRANSFEREE OF WESTERN STATES INSURANCE COMPANY, BY ITS TRANSFEREE ONEBEACON INSURANCE COMPANY, | ) ) ) ) ) ) ) | FILED COPY: MAY 22, 2008 08CV2991  EDA JUDGE GUZMAN MAGISTRATE JUDGE BROWN |
| | ) | No.: |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| TUSCHALL ENGINEERING COMPANY, INC., F.H. PASCHEN, S.N. NIELSEN, INC., | ) ) ) | |
| Defendants. | ) ) ) | |

**COMPLAINT FOR DECLARATORY RELIEF**

NOW COMES the Plaintiff, Homeland Central Insurance Company f/k/a Hawkeye-Security Insurance Company (IA) as transferee of Western States Insurance Company; by its transferee OneBeacon Insurance Company ("OneBeacon") by and through its attorneys, and for its Complaint for Declaratory Judgment, states as follows:

**THE PARTIES, JURISDICTION, AND VENUE**

1.      Homeland Central Insurance Company f/k/a Hawkeye-Security Insurance Company (IA) as transferee of Western States Insurance Company; by its transferee OneBeacon Insurance Company ("OneBeacon") is a Pennsylvania corporation with its principal place of business in Canton, Massachusetts.

2.      Upon information and belief, Defendant Tuschall Engineering Company, Inc. ("Tuschall") is an Illinois corporation with its principal place of business in Burr Ridge, Illinois.

3.     Upon information and belief, Defendant F.H. Paschen, S.N. Nielsen, Inc. ("Nielsen") is an Illinois corporation with its principal place of business in Des Plaines, Illinois.

4.     This Court maintains jurisdiction pursuant to 28 U.S.C. § 1332.  There is diversity of citizenship between the parties and the amount in controversy, exclusive of costs and interest, exceeds Seventy-Five Thousand Dollars ($75,000.00).

5.     Venue is proper in this jurisdictional district pursuant to 28 U.S.C. § 1391.

## JURY DEMAND

6.     OneBeacon demands a jury trial of any factual issues pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## THE UNDERLYING LAWSUIT

7.     On or about June 5, 2006, the Board of Trustees of William Rainey Harper College No. 512 and Illinois Capital Development Board, for the use and benefit of Board of Trustees of William Rainey Harper College No. 512 ("William Rainey ") filed a lawsuit against Burnidge, Cassell and Associates, Inc. and F.H. Paschen, S.N. Nielsen, Inc. ("Nielsen") for water damage that William Rainey alleged it suffered as a result of the defective construction of its performing arts center and instructional conference center ("the Project"), in the Circuit Court of Cook County, Illinois, No 06-L-005812 ("the Underlying Action").  A true and correct copy of the Complaint is attached as Exhibit A.

8.     The Complaint does not specify when work on the Project commenced or was complete.  Exhibit A.

9.     On or about June 4, 2007, Nielsen filed a Third-Party complaint against Tuschall and another third party in the Underlying Action, claiming that Tuschall breached its subcontract and seeking indemnity for the work that Tuschall performed as a subcontractor on the Project.  In

2

doing so, Nielsen claimed that Tuschall breached the subcontract by failing to perform the work: (1) in a workmanlike manner; (2) free from defect; and (3) in conformity with the requirements of the subcontract agreement. A true and correct copy of the Third Party Complaint is attached as Exhibit B.

10.    The Third Party Complaint does not specify when Tuschall began or completed its work on the Project. Exhibit B.

11.    Tuschall has requested a defense and indemnification from OneBeacon for the damages alleged in the Third Party Complaint. OneBeacon has been providing a defense to Tuschall under a reservation of rights.

## THE COVERAGE

12.    Western States Insurance Company[1] issued to Tuschall a commercial general liability policy under policy number WAL2054489, in effect from January 21, 2001 to January 23, 2002 ("the Policy"). A true and correct copy of the Policy is attached as Exhibit C.

13.    The insuring agreement for the Policy provides:

1.    **Insuring Agreement**

a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result. But:

---

[1]    The rights and responsibilities of Western States Insurance Company were transferred to Homeland Central Insurance Company f/k/a Hawkeye-Security Insurance Company (IA) as transferee of Western States Insurance Company, which are now the rights and responsibilities of its transferee OneBeacon Insurance Company ("OneBeacon").

3

**b.**    This insurance applies to "bodily injury" and "property damage" only if:

    **(1)**    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;" and

    **(2)**    The "bodily injury" or "property damage" occurs during the policy period.

14.    The term "occurrence" is defined in the policy as follows:

    **9.**    "Occurrence" means any accident, including continuous or repeated exposure to substantially the same general harmful conditions.

15.    The phrase "property damage" is also defined in the policy:

    **12.**    "Property damage" means:

    **a.**    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    **b.**    Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

16.    No property damage was sustained while the Policy was in effect.

17.    The policy incorporates the following exclusion:

This insurance does not apply to:

\* \* \*

**b.    Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

    **(1)**    That the insured would have in the absence of the contract or agreement; or

    **(2)**    Assumed in a contract or agreement that is an

4

"insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damages", provided:

(a)     Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract" and

(b)     Such attorney fees and litigation expenses are for defense of the party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

18.     The policy defines an "insured contract" in relevant part as follows:

**9.**     "Insured contract" means:

* * *

**f.**     That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

19.     There is no coverage under the Policy to the extent that Tuschall's agreement with Nielsen does not qualify as an "insured contract."

20.     The policy incorporates the following exclusion:

This insurance does not apply to:

* * *

**j.     Damage to Property**

"Property Damage" to:

121209145v1 886033

* * *

(5)     that particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6)     That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

* * *

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

21.     There is no coverage under the policy to the extent that any damages awarded in the Underlying Action represent any property damage to real property at William Rainey that arose out of Tuschall's operations.

22.     The term "your work" is defined in the policy as follows:

19.     "Your work means:

a.     Work or operations performed by you or on your behalf; and

b.     Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

a.     Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

b.     The providing of or failure to provide warnings or instructions.

23.     There is no coverage under the policy to the extent that any damages awarded in the Underlying Action represent repairs to Tuschall's own work at William Rainey that has not been completed or put to its intended purpose.

6

121209145v1 886033

24.   The policy incorporates the following exclusion:

**k.    Damage to Your Product**

"Property damage" to "your product" arising out of it or any part of it.

25.   The policy defines the term "your product":

**20.    "Your product" means:**

**a.**    Any good or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(1)**    You;

**(2)**    Others trading under your name; or

**(3)**    A person or organization whose business or assets you have acquired; and

**b.**    containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes:

**a.**    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**b.**    Materials, parts or equipment furnished in connection with such work or operations.

26.   There is no coverage under the OneBeacon policy to the extent that Tuschall is required to undertake, or to pay for, repairs to its own product, the curtain wall.

27.   The policy incorporates the following exclusion:

**l.    Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

7

121209145v1 886033

28.    The term "products-completed operations hazard" is defined in the policy as follows:

16.    "Products-completed operations hazard":

    a.    includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work"  except:

        (1)    Products that are still in your physical possession; or

        (2)    Work that has not yet been completed or abandoned.  However, "your work" will be deemed completed at the earliest of the following times:

            (a)    When all of the work called for in your contract has been completed.

            (b)    When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

            (c)    When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

    Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

    b.    Does not include "bodily injury" or "property damage" arising out of:

        (1)    The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured.

        (2)    The existence of tools, uninstalled equipment or abandoned or unused materials or

        (3)    Products or operations for which the classification, listed in the Declarations or in a policy schedule

8

states that products-completed operations are subject to the General Aggregate Limit.

29.    There is no coverage under the OneBeacon policy to the extent that the damages sought in the Underlying Action arose out of Tuschall's work on the curtain wall and part of Tuschall's completed operations.

30.    The policy incorporates the following exclusion:

**m.    Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1)    A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2)    A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

31.    The policy defines "impaired property" as follows:

**8.**    "Impaired property" means tangible property other than "your product" or "your work," that cannot be used or is less useful because:

a.    It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b.    You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

a.    The repair, replacement, adjustment or removal of "your product" or "your work;" or

b.    Your fulfilling the terms of the contract or agreement.

9

121209145v1 886033

32.     Coverage is barred under the Policy for the damages claimed in the Underlying Action on the Basis of Exclusion m.

33.     The policy includes the following reporting requirement:

**2.     Duties In The Event of Occurrence, Offense, Claim or Suit**

a.      You must see to it that we are notified as soon as practicable of an occurrence" or an offense which may result in a claim.   To the extent possible, notice should include:

(1)     How, when and where the "occurrence" or offense took place;

(2)     The names and addresses of any injured person and witnesses; and

(3)     The nature and location of any injury or damage arising out of an "occurrence" or offense.

b.      If a claim is made or "suit" is brought against any insured, you must

(1)     Immediately record the specifics of the claim or "suit" and the date received.

and

(2)     Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c.      You and any other involved insured must:

(1)     Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit;"

(2)     Authorize us to obtain records and other information;

(3)     Cooperate with us in the investigation, settlement or defense of the claim or "suit;" and

(4)     Assist us, upon our request, in the enforcement of

121209145v1 886033

any right against any person or organization which
may be liable to the insured because of injury or
damage to which this insurance may also apply.

34.    There is no coverage under the Policy because Tuschall did not provide timely

notice of the William Rainey matter.

## COUNT I – DECLARATORY RELIEF
### (against all Defendants)

35.    OneBeacon restates and incorporates by reference the allegations contained in

Paragraphs 1-33 of this Complaint.

36.    There is a justiciable controversy between OneBeacon, Tuschall, and Nielsen as

to whether the Policy issued to Tuschall provides coverage for the damages sought in the

Underlying Action.

37.    OneBeacon is entitled to a declaration that there is no coverage under the Policy

because neither the Complaint nor the Third Party Complaint concerns claims that the Plaintiff

sustained property damage during the applicable Policy period.

38.    OneBeacon is entitled to a declaration that there is no coverage under the Policy

for liability that Tuschall assumed in any contract with Nielsen and Exclusion b applies.

39.    OneBeacon is entitled to a declaration that there is no coverage under the Policy

for property damage to real property on which Tuschall was performing operations at the Project

or to the extent that Tuschall is required to undertake, or pay for, repairs to its own work on the

Project that had not been completed or put to its intended purpose and Exclusion j applies.

40.    OneBeacon is entitled to a declaration that there is no coverage under the Policy

to the extent that Tuschall is required to undertake, or pay for, repairs to its own product, the

curtain wall, and Exclusion k applies.

41.    OneBeacon is entitled to a declaration that there is no coverage under the Policy

121209145v1 886033

to the extent that the damages alleged in the Underlying Action arose out of Tuschall's work on the curtain wall and part of Tuschall's completed operations, and Exclusion l applies.

42.    OneBeacon is entitled to a declaration that there is no coverage under the Policy on the basis of Exclusion m.

43.    OneBeacon is entitled to a declaration that there is no coverage under the Policy because Tuschall did not provide timely notice of the William Rainey matter, as required by the Policy.

44.    OneBeacon is entitled to a declaration that it has no duty to defend Tuschall because there is no potential for coverage under the Policy.

## **PRAYER FOR RELIEF**

WHEREFORE, OneBeacon requests the following relief:

a.    The declaratory relief requested under Count One; and

b.    Such other and further relief as this Court deems to be just and appropriate.

Respectfully submitted,

**HOMELAND CENTRAL INSURANCE COMPANY F/K/A HAWKEYE SECURITY INSURANCE COMPANY (IA) AS TRANSFEREE OF WESTERN STATES INSURANCE COMPANY, BY ITS TRANSFEREE ONEBEACON INSURANCE COMPANY**

By: /s/ Ali R. Amin_____
        One of their attorneys

Ali R. Amin (6274471)
Hinshaw & Culbertson, LLP
222 North LaSalle Street, Suite 300
Chicago, IL 60601
Telephone: 312-704-3694
Facsimile:  312-704-3001

121209145v1 886033

JUDGE GUZMAN
MAGISTRATE JUDGE BROWN

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HOMELAND CENTRAL INSURANCE COMPANY F/K/A HAWKEYE SECURITY INSURANCE COMPANY (IA) AS TRANSFEREE OF WESTERN STATES INSURANCE COMPANY, BY ITS TRANSFEREE ONEBEACON INSURANCE COMPANY, | ) ) ) ) ) ) ) | No.: |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| TUSCHALL ENGINEERING COMPANY, INC., F.H. PASCHEN, S.N. NIELSEN, INC., | ) ) ) | |
| Defendants. | ) ) ) | |

**EXHIBIT "A"**

**TO COMPLAINT FOR DECLARATORY RELIEF**

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| BOARD OF TRUSTEES OF WILLIAM RAINEY HARPER COLLEGE NO. 512, and ILLINOIS CAPITAL DEVELOPMENT BOARD, for the use and benefit of BOARD OF TRUSTEES OF WILLIAM RAINEY HARPER COLLEGE NO. 512, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | No. |
| BURNIDGE, CASSELL AND ASSOCIATES, INC., | ) ) ) | |
| Serve:     Charles H. Burnidge Burnidge-Cassell Assoc. 2425 Royal Blvd. Elgin, IL 60123 | ) ) ) ) ) ) | |
| and | ) | |
| F.H. PASCHEN, S.N. NIELSEN, INC., | ) ) | |
| Serve:     Edward J. Burke Burke Burns & Pinelli, Ltd. 3 1st National Plaza Suite 4300 Chicago, IL 60602 | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

2006L005812
CALENDAR/ROOM Y
TIME 00:00
Breach of Contract

## COMPLAINT

NOW COME Plaintiffs, Board of Trustees of William Rainey Harper College No.

512, a body politic and corporate, and the Illinois Capital Development Board, an agency

of the State of Illinois, by their attorneys, Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd.,

1

From: Marilyn Rad  At: Insurance Resource Consultants  Fax ID: insurance Resource C  To: Michelle LeConey  Date: 06/26/07  11:55 AM  Page: 46 of 41

and for their Complaint against Defendants, state as follows:

## ALLEGATIONS COMMON TO ALL COUNTS

1.     Plaintiff, Board of Trustees of William Rainey Harper College No. 512 ("Harper College"), is a body politic and corporate under the laws of the State of Illinois.

2.     Plaintiff, the Illinois Capital Development Board (the "CDB" and together with Harper College, "Plaintiffs"), is a body politic and corporate organized under the laws of Illinois, and has the statutory authority to enter into contracts for the construction of State agency facilities, including but not limited to those for the Board of Trustees of William Rainey Harper College No. 512, and to exercise all powers necessary to accomplish the purposes thereof.

3.     Defendant Burnidge, Cassell and Associates, Inc. ("Burnidge") is an Illinois corporation engaged in the business of performing architectural design and related construction services.

4.     Defendant F.H. Paschen, S.N. Nielsen, Inc. ("Paschen" and together with Burnidge, "Defendants") is an Illinois corporation engaged in the business of general construction contracting and other construction related services.

5.     On or about February 14, 1996, Burnidge entered into an agreement with the CDB under which it was to prepare plans and specifications for the construction of the Wojcik Conference Center and Performing Arts Center on the Harper College Campus (the "Project") and to provide full time project representation for the Project on the job site (the "Design Contract"). A copy of said agreement is attached hereto and incorporated by reference as Exhibit A.

2

6.    At all relevant times, Harper College was identified as the user agency in the Design Contract and was intended by the parties to be a direct intended third party beneficiarry of the Design Contract.

7.    The Design Contract incorporated an alternative dispute resolution clause, which provides in part:

> Each party to any dispute over $50,000 agrees, upon the request of any other party to the dispute, to submit the matter to ADR, in a form to be determined by agreement of the parties. The parties shall first confer informally with one another to attempt to resolve the dispute. In the event that the assistance of an unbiased neutral is required, the parties shall meet and come to an agreement as to what form the ADR should take and who the unbiased neutral should be. Forms of ADR that may be utilized include, but are not limited to, mediation and mini-trials, but do not include formal arbitration. (See Section 00715 of Appendix E to Design Contract, attached as **Exhibit A.**)

8.    On or about March 28, 2000, the CDB entered into a contract with Paschen to construct the Project in strict accordance with the plans and specifications prepared by Burnidge (the "Construction Contract"). A true and correct copy of the Construction Contract is attached hereto and incorporated by reference herein as **Exhibit B.** Copies of the plans and specifications which are part of the contract documents are too voluminous to attach hereto and will be supplied upon a reasonable production request.

9.    At all relevant times, Harper College was identified as the user agency in the Construction Contract and was intended by the parties to be a direct intended third party beneficiary of the Construction Contract.

10.    The Construction Contract incorporated an alternative dispute resolution clause, which provides:

> Each party to any dispute of more than $50,000 agrees upon the request of any other party to the dispute, to submit the matter to ADR, in a form to be

3

From: Marilyn Rad  At: Insurance Resource Consultants  FaxID: Insurance Resource C  To: Marilyn Ceustor

determined by agreement of the parties. The parties shall first confer informally with one another to attempt to resolve the dispute. In the event that the assistance of an unbiased neutral is required, the parties shall meet and come to an agreement as to what form the ADR should take and who the unbiased neutral should be. Forms of ADR that may be utilized include, but [are] not limited to, mediation and mini-trials, but do not include formal arbitration. (*See* Standard Documents for Construction, attached as **Exhibit B**, which are incorporated into the Construction Contract.)

11.  Prior to commencing this action, Harper College, through its attorneys, sent a letter to Burnidge and Paschen, requesting their participation in the process of alternative dispute resolution of the claims in this action, in accordance with the terms of the Design Contract and Construction Contract. (*See* **Exhibit C**.)

12.  To date, neither Burnidge nor Paschen have responded to Harper College's aforesaid request for alternative dispute resolution.

13.  Plaintiffs have observed various symptoms of problems that occurred in connection with the Project.

14.  In response to these symptoms, Plaintiffs commenced discussions with Burnidge and Paschen, during which Plaintiffs notified Burnidge and Paschen of the above-referenced symptoms, and in response to which Burnidge and/or Paschen investigated these occurrences in an effort to identify the root causes of the symptoms and propose various solutions.

15.  Burnidge and Paschen continued to attempt to identify the root causes of these occurrences and to propose solutions to Plaintiffs throughout the course of the construction of the Project and until late 2004, at which time Plaintiffs engaged the firm of Wiss, Janney, Elstner Associates, Inc. (herein after referred to as "Wiss, Janney") to

4

conduct an independent review and field investigation of the above-referenced symptoms and make specific recommendations to remedy the symptoms Plaintiffs had experienced.

16.     On or about December 13, 2004, Wiss, Janney submitted a written report to Harper College (hereinafter referred to as the "Wiss Janney Report"), detailing its observations of the symptoms previously recognized by Plaintiffs and its theories of their root causes.

17.     The Wiss Janney Report implied for the first time that the symptoms were caused by breaches of the Design and Construction Contracts committed respectively by Burnidge and Paschen, as more fully described in Counts I and II of this Complaint.

18.     Plaintiffs did not know and could not have reasonably known until late December 2004, when they received and reviewed the Wiss Janney Report, that the above-referenced symptoms were caused by Burnidge's and Paschen's respective breaches of the Design and Construction Contracts.

19.     After learning that the above-referenced symptoms were due to Burnidge's and Paschen's respective breaches of the Design and Construction Contracts, Plaintiffs commenced good-faith settlement discussions with Burnidge and Paschen, during which time Burnidge and Paschen represented to Plaintiffs on multiple occasions their willingness to work with Plaintiffs to resolve the issues arising from the symptoms exhibited in the construction of the Project, and indicated to Plaintiffs that both were willing to participate in mediation in accordance with the ADR provisions of the Design and Construction Contracts.

20.     Despite repeated attempts by Plaintiffs, Defendants subsequently failed to follow through with their promises and participate in mediation.

From: Marilyn Rad At: Insurance Resource Consultants Fax ID: Insurance Resource O To: Marilyn Lorentz

21.   Accordingly, Defendants are estopped from defending this action on the ground that the causes of action alleged in Counts I and II of this Complaint are barred by the statute of limitations or by any conditions precedent.

22.   Venue of this action is proper in this Court pursuant to 735 ILCS 5/2-101(2), because the Design and Construction Contracts were performed and a substantial part of the events giving rise to this action occurred in Cook County, Illinois.

COUNT I<br>(Breach of Contract - Burnidge, Cassell and Associates, Inc.)

23.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 22 of their Allegations Common to All Counts as if stated fully herein.

24.   At all relevant times, Burnidge held itself out and represented that it had the requisite skill and expertise to provide architectural, structural, mechanical, and engineering services, including the preparation of architectural, structural, mechanical and civil drawings, project manuals, specifications, bid packages, and addenda, to review and approve shop drawings and submittals as well as to provide contract administration services and full-time on-site Project representation and inspection of the construction, which included, but was not limited to, verification of the constructed Project's conformance with the contract documents.

25.   Burnidge had a contractual duty to exercise the requisite care and skill of a professional to design and provide full-time observation of the construction of the Project in accordance with industry standards.

26.   Burnidge had a statutory duty to exercise the requisite care and skill of a professional architect in the performance of its obligations under the Design Contract.

6

27.    Burnidge had a contractual duty to exercise reasonable care to make revisions to the contract documents during construction of the Project to conform to industry standards, and to correct errors, ambiguities, or omissions in its drawings and specifications.

28.    Burnidge, as full-time Project representative, had a duty to observe the construction of the Project to guard and protect the interests of Harper College and the CDB and to assure Harper College and the CDB of conformance of construction with the contract plans and specifications.

29.    During design and construction of the Project, Burnidge materially breached its statutory, express, and implied duties and obligations to Harper College and the CDB in the following manners:

a.    the architectural drawings prepared by Burnidge do not indicate any specific type of material to be used for the exterior soffit near the dinning room, and no control joints were indicated on the drawings, and accordingly the aforesaid soffit is apparently constructed of painted gypsum sheathing without all necessary joints;

b.    the dining room roof was defectively designed such that there is ponding and leakage;

c.    portions of the roof membrane over the performing arts center exhibit blisters and ridges;

d.    a recessed floor slab in the auditorium near a wheelchair lift is constructed of insufficient thickness, allowing water intrusion and rusting of bolts;

7

    e.    the masonry wall is constructed without sufficient expansion joints, and as a result cracking has occurred, which has resulted in water infiltration;

    f.    the coatings on the performing arts center fly tower walls has been misapplied such that the coating does not adequately bond to the concrete surface;

    g.    the conference center curtain walls leak;

    h.    the performing arts center sidewalk is constructed without sufficient control joints; and

    i.    by causing other design defects in the Project.

30.    As a direct and proximate result of Burnidge's aforesaid material breaches of contract, Harper College and the CDB have been damaged in an amount to be determined at trial in excess of Fifty Thousand Dollars ($50,000).

31.    The CDB, and Harper College as the intended third party beneficiary of the Design Contract between the CDB and Burnidge, have fully performed all of their obligations under the Design Contract.

WHEREFORE, Plaintiffs Board of Trustees of William Rainey Harper College No. 512 and the Illinois Capital Development Board pray for entry of a judgment in their favor and against Defendant Burnidge, Cassell and Associates, Inc. in an amount in excess of Fifty Thousand Dollars ($50,000), together with attorneys' fees and costs, and for such other and further relief as this Court deems just and proper in the circumstances.

## COUNT II
(Breach of Contract - F.H. Paschen, S.N. Nielsen, Inc.)

8

From: Marilyn Rao At: Insurance Resource Consultants

32.    Plaintiffs incorporate the allegations contained in Paragraphs 1 through 22 of their Allegations Common to All Counts as if stated fully herein.

33.    At all relevant times, Paschen held itself out and represented that it had the requisite skill and expertise to comply with the contract plans and specifications.

34.    Paschen had an express and implied contractual duty to strictly conform to the Construction Contract prepared by Burnidge.

35.    Paschen materially breached its express and implied contract obligations and duties in the following manner:

    a.    a recessed floor slab in the auditorium near a wheelchair lift is constructed of insufficient thickness, allowing water intrusion and rusting of bolts;

    b.    the exterior soffit near the dining room is constructed without sufficient control joints;

    c.    the masonry wall is constructed without sufficient expansion joints, and as a result cracking as occurred, which has resulted in water infiltration;

    d.    the roof membrane over the performing arts center exhibits blistering and ridges;

    e.    the coatings on the performing arts center fly tower walls has been misapplied such that the coating does not adequately bond to the concrete surface;

    f.    the conference center curtain walls leak;

9

g.    the performing arts center sidewalk is constructed without sufficient

control joints; and

h.    there is ponding and leakage in the dining room roof.

36.    Each of the aforesaid defects is a material breach of the Construction

Contract.

37.    Harper College and the CDB have been damaged by the aforesaid material

breaches of contract because the defective work must be replaced and/or has diminished

the value of the Project.

38.    As a direct and proximate result of Paschen's aforesaid material breaches

of contract, Harper College and the CDB have been damaged in an amount to be

determined at trial in excess of Fifty Thousand Dollars ($50,000).

39.    The CDB, and Harper College as the intended third party beneficiary of the

Construction Contract between the CDB and Paschen, have fully performed all of their

obligations under the Construction Contract.

WHEREFORE, Plaintiffs Board of Trustees of William Rainey Harper College No.

512 and the Illinois Capital Development Board pray for the entry of a judgment in their

favor and against Defendant Burnidge, Cassell and Associates, Inc. in an amount in

excess of Fifty Thousand Dollars ($50,000), together with attorneys' fees and costs, and

for such other and further relief as this Court deems just and proper in the circumstances.

One of the Attorneys for Board of Trustees
of William Rainey Harper College No. 512
and the Illinois Capital Development Board

10

From: Marilyn Rad At: Insurance Resource Consultants FaxID: Insurance Resource C To: Michelle Lecaney          Date: 6/2/07  1:03 AM  Page: 56 of 57

Case 1:08-cv-02991     Document 1-2     Filed 05/22/2008     Page 12 of 12

Kenneth M. Florey
Scott A. Strange
ROBBINS, SCHWARTZ, NICHOLAS,
 LIFTON & TAYLOR, LTD.
20 N. Clark Street, Suite 900
Chicago, Illinois 60602
(312) 332-7760
I.D. No. 115190

11

08CV2991   EDA
JUDGE GUZMAN
MAGISTRATE JUDGE BROWN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| HOMELAND CENTRAL INSURANCE COMPANY F/K/A HAWKEYE SECURITY INSURANCE COMPANY (IA) AS TRANSFEREE OF WESTERN STATES INSURANCE COMPANY, BY ITS TRANSFEREE ONEBEACON INSURANCE COMPANY, | ) ) ) ) ) ) ) | |
| | ) | No.: |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| TUSCHALL ENGINEERING COMPANY, INC., F.H. PASCHEN, S.N. NIELSEN, INC., | ) ) ) | |
| Defendants. | ) ) ) | |

## EXHIBIT "B" – PART 1

## TO COMPLAINT FOR DECLARATORY RELIEF

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

BOARD OF TRUSTEES OF WILLIAM )
RAINEY HARPER COLLEGE NO. 512, )
and ILLINOIS CAPITAL DEVELOPMENT )
BOARD, for the use and benefit of BOARD OF )    No. 06 L 005812
TRUSTEES OF WILLIAM RAINEY HARPER )
COLLEGE NO. 512, )
                    )    Judge Ronald F. Bartkowicz
       Plaintiffs, )
                    )    Calendar Y
       v. )
                    )
BURNIDGE, CASSELL AND ASSOCIATES, )
INC., and F.H. PASCHEN, S.N. NIELSEN, INC., )
                    )
       Defendants. )
_____)
F.H. PASCHEN, S.N. NIELSEN, INC., an )
Illinois corporation, )
                    )
       Third-Party Plaintiff, )
                    )
       v. )
                    )
TUSCHALL ENGINEERING COMPANY, INC., )
an Illinois corporation; and UNDERLAND )
ARCHITECTURAL SYSTEMS, INC., an )
Illinois corporation, )
                    )
       Third-Party Defendants. )

## THIRD-PARTY COMPLAINT OF DEFENDANT/THIRD-PARTY PLAINTIFF
## F.H. PASCHEN, S.N. NIELSEN, INC.

Defendant/Third-Party Plaintiff **F.H. PASCHEN, SN. NIELSEN, INC.** ("Paschen"), an

Illinois corporation, by its undersigned attorneys, complains as follows against Third-Party

Defendants **TUSCHALL ENGINEERING COMPANY, INC.** ("Tuschall") **and UNDERLAND**

**ARCHITECTURAL SYSTEMS, INC.** ("Underland") (collectively referred to herein as the

"Third-Party Defendants").

## COUNT I
### (Breach of Contract-Tuschall)

1.     At all relevant times, Third-Party Plaintiff, F.H. Paschen, S.N. Nielsen, Inc. ("Paschen") was an Illinois corporation. Paschen maintains its principal place of business in the City of Chicago, State of Illinois.

2.     Upon information and belief, and at all relevant times, Third-Party Defendant Tuschall Engineering Co., Inc. ("Tuschall") was an Illinois corporation with its principal place of business located in Burr Ridge, Illinois.

3.     On or about July 18, 2000 Paschen and Tuschall entered into a written Subcontract Agreement (the "Subcontract Agreement") whereby Tuschall agreed to provide certain construction services (the "Work") in relation to a construction project known as the William Rainey Harper College Performing Arts Center (JC11R) & Instructional Conference Center (JC11W), CDB Project No. 810-032-016 (the "Harper Project"), located in Palatine, Cook County, Illinois. A copy of the Subcontract Agreement is attached hereto as Exhibit A.

4.     Paschen has performed all obligations required of it pursuant to said Subcontract Agreement.

5.     Pursuant to the terms of the Subcontract Agreement, Tuschall guaranteed, and was required, to perform its Work, as defined therein, free from defects and in conformity with the requirements of the Subcontract Agreement and all Project Documents (Exhibit A, Subcontract Agreement, Paragraphs Thirteen, Fourteen and Fifteen).

6.     Contrary to the terms of the Subcontract Agreement, Tuschall breached the terms of the Subcontract Agreement by failing to perform the Work: a) in a workmanlike manner; b) free

2

From: Marilyn Rau At: Insurance Resource Consultants

from defect; and/or c) in conformity with the requirements of the Subcontract Agreement and of the Project Documents.

     7.     As a direct and proximate result of Tuschall's breach of the Subcontract Agreement, Paschen has been damaged in an amount yet to be determined, but believed to be in excess of $50,000.00.

     **WHEREFORE,** Defendant/Third-Party Plaintiff **F.H. PASCHEN, S.N. NIELSEN, INC.** hereby prays for judgment in its favor and against Third-Party Defendant **TUSCHALL ENGINEERING COMPANY, INC.** and that it be granted compensatory damages in an amount shown to be due Paschen as a result of Tuschall's breach of the Subcontract Agreement, an amount as yet to be determined at trial, but believed to be in excess of $50,000.00; plus an award of contractually allowed attorneys fees, expenses and costs; and for such other relief as this Court deems just and proper.

## COUNT II
### (Indemnity-Tuschall)

     1.     At all relevant times, Third-Party Plaintiff, F.H. Paschen, S.N. Nielsen, Inc. ("Paschen") was an Illinois corporation. Paschen maintains its principal place of business in the City of Chicago, State of Illinois.

     2.     Upon information and belief, and at all relevant times, Third-Party Defendant Tuschall Engineering Co., Inc. ("Tuschall") was an Illinois corporation with its principal place of business located in Burr Ridge, Illinois.

     3.     On or about July 18, 2000 Paschen and Tuschall entered into a written Subcontract Agreement (the "Subcontract Agreement") whereby Tuschall agreed to provide certain construction

3

From: Marilyn Rao At: Insurance Resource Consultants Fax: Insurance Resource C

services (the "Work") in relation to a construction project known as the William Rainey Harper College Performing Arts Center (JC11R) & Instructional Conference Center (JC11W), CDB Project No. 810-032-016 (the "Harper Project") located in Palatine, Cook County, Illinois. A copy of the Subcontract Agreement is attached hereto as Exhibit A.

4.      Pursuant to the terms of the Subcontract Agreement Tuschall guaranteed, and was required, to perform its Work, as defined therein, free from defects and in conformity with the requirements of the Subcontract Agreement and all Project Documents (Exhibit A, Subcontract Agreement, Paragraphs Thirteen, Fourteen and Fifteen).

5.      The terms of the Subcontract Agreement, Paragraphs Twenty-Two and Twenty-Four, further provide that Tuschall shall indemnify, defend, and hold harmless Paschen from and against any and all claims arising from the Work performed by Tuschall pursuant to its Subcontract Agreement with Paschen, including, without limitation, any claims that its Work was defective or not in conformity with Subcontract Agreement or Project documents.

6.      The Subcontract Agreement also provides for payment by Tuschall of Paschen's attorneys fees, costs and expenses in relation to defense of said claims.

7.      Upon information and belief, Tuschall performed, without limitation, defective and unworkmanlike work on the Harper Project and/or work not in conformity with the Harper Project Documents.

8.      On or about June 5, 2006 a complaint was filed in the Circuit Court of Cook County, Illinois County Department, Law Division, captioned *Board of Trustees of William Rainey Harper College No. 512, and Illinois Capital Development Board v. Burnidge, Cassell and Associates, Inc. and F.H. Paschen, S.N. Nielsen, Inc.,* Case Number 06 CH 005812 (the Underlying Litigation"). A

4

copy of the Complaint, minus Exhibits, is attached hereto as Exhibit B.

9.    In the Underlying Litigation, Plaintiffs claim that certain construction work performed at Harper College was performed defectively, or not in conformity with the Project Documents, including, without limitation, the "conference center curtain walls" (Exhibit B, Complaint, Paragraph 35(f)).

10.    In their Complaint, the Plaintiffs request the following relief in the Underlying Litigation: a) that Paschen pay an amount in damages in excess of $50,000.00; and b) that Paschen pay the Plaintiffs' attorneys fees and costs.

11.    In addition, on April 12, 2007, Plaintiffs, through their counsel, issued an itemized list of alleged "actual and estimated costs of repairing and/or replacing the defectively designed and/or constructed portions of the work associated with Harper College's Wojcik Conference Center and Performing Arts Project" (the "List"). Included in Plaintiffs' itemized List is alleged Item #15, "Replacement of Leaking Curtain Wall, for a sum of $963,000.00". A copy of the List is attached hereto as Exhibit C.

12.    Pursuant to the terms of the Subcontract Agreement, Exhibit A hereto, in the event that there is a finding of liability against Paschen and in favor of the Plaintiffs, or in the event a settlement is reached by Paschen with the Plaintiffs in relation to the claims raised in the Underlying Litigation, Paschen would be entitled to a judgment against Tuschall in an amount equal to the judgment, plus Paschen's costs or attorneys fees, or in the amount of the settlement paid by Paschen to Plaintiffs, plus Paschen's attorneys fees and costs.

WHEREFORE, Third-Party Plaintiff F.H. PASCHEN, S.N. NIELSEN, INC. respectfully requests that in the event a judgment is entered against it in the Underlying Litigation, or in the event

5

Paschen settles with the Plaintiffs, that a judgment be entered in its favor and against the Third-Party

Defendant **TUSCHALL ENGINEERING, INC.** in an amount equal to the amount Paschen is

found liable to Plaintiffs in the Underlying Litigation or in the amount of settlement of any said

claims; for an award of contractual attorney fees and costs; and for such other and further relief as

this Court deems just and appropriate.

## COUNT III
### (Breach of Contract-Underland)

1.    At all relevant times, Third-Party Plaintiff, F.H. Paschen, S.N. Nielsen, Inc.,

("Paschen") was an Illinois corporation. Paschen maintains its principal place of business in the City

of Chicago, State of Illinois.

2.    Upon information and belief, and at all relevant times, Third-Party Defendant

Underland Architectural Systems, Inc.("Underland") maintained a business office in Lynwood,

Illinois and its Illinois Registered Agent is located in the City of Lynwood, State of Illinois.

3.    On or about August 29, 2000 Paschen and Underland entered into a written

Subcontract Agreement (the "Subcontract Agreement") whereby Underland agreed to provide certain

construction services (the "Work") in relation to a construction project known as the William Rainey

Harper College Performing Arts Center (JC11R) & Instructional Conference Center (JC11W), CDB

Project No. 810-032-016 (the "Harper Project"), located in Palatine, Cook County, Illinois. A copy

of the Subcontract Agreement is attached hereto as Exhibit D.

4.    Paschen performed all obligations required of it pursuant to said Subcontract

Agreement.

5.    Pursuant to the terms of the Subcontract Agreement, Underland guaranteed, and was

6

required, to perform its Work, as defined therein, free from defects and in conformity with the requirements of the Subcontract Agreement and all Project Documents (Exhibit D, Subcontract Agreement, Paragraphs Thirteen, Fourteen and Fifteen).

6.     Contrary to the terms of the Subcontract Agreement, Underland breached the terms of the Subcontract Agreement by failing to perform the Work: a) in a workmanlike manner; b) free from defect; and/or c) in conformity with the requirements of the Subcontract Agreement and of the Project Documents.

7.     As a direct and proximate result of Underland's breach of the Subcontract Agreement, Paschen has been damaged in an amount yet to be determined, but believed to be in excess of $50,000.00.

WHEREFORE, Defendant/Third-Party Plaintiff **F.H. PASCHEN, S.N. NIELSEN, INC.** hereby prays for judgment in its favor and against Third-Party Defendant **UNDERLAND ARCHITECTURAL SYSTEMS, INC.** and that it be granted compensatory damages in an amount shown to be due Paschen as a result of Underland's breach of the Subcontract Agreement, an amount as yet to be determined at trial, but believed to be in excess of $50,000.00; plus an award of contractually allowed attorneys fees, expenses and costs; and for such other relief as this Court deems just and proper.

## COUNT IV
### (Indemnity-Underland)

1.     At all relevant times, Third-Party Plaintiff, F.H. Paschen, S.N. Nielsen, Inc. ("Paschen") was an Illinois corporation. Paschen maintains its principal place of business in the City of Chicago, State of Illinois.

7

2.    Upon information and belief, and at all relevant times, Third-Party Defendant Underland Architectural Systems, Inc. ("Underland") maintained a business office in Lynwood, Illinois and its Illinois Registered Agent is located in the City of Lynwood, State of Illinois.

3.    On or about August 29, 2000 Paschen and Underland entered into a written Subcontract Agreement (the "Subcontract Agreement") whereby Underland agreed to provide certain construction services (the "Work") in relation to a construction project known as the William Rainey Harper College Performing Arts Center (JC11R) & Instructional Conference Center (JC11W), CDB Project No. 810-032-016 (the "Harper Project") located in Palatine, Cook County, Illinois. A copy of the Subcontract Agreement is attached hereto as Exhibit D.

4.    Pursuant to the terms of the Subcontract Agreement Underland guaranteed, and was required, to perform its Work, as defined therein, free from defects and in conformity with the requirements of the Subcontract Agreement and all Project Documents (Exhibit D, Subcontract Agreement, Paragraphs Thirteen, Fourteen and Fifteen).

5.    The terms of the Subcontract Agreement, Paragraphs Twenty-Two and Twenty-Four, further provide that Underland shall indemnify, defend, and hold harmless Paschen from and against any and all claims arising from the Work performed by Underland pursuant to its Subcontract Agreement with Paschen, including, without limitation, any claims that its Work was defective or not in conformity with Subcontract Agreement or Project documents.

6.    The Subcontract Agreement also provides for payment by Underland of Paschen's attorneys fees, costs and expenses in relation to defense of said claims.

7.    Upon information and belief, Underland performed, without limitation, defective and unworkmanlike work on the Harper Project and/or work not in conformity with the Harper Project

8

Documents.

8.     On or about June 5, 2006 a complaint was filed in the Circuit Court of Cook County, Illinois County Department, Law Division, captioned *Board of Trustees of William Rainey Harper College No. 512, and Illinois Capital Development Board v. Burnidge, Cassell and Associates, Inc. and F.H. Paschen, S.N. Nielsen, Inc.*, Case Number 06 CH 005812 (the Underlying Litigation"). A copy of the Complaint, minus Exhibits, is attached hereto as Exhibit B.

9.     In the Underlying Litigation, Plaintiffs claim that certain construction work performed at Harper College was performed defectively, or not in conformity with Project Documents, including, without limitation, the "conference center curtain walls" (Exhibit B, Complaint, Paragraph 35(f)).

10.     In their Complaint, Plaintiffs request the following relief in the Underlying Litigation: a) that Paschen pay an amount in damages in excess of $50,000.00; and b) that Paschen pay the Plaintiffs' attorneys fees and costs.

11.     In addition, on April 12, 2007, Plaintiffs, through their counsel, issued an itemized list of alleged "actual and estimated costs of repairing and/or replacing the defectively designed and/or constructed portions of the work associated with Harper College's Wojcik Conference Center and Performing Arts Project" (the "List"). Included in Plaintiffs' itemized List is alleged Item #15, "Replacement of Leaking Curtain Wall, for a sum of $963,000.00". A copy of the List is attached hereto as Exhibit C.

12.     Pursuant to the terms of the Subcontract Agreement, Exhibit D hereto, in the event that there is a finding of liability against Paschen and in favor of the Plaintiffs, or in the event a settlement is reached by Paschen with the Plaintiffs in relation to the claims raised in the Underlying

9

Litigation, Paschen would be entitled to a judgment against Underland in an amount equal to the

judgment, plus Paschen's costs or attorneys fees, or in the amount of the settlement paid by Paschen

to Plaintiffs, plus Paschen's attorneys fees and costs.

WHEREFORE, Third-Party Plaintiff F.H. PASCHEN, S.N. NIELSEN, INC. respectfully

requests that in the event a judgment is entered against it in the Underlying Litigation, or in the event

Paschen settles with the Plaintiffs, that a judgment be entered in its favor and against the Third-Party

Defendant UNDERLAND ARCHITECTURAL SERVICES, INC. in an amount equal to the

amount Paschen is found liable to Plaintiffs in the Underlying Litigation or in the amount of

settlement of any said claims; for an award of contractual attorney fees and costs; and for such other

and further relief as this Court deems just and appropriate.

Respectfully submitted,
F.H. PASCHEN, S.N. NIELSEN, INC.



By: _____
     One of the Attorneys for F.H. Paschen

Ellen B. Epstein
BURKE BURNS & PINELLI, LTD.
Three First National Plaza
Suite 4300
Chicago, Illinois 60602
(312) 541-8600
Firm No. 29282
Dated: June 4, 2007

10

From: Marilyn Rad At: Insurance Resource Consultants



# F.H. PASCHEN, SN NIELSEN, INC.
## GENERAL CONTRACTORS

**FILE COPY**

## SUBCONTRACT AGREEMENT
### CONTRACT NUMBER 353-015

**Date:**                July 18, 2000

**Contractor:**          F.H. Paschen/SN Nielsen, Inc.
                         701 Lee Street, Suite 550
                         Des Plaines, IL 60016

**Project:**             Performing Arts Center (JC11R) & Instructional Conference Center (JC11W)
                         William Rainey Harper College
                         1200 West Algonquin, Palatine, Cook County, Illinois 60067
                         CDB Project No. 810-032-016 / CDB Contract No. 50-0735-81

**Owner:**               State of Illinois, Capital Development Board
                         William G. Stratton Building, Third Floor
                         401 South Spring Street
                         Springfield, Illinois 62706-4050

**Architect:**           Burnidge Cassell Associates
                         2425 Royal Boulevard
                         Elgin, Illinois 60123

**Subcontractor:**       Tuschall Engineering Company, Inc.
                         15W700 79th Street
                         Burr Ridge, IL 60521-5966
                         Contact: James Tuschall
                         Phone: (630) 655-9100 Fax: (630) 655-9109

**Subcontract Price:**   $280,000.00
                         Two Hundred Eighty Thousand Dollars and 00/100

**General Contract Dated:**    February 29, 2000

**Performance Bond and Payment Bond:**    Not required

**Retainage Percentage:**      10%

This Agreement, including the Schedules attached hereto and incorporated herein, is made this **18th** day of **July, 2000**, by and between **F.H. PASCHEN/SN NIELSEN, INC.** (hereinafter the "Contractor") and **TUSCHALL ENGINEERING** (hereinafter the "Subcontractor").

For the consideration hereinafter set forth, Subcontractor covenants and agrees with Contractor as follows:

**EXHIBIT**
**A**

1.    **DESCRIPTION OF WORK**

Subcontractor shall perform and furnish all the work, labor, supervision, services, plant equipment, tools, scaffolds, appliances, materials, and all other things necessary for the incorporation into the Project of the work described in Schedule A (hereinafter the "Work"). The Work shall be performed in accordance with this Agreement and the Contract Documents identified in Schedule B, and the Additional Provisions, if any, set forth in Schedule E to this Agreement.

2.    **CONTRACT DOCUMENTS**

Subcontractor represents and agrees that it has examined and understands this Agreement and the other Contract Documents, has investigated the nature, locality and site of the Work and the conditions and difficulties under which the Work is to be performed, and that it enters into this Agreement on the basis of its own examination, investigation and evaluation of all such matters and not in reliance upon any opinions or representations of Contractor, or of Owner or Architect, or of any of their respective officers, agents, servants, or employees.

It is further agreed that the provisions of the contract between the Contractor and the Owner (hereinafter the "General Contract") including but not limited to, the General and Supplementary Conditions, the Plans and Specifications, all Contract Requirements, and the particular Specifications relating to the Work of Subcontractor, insofar as they are applicable, are hereby incorporated herein by this reference and are binding upon the Subcontractor. A copy of the General Contract is on file at the Contractor's office and has been inspected by Subcontractor.

3.    **RELATIONSHIPS**

The Work to be performed pursuant to this Agreement is a portion of the work to be provided by Contractor to Owner under the General Contract and is to be performed and furnished to the satisfaction of the Contractor, Architect, and Owner. The decision of the Owner or the Owner's designated representative as to the true construction, meaning and intent of the Plans and Specifications shall be final and binding upon the parties hereto. Contractor will furnish to Subcontractor such additional information and Plans as may be prepared by Architect to further describe the Work to be performed and furnished by Subcontractor, and Subcontractor shall conform to and abide by same.

The Contractor and Subcontractor shall be mutually bound by the terms of this Agreement and, to the extent that provisions of the General Contract apply to the Work of the Subcontractor, the Contractor shall assume toward the Subcontractor all obligations and responsibilities that the Owner, under the General Contract, assumes toward the Contractor, and the Subcontractor shall assume toward the Contractor all obligations and responsibilities which the Contractor, under the General Contract, assumes toward the Owner and Architect.

In addition to the rights and powers set forth in this Agreement, Contractor shall have the benefit of all rights, remedies and redress against Subcontractor which the Owner, by the Contract Documents, has against Contractor. If any provision of this Agreement is inconsistent or conflicts with any provision of the General or Supplementary Conditions of the Contract Documents, the provision in this Agreement shall control. In the event there is a conflict between any provision of this Agreement and any provision of the Special Conditions or the Plans and Specifications, the provision in the Special Conditions or the Plans and Specifications, as the case may be, shall govern.

- 2 -

4.    **SUBCONTRACT PRICE**

The sum to be paid Subcontractor for the satisfactory and timely performance and completion of the Work and of all the duties, obligations and responsibilities of Subcontractor under this Agreement and the other Contract Documents shall be the price set forth above (hereinafter the "Subcontract Price") which shall be paid subject to the conditions stated herein, except that if all or a portion of the Work is to be performed on a unit price basis, then the Subcontract Price shall be deemed an estimated total price for the Work and the actual Subcontract Price shall be computed in accordance with the lump sum prices, if any, and the unit prices set forth in Schedule C, based on actual quantities determined in accordance with the Contract Documents. Receipt of payment from the Owner to the Contractor for Subcontractor's Work is an absolute condition precedent to the Subcontractor's right to payment.

5.    **PROGRESS PAYMENTS**

a)    As a condition to filing a request for payment, or at any time upon request by the Contractor, Subcontractor shall submit a schedule of values of the various portions of the Work, including quantities, if required by the Contractor. On or before the Progress Estimate Date, Subcontractor shall submit to Contractor, in the form required, a written progress estimate showing the proportionate value of the Work installed to the date, from which shall be deducted the current retainage, all previous payments, and all charges for services, materials, equipment and other items furnished by Contractor to or chargeable to Subcontractor. The "Progress Estimate Date" shall be the first business day of the month, unless otherwise designated by the Contractor in writing to the Subcontractor. Subcontractor agrees that it shall furnish a release of liens and such information, evidence and substantiation with respect to the nature and extent of all obligations incurred by Subcontractor for or in connection with the Work, all payments made by Subcontractor thereon and the amounts remaining unpaid, to whom and the reasons therefore.

Contractor shall pay to Subcontractor, upon receipt of payment from the Owner, an amount equal to the value of Subcontractor's completed Work, to the extent allowed and paid by Owner to Contractor on account of Subcontractor's Work, less all previous payments and less the amount of current retainage. The term "previous payments" shall include all amounts already paid on account of the Work, all charges for materials or services furnished by Contractor and properly chargeable to Subcontractor and all costs incurred by Contractor properly chargeable to Subcontractor as obligations of Subcontractor. The term "current retainage" shall be calculated in accordance with the Retainage Percentage set forth above. Receipt of Progress Payments from the Owner to Contractor is an absolute condition precedent to the Subcontractor's right to payment.

b)    Subcontractor shall be required to file daily subcontractor work reports on the form provided by Contractor. Failure of Subcontractor to provide Contractor with such reports in a timely manner shall be cause for the withholding of Progress Payments.

6.    **FINAL PAYMENT**

A final payment, including the unpaid balance of the Subcontract Price and retention to the extent allowed and paid by Owner to Contractor on account of Subcontractor's Work, shall be made within sixty (60) days after the last of the following to occur: a) full completion of the Work by Subcontractor, b) final acceptance thereof by Architect and Owner, c) final payment by

Owner to Contractor on account of Subcontractor's work, d) the furnishing of satisfactory evidence by Subcontractor that Subcontractor has paid in full all persons furnishing labor or materials in connection with the Work including any taxes or governmental charges with respect thereto or with respect to the Work, and that neither Subcontractor nor any persons claiming under or through Subcontractor has filed or has the right to maintain a lien or other claim against Owner, Contractor, Contractor's Surety, if any, on the Project and e) the delivery of all guarantees, warranties, bonds, instruction manuals, performance charts, diagrams, as-built drawings and similar items required of Subcontractor or its suppliers with respect to the Work.

## 7.    NO LIENS

a)    As often as required by Contractor, Subcontractor shall furnish an affidavit showing the names and addresses of all persons who shall have furnished labor or materials for the Work and the amount due or to become due to each such person.  Progress payments may be made in the form of checks payable jointly to Subcontractor and any of the Subcontractor's equipment lessors, material suppliers, or anyone else to whom the Subcontractor owes money for this Project.    The Contractor will not be under any obligation, however, to issue joint payment checks, but may do so in the event that there is a reasonable likelihood that such obligations of the Subcontractor, as described above, may not be timely paid by the Subcontractor and/or could become the obligation of the Contractor under any surety bond issued by the Contractor or under the applicable mechanic's lien law.

b)    Subcontractor, for itself and for its subcontractors, laborers and materialmen and all other directly or indirectly acting for, through or under it or any of them covenants and agrees that no liens for or on account of any work, labor, services, materials, equipment or other items performed or furnished for or on account of the Project will be filed.  Subcontractor, for itself and its subcontractors, laborers and materialmen and all others above mentioned does hereby expressly waive, release and relinquish all rights to file or maintain such liens and further agrees that this waiver of the right to file or maintain such liens shall be an independent covenant and shall apply as well to work, labor and services performed and materials, equipment and their items furnished under any change order or supplemental agreement for extra or additional work in connection with the Project as well as to the original Work covered by this Agreement. Subcontractor shall, as often as requested by Contractor, furnish a separate release of lien for itself, its subcontractors and suppliers. Subcontractor shall indemnify (including the payment of reasonable attorneys fees), defend and hold harmless Contractor from Subcontractor's failure to properly pay any laborer, supplier, subcontractor and/or equipment lessor for work, materials, and/or equipment supplied to the Project.

## 8.    PAYMENTS WITHHELD

a)    Contractor's right to withhold money, shall include, but shall not be limited to, money withheld because of 1) a claim being made or lien being filed with or against Contractor, its Surety, if any, the Owner, the Project or the premises upon which the Project is located, by any person claiming that Subcontractor or any subcontractor or other person under it has failed to make payment for any labor, services, materials, equipment, taxes or other items or obligations furnished or incurred for in connection with the Work, 2) Subcontractor or any subcontractor or other person under it has caused damage to the Work or to any other work on the Project, or 3) the Subcontractor has failed to perform or is otherwise in default under any of the terms or provisions of this Agreement.

From: Marilyn Rad  At: Insurance Resource Consultants  Fax ID: Insurance Resource C  To: Michelle Lechley                Date: 6/20/2007  1:55 AM  Page: 16 of 41

Case 1:08-cv-02991     Document 1-3     Filed 05/22/2008     Page 16 of 41

Contractor may apply and charge against the Subcontractor so much of the amount withheld as may be required to satisfy any of the foregoing purposes. If the amount withheld is insufficient to fully satisfy said purposes, Subcontractor shall be liable to the Contractor for the difference.

b)     If for any reason the Contractor deems it necessary under the terms and conditions of this Agreement to withhold from the Subcontractor money retained or any other money claimed by the Subcontractor, then the Contractor shall not be liable for the payment of interest on said money.

## 9.     TIMELY EXECUTION OF THE WORK

It is understood that completion of the Work and its several parts within the time allotted is of the essence. Subcontractor agrees to: a) provide a schedule and, upon request, revised schedules of the Work to Contractor for its use in scheduling the Project, b) provide at the Project site the materials, equipment, laborers and supervision necessary to begin the Work upon the Contractor's order to do so, and to furnish sufficient forces, supervision, equipment and materials, at such other times and for such other periods as Contractor may direct, and c) perform the Work and all parts thereof, promptly, diligently, and in such order and sequence as Contractor may direct to assure the efficient, expeditious and timely prosecution of the entire work for the Project. Contractor reserves the right to modify any progress schedule with respect to the required sequence or duration of the Work or any portion thereof, and Contractor makes no representation that Subcontractor will be able to commence, prosecute, or complete the Work in accordance with any progress schedule.

Subcontractor shall cooperate and coordinate with others participating in the construction of the Project and shall not delay, impede or otherwise impair their work. Subcontractor shall use its best efforts to diligently pursue its work in order to permit Contractor to meet the dates for Subcontractor's Work as they relate to its own work and the work of others and to achieve the completion dates established in the schedule for the overall project.

Should Subcontractor or any of its officers, agents, servants, or employees fail to begin, continue or complete the Work as herein provided, or otherwise unreasonably delay the progress of the Work so as to cause any additional cost, expense, liability, or damage to Contractor or Owner, Subcontractor shall and does hereby agree to compensate Contractor or Owner for and indemnify them against all costs, expenses, damages, and liability.

Contractor may direct Subcontractor, upon forty-eight (48) hours prior written notice, to provide additional labor and supervision or to work overtime and if so directed, Subcontractor shall work said overtime or provide such additional labor and supervision. Provided that Subcontractor is not in default under any of the terms or provisions of this Agreement or of any of the other Contract Documents, and further providing that the progress of the Work has not been delayed by Subcontractor or any of its officers, agents, servants or employees, then Subcontractor will be paid the premium time rate for any such overtime or additional labor, if any, at rates which have been previously approved by the Contractor in writing, plus taxes imposed by law on such premium wages if required to be paid by Subcontractor. If, however, the progress of the Work or of the Project has been delayed by the Subcontractor, then the Subcontractor shall, at its own cost and expense, work such overtime or provide such additional labor and supervision as may be necessary to make up for all time lost and to avoid delay in the completion of the Work and of the Project.

10.    **LIQUIDATED DAMAGES**

In the event that Subcontractor shall fail in the performance of the Work to be performed under this Subcontract by and at the time or times referred to, or agreed to in the progress schedule or the Subcontractor is otherwise responsible for the late completion of the Project, and a time extension has not been issued either by the Owner or the Contractor, Subcontractor shall pay to Contractor, as damages, all such actual damages or liquidated damages suffered by Contractor by reason of such default; including, but not limited to, damages assessed by the Owner pursuant to any applicable provisions of the General Contractor or other Contract Documents. The Contractor shall have the right to deduct from any monies otherwise due or to become due to Subcontractor or to sue for and recover compensation or damages for the non-performance of this Agreement at the time or times stipulated or provided for herein.

11.    **EXTENSIONS OF TIME/DELAY CLAIMS**

a)    Should Subcontractor be delayed in the commencement, prosecution or completion of the Work by the act, omission, neglect or default of Contractor, Owner, and/or of anyone employed by Contractor, Owner, or of any other contractor or subcontractor on the Project, or by any damage caused by fire or other casualty or by the combined action of workmen in no way chargeable to Subcontractor's control and not due to any fault, neglect, act or omission on its part, then Subcontractor may be entitled to an extension of time in which to complete its Work. Such extension may be for a period equivalent to the time lost by reason of any and all of the aforesaid causes, as determined by Contractor. It is expressly agreed, however, that the Contractor shall not be liable to the Subcontractor for any delays whether caused by the Contractor, its other subcontractors, the Owner or other independent contractors of the Owner unless an extension of time for such delays is first granted to the Contractor by the Owner and, except to the extent and amount that the Contractor is actually paid therefore by the Owner, subcontractor or others for the specific use and payment of Subcontractor's claim arising from said delays.

b)    If the Subcontractor is delayed in the prosecution of its Work due to the acts of the Owner and/or its agents and the Subcontractor suffers delay damages therefrom, the Contractor agrees to transmit to the Owner any claims submitted to it by the Subcontractor. The Owner's decision regarding such claims will be final and binding upon Subcontractor. It is agreed that in no event will the Contractor be liable for Subcontractor's claims for delay; the Contractor under this provision merely acts as a conduit to provide the Subcontractor access to the Owner to seek reimbursement for damages incurred for delays caused by the Owner and/or its agents.

12.    **CHANGE ORDERS/EXTRAS**

Subcontractor shall not make any changes, additions or deletions in the Work, except upon written order of Contractor. Contractor shall have the right to make changes, additions and/or deletions in the Work, upon written order to Subcontractor. The value of the Work as changed, added, or deleted shall be stated in the written order, approved by Contractor, and the Subcontract Price shall be adjusted as provided in the Contract Documents or as hereinafter provided. No extra work or changes from Plans and Specifications or from this Agreement will be recognized or paid for unless agreed to in writing before the extra work is started or the changes made. All such orders must be signed by an authorized representative of the Contractor.

Should the parties be unable to agree on the amount of the addition or the reduction from the Subcontract Price, Subcontractor shall proceed with the Work, as changed, added or deleted, promptly upon the written order of Contractor from which order the stated value of such Work shall be omitted, and the determination of the amount of such addition or reduction by the Owner as provided in the General Contract shall be binding on the Subcontractor and the Contractor.

It is understood and agreed that any claims for extras demanded by the Subcontractor arising from omissions and/or discrepancies in the Plans or Specifications shall not be binding upon the Contractor or honored by the Contractor except to the extent previously approved and the extent actually paid for by the Owner. In case of Work omitted by the Subcontractor, Contractor shall have the right to withhold from payments due or to become due the Subcontractor an amount which, in the Contractor's opinion, is equal to the value of such Work until such time as the value thereof is determined by agreement or by equitable adjustment upon completion of the Work.

All changes, additions or deletions in the Work ordered in writing by Contractor shall be deemed to be a part of the Work hereunder and shall be performed and furnished in accordance with all the terms and provisions of this Agreement and the other Contract Documents.

Any change which will affect work performed by another Subcontractor shall be specifically brought to the attention of the Contractor. Failure to convey such notification shall cause the Subcontractor who originates the change to bear any additional cost which may result from such change or modification.

13.    **GUARANTEE**

Subcontractor guarantees that the Work, including any materials or equipment furnished in connection therewith, shall be free from defects in material and workmanship and shall conform to and meet the requirements of this Agreement, the General Contract, the Contract Documents and any Additional Provisions, if any. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. Subcontractor shall furnish any separate guarantee for the Work or portions thereof as required under any of the applicable Contract Documents.

Subcontractor's guarantee shall be in addition to any other warranty or remedy required by law or by this Agreement.

14.    **DETAILS OF THE WORK**

Notwithstanding the dimensions given on the Plans, Specifications and other Contract Documents, it shall be the obligation and responsibility of Subcontractor to take such measurements as will insure the proper matching and fitting of the Work with contiguous work.

Subcontractor shall prepare and submit to Contractor such shop drawings as required to describe completely the details and construction of the Work. Approval of shop drawings shall not relieve Subcontractor of its obligations to perform the Work in strict accordance with the Plans, Specifications, Additional Provisions, if any, and the other Contract Documents, nor of its responsibility for the proper matching and fitting of the Work with contiguous work. Prior approval of equipment and/or material in connection with a previous project shall not be construed by Subcontractor as giving an approval for use on this Project.

Should the proper and accurate performance of the Work hereunder depend upon the proper and accurate performance of other work not covered by this Agreement, Subcontractor shall carefully examine such other work, determine whether it is fit, ready and in suitable condition for the proper and accurate performance of the Work hereunder, use all reasonable means necessary to discover any defects in such other work, and before proceeding with the Work hereunder, report promptly any such improper conditions and defects to Contractor in writing and allow a reasonable time to have such improper conditions and defects remedied.

15.   **INSPECTION AND DEFECTIVE WORK**

Subcontractor shall provide sufficient, safe and proper facilities at all times for the inspection of the Work by Contractor, Owner and Architect and their authorized representatives. Subcontractor shall, within forty-eight (48) hours after receiving written notice from Contractor, remove all materials, whether worked or unworked, and take down and rebuild all portions of the Work condemned by Architect or Contractor as unsound, defective or improper or as in any way failing to conform to the Contract Documents. Subcontractor, at its own expense and cost, shall replace same with proper and satisfactory work and materials and make good all work damaged or destroyed by or as a result of such unsound, defective, improper or non-conforming work or materials or by the taking down, removal or replacement thereof.

Subcontractor agrees and understands that neither Contractor nor Architect will provide continuous or exhaustive inspection of Subcontractor's Work and that Subcontractor is fully responsible for the materials, procedures, methods and techniques utilized and for providing completed Work to the full satisfaction of the Contractor and Architect. Neither failure to inspect the Work nor, upon inspection, failure to uncover defects in the Work shall be deemed acceptance of the Work by Contractor or Architect.

16.   **SUBCONTRACTOR**

The Subcontractor warrants that it is sufficiently fiscally responsible to carry out the work as provided in this Agreement, together with all other work it may have on hand or undertake whether it be with the Contractor or others. Should the Subcontractor's financial condition change in any manner from that at the time of entering into this Agreement, it shall immediately notify the Contractor so that procedures may be instituted to help safeguard the performance by the Subcontractor hereunder.

The Contractor may, at any time, make inquiries as to the financial condition of the Subcontractor including, but not necessarily limited to, lower-tier subcontractors, suppliers, etc. that are supplying material and/or services to the Project, any other creditors, and Subcontractor's banker, Certified Public Accountant, and Surety, if any.

The Contractor may institute such financial and other measures, including those provided elsewhere in this Agreement, when, in Contractor's sole determination, the best interests of the Project would be served thereby.

17.    **SECOND TIER SUBCONTRACTORS**

Subcontractor shall not sublet the work to be performed under this Agreement either in whole or in part without the prior, express, and written consent of Contractor. All subcontracts under this Agreement shall be subject to the provisions of the General Contract and this Agreement but shall create no contractual relationship with Contractor.

18.    **COMPLIANCE WITH LAW AND PERMITS**

Subcontractor shall obtain and pay for all necessary permits, patents and licenses pertaining to the Work and shall comply with all Federal, State, Municipal and local laws, ordinances, rules, regulations, standards, orders, notices, and requirements as may be applicable to the Project, including, among others, those relating to safety, utilization of minority employees, discrimination in employment, and fair employment or equal opportunity. Subcontractor shall be responsible for all damages and penalties and shall indemnify and hold harmless the Contractor from and against all damages, penalties and liability which may arise out of Subcontractor's failure to secure and pay for any such licenses and permits or its failure to comply fully with any and all applicable laws, ordinances, rules and regulations. Subcontractor shall furnish, upon demand, such proof as Contractor or Owner may require showing compliance with applicable laws and regulations and/or the correction of any violation.

19.    **SAFETY**

a)    Subcontractor shall take reasonable safety precautions with respect to its Work and shall comply with all safety measures initiated by Contractor and the Owner and with all applicable laws, ordinances, rules, regulations and orders of any public authority for the safety of persons or property, including, but not limited to, applicable OSHA Standards. Subcontractor shall report within three (3) days to Contractor any injury to any of the Subcontractor's employees at the Project site.

b)    Subcontractor understands and agrees that neither Contractor nor Architect will make continuous or exhaustive inspections to assure Subcontractor's compliance with applicable safety rules, regulations or requirements. Subcontractor shall be solely responsible to assure the safety of its own equipment, appliances, material, and working conditions, techniques, and procedures, and Contractor is not responsible in any manner for the safety of Subcontractor's Work. If the Subcontractor fails to correct unsafe procedures, acts or conditions within a reasonable time of notification by Contractor, however, Contractor may (but has no contractual obligation to do so ) correct the unsafe practice and backcharge the Subcontractor for these costs. Repeated failures to correct unsafe practices may result in the termination of this Agreement. In the event Contractor receives a penalty from OSHA as a result of a violation of OSHA by Subcontractor and Contractor is cited under the multi-employer worksite rule, Subcontractor agrees to defend, indemnify and hold harmless Contractor for the imposition of any fines and/or penalties.

- 0 -

c)    Subcontractor agrees that all applicable Material Safety Data Sheets (MSDS) required pursuant to the Hazardous Communication Standards (29 CFR § 1915.1200) for the proper performance of the Subcontractor's obligation, are to be provided by the Subcontractor. All MSDS forms shall be mailed to the Project Job Site address and should reference this Agreement and the Project name and number. Subcontractor shall indemnify and hold harmless the Contractor from any liability, claim, loss or expense arising out of or in connection with Subcontractor's failure to abide by this requirement.

20.    **CLEAN-UP**

a)    Subcontractor shall, at its own cost and expense (1) keep the premises free at all times from all waste materials, packing materials and other rubbish generated by Subcontractor in locations or containers as designated by Contractor, 2) clean and remove from its own Work and from all contiguous work areas any soiling, staining, mortar, plaster, concrete, or dirt resulting from the execution of its Work in each area, 3) perform such cleaning as may be required to leave the Work area "broom clean" and 4) at the completion of its Work, remove all of its tools, equipment, scaffolds, shanties, and surplus materials and perform final clean-up as required by Contractor.

b)    If the Subcontractor is lax in its cleaning, the Contractor will give notice to the Subcontractor's field personnel and written notice to the Subcontractor that the cleaning is not being kept current. If after twenty four hours (24) notice, Subcontractor has failed to abide with clean up requirements, Contractor shall perform the Subcontractor's cleaning and backcharge the Subcontractor for the costs.

21.    **LABOR**

a)    Subcontractor agrees that in the preparation of the material and the performance of the Work, it will employ only such workers as will work in harmony with the other workers employed by Contractor or the other Subcontractors, and Subcontractor further agrees that it will, at the request of Contractor, discharge and remove from the Project premises, any person designated by the Contractor as being detrimental to the Project. The right of the Contractor to request the discharge of any workers employed by Subcontractor shall not be construed to constitute the Contractor as the employer of any workers employed by the Subcontractor.

b)    Subcontractor agrees that all disputes as to jurisdiction of trades shall be adjusted in accordance with any plan for the settlement of jurisdictional disputes which may be in effect either nationally or in the locality in which the Work is being done and that it shall be bound and abide by all such adjustments and settlements of jurisdictional disputes, provided that the provisions of this paragraph shall not be in violation of or in conflict with any provisions of law applicable to the settlement of such disputes. Should Subcontractor fail to carry out or comply with any of the foregoing provisions, Contractor shall have the right, in addition to any other remedies provided by this Agreement or other Contract Documents or by law, upon forty-eight (48) hours written notice to Subcontractor, for all or any portion of the Work and, for the purpose of completing the Work, to enter upon the Project premises and take possession, in the same manner, to the same extent and upon the same terms and conditions applicable for failure to prosecute the Work.

c)  Subcontractor agrees to adhere strictly to all laws and regulations in connection with employment of labor, including, but not limited to, those contained in the specifications, bulletins and all subsequent amendments and modifications thereof, which are part of the General Contract and which form a part of this Agreement. Subcontractor further agrees that any penalty imposed upon Contractor due to any infraction of these requirements or violations thereof by Subcontractor shall be charged to and borne by Subcontractor.

## 22.   GENERAL INDEMNIFICATION

Subcontractor hereby assumes the entire responsibility for any and all damage or injury of any kind or nature whatsoever (including death resulting therefrom), to all persons, whether employees of the Subcontractor or otherwise, and to all property caused by, resulting from, arising out of or occurring in connection with the execution of the Work; and if any claims for such damage or injury (including death resulting therefrom) be made or asserted, Subcontractor agrees to indemnify and save harmless Contractor, and Owner, their officers, agents, servants, and employees from and against any and all such claims, and further from and against any and all loss, cost, expenses, liability, damage or injury, including legal fees and disbursements Contractor, Owner, their officers, agents, servants, or employees may directly or indirectly sustain, suffer or incur as a result of Subcontractor's work. Subcontractor further agrees to and does hereby assume, on behalf of Contractor, and Owner, their officers, agents, servants and employees, the defense of any action at law or in equity which may be brought against Contractor or Owner, their officers, agents, servants, or employees upon or by reason of such claims. The Subcontractor agrees to pay on behalf of Contractor, or Owner, their officers, agents, servants, and employees the amount of any judgment so entered, upon proof of judgment and submission of evidence or finding by a court of competent jurisdiction that such judgment arose out of or occurred in connection with the execution of the work of Subcontractor.

## 23.   RENTED OR LOANED EQUIPMENT

In the event Contractor rents or loans equipment, machines, and/or tools to Subcontractor, and whether or not such rental or loan includes the providing of Contractor's operator, Subcontractor hereby agrees to make no claim whatsoever against Contractor for any personal injuries or property damages caused in the course of carrying out Subcontractor's request for the rental or loaned equipment. It is further understood and agreed that in the event that such equipment is operated by employees or agents of Contractor that such operators shall for the purpose of this Agreement, and for such purpose only, by considered subject to the direction and control of Subcontractor so that Subcontractor, as between Contractor and Subcontractor, shall be considered as being liable for any and all negligent acts or omissions of such operators.

Subcontractor hereby agrees to defend, indemnify and hold harmless the Contractor against any and all claims, loss or damages, including reasonable attorneys fees, that may arise from Contractor's complying with or attempt to comply with Subcontractor's request for rented or loaned equipment. This indemnification shall apply regardless of whether or not such personal injuries or property damages may be the result of the negligence, in whole or in part, of Contractor or its employees or otherwise due to the fault of Contractor or its employees.

- 11 -

24.    **DEFAULT**

It shall be considered an event of default under this Agreement if Subcontractor should: 1) refuse or neglect to supply sufficient workmen or materials of the proper quality and quantity, 2) fail in any respect to prosecute the Work with promptness and diligence, or cause the stoppage, delay, interference with, or damage to the work of Contractor and Owner or any other contractors or subcontractors on the Project, 3) fail to perform in accordance with any of the terms or provisions of this Agreement or of the other Contract Documents, 4) allow a petition in bankruptcy or for an arrangement or reorganization to be filed by or against it, 5) become insolvent or be adjudicated as bankrupt or go into liquidation, either voluntarily or involuntarily or under court order, or made a general assignment for the benefit of creditors, or 6) the Architect shall have determined that the Work or any portion thereof is not being performed in accordance with the Contract Documents.

Upon the occurrence of an event of default, Contractor shall have the right, in addition to any other remedies provided by this Agreement and the other Contract Documents or by law, after forty-eight (48) hours notice to Subcontractor a) to perform and furnish any such labor and materials for the Work and to deduct the cost thereof from any moneys due or to become due to Subcontractor under this Agreement, and/or b) terminate the employment of Subcontractor, for all or any portion of the Work, enter upon the premises and take possession, for the purpose of completing the Work, of all materials, equipment, scaffolds, tools, appliances and other items thereon, all of which Subcontractor hereby transfers and assigns to Contractor for such limited purpose and for whatever period of time is necessary for completion of the Work.   .

In case of such termination of the employment of Subcontractor, Subcontractor shall not be entitled to receive any further payment under this Agreement until the Work shall be wholly completed to the satisfaction of Contractor, Owner, and Architect, and shall have been accepted by them, at which time, if the unpaid balance of the amount to be paid under this Agreement shall exceed the cost and expense incurred by Contractor and/or Owner in completing the Work, such excess shall be paid by Contractor to the Subcontractor; provided, however, that if such cost and expense shall exceed such unpaid balance, the Subcontractor shall pay the difference to the Contractor. Such cost and expense shall include, not only the cost of completing the Work to the satisfaction of the Contractor, Owner and Architect, but also all other damages incurred or suffered by reason of or resulting from Subcontractor's default.  In the event it becomes necessary for the Contractor to collect any deficiency from the Subcontractor by legal action, the Subcontractor agrees to reimburse Contractor for all of its reasonable attorney's fees and costs incurred in connection with such action. ·

25.    **COOPERATION**

Subcontractor and its subcontractors, if any, shall cooperate with Contractor and other subcontractors on the Project premises and shall so carry on their work so that other cooperating subcontractors shall not be hindered, delayed or interfered with in the progress of their work and so that all of such work shall be a finished and completed in accordance with the Project schedule.

26. **DISPUTES**

Should any dispute arise between the parties respecting the true construction or interpretation of the Plans, Specifications and/or the Contract Requirements, the decision of the Owner or the Owner's designated representative as set forth in the General Contract shall be final. In the event of any such dispute, the Subcontractor shall proceed, without interruption, with the Work in such manner as directed by the Contractor, pending the decision of the Owner or its representative as set forth in the General Contract. It is further agreed that in the event of any dispute arising between the Subcontractor and Contractor as to the scope and/or intent of this Agreement, the Subcontractor shall proceed with its work without interruption pending settlement thereof.

27. **TERMINATION**

Contractor shall have the right at any time by written notice to Subcontractor to terminate this Agreement and require Subcontractor to cease work hereunder, in which case, provided the Subcontractor be not then in default, Subcontractor shall be entitled to the value of the work performed and materials furnished. In the event of termination, Subcontractor shall not be entitled to anticipated profits on work unperformed or on materials or equipment unfurnished.

In lieu of termination of Subcontractor's suppliers and subcontractors, Subcontractor shall, at Contractor's election, assign its contracts or subcontracts, as the case may be, to Contractor within ten (10) days of notice to do so.

Subcontractor's payment after termination shall become due and payable sixty (60) days after assignment of contracts or subcontracts or settlement of accounts, whichever occurs later, and the Subcontractor's compliance with any conditions to final payment that may be applicable to the termination.

28. **COMPENSATION AND LIABILITY INSURANCE**

Before commencing the Work, Subcontractor shall procure and shall thereafter maintain, at its own expense, until completion and final acceptance of the Work the types and minimum limits of insurance set forth in Schedule D.

29. **BONDS**

Before commencing the Work Subcontractor shall furnish to Contractor, at its expense, a performance bond and a separate payment bond in the amount set forth and in the form and content and from such Surety or Sureties as are satisfactory to Contractor and Owner.

30. **CHOICE OF LAW**

The performance of this Agreement and all of its terms and conditions shall be interpreted and governed by the laws of the State of Illinois.

31.    **NO WAIVER**

The failure of either party to this Agreement to insist upon the performance of any of the terms and conditions of this Agreement, or the waiver of any breach of any of the terms and conditions of this Agreement, shall not be construed as thereafter waiving any such terms and conditions, but such terms and conditions shall continue and remain in full force and effect as if no such forbearance or waiver had occurred.

32.    **SEVERABILITY**

If any one or more of the provisions contained in this Agreement, for any reason, are held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

33.    **OWNER APPROVAL/ SUCCESSION OF INTERESTS**

Subcontractor understands and agrees that the Owner has the right to approve or disapprove the employment of this Subcontractor and in the event that the Owner does not approve this Subcontractor, this Agreement shall become null and void.

This Agreement shall be binding upon and inure to the benefit of the respective heirs, executors, administrators, successors and permitted assigns of the parties hereto, but no third party benefits are created by this Agreement.

34.    **MISCELLANEOUS**

a)    All previous oral or written promises negotiations, representations or agreements relating to the subject matter of this Agreement are hereby declared to be null and void, it being expressly agreed that the terms of this Agreement shall constitute the full and complete agreement between the parties hereto.

b)    This Agreement may not be changed in any way unless such changes are in writing and signed or initialed by both parties to this Agreement, and no term or provision of this Agreement may be waived by Contractor except in writing signed or initialed by its duly authorized officer or agent. Subcontractor shall not sell, assign, sublet, transfer, or otherwise dispose of this subcontract Agreement, or any part thereof, nor assign any moneys due or to become due hereunder, except with the prior written consent of the Contractor.

c)    The titles or headings of any term or provision of this Agreement are for convenience only and shall in no way affect the interpretation of this Agreement.

## SCHEDULE A

**WORK:**  The **Manufactured Wall Panel and Manufactured Column Cover** work shall consist of all supervision, labor, material, and equipment necessary to complete the project in accordance with the Contract Plans and Specifications including but not limited to the following:

### Specification Sections

- **Division 1 - General Requirements (as applicable)**
- ~~07195 – Wall Air Barrier~~ *9 CT    8 – 15 - 00*
- ~~07270 – Firestopping~~ *5CT    8 – 15 - 00*
- **07412 – Manufactured Wall Panels**
- **07415 – Manufactured Column Covers**
- **07600 – Flashing and Sheet Metal**
- **07900 – Joint Sealers**

- Fabricate, deliver, and install complete manufactured wall panel system as specified
- Fabricate, deliver, and install manufactured column covers as specified
- Fabricate, deliver, and install exterior panel faces, interior panel faces, insulation, exterior joint design, finishes, trim material, cap material, flashing material, mitered panels, column covers, and wall panel support/anchoring system, accessories as specified, as required
- Fabricate, deliver, and install base flashing, sheet metal closure flashing, corner flashing, endwall flashing, filler flashing, jamb flashing, metal drip flashing, rubberized flashing, counterflashing, metal sill flashing, extruded aluminum trim adjacent to manufactured wall panel installation as specified, as detailed
- Furnish, deliver, install all hardware for a complete manufactured wall panel and column cover system installation
- Furnish, deliver, install all manufactured wall panel and column cover joint sealants as required
- Provide for all sub-framing, furring as detailed, as specified, as required for manufactured wall panel and column cover attachment, installation
- Provide for 'System Performance Requirements' as specified
- Provide for 'Quality Assurance' requirements as specified
- Provide for all 'Submittals' requirements as specified
- Provide for 'Design' requirements as specified
- Provide structural design calculations as certified by a registered professional engineer in the State of Illinois as specified
- Field measurements, verification of existing conditions as required
- Provide for 'Warranties' requirements as specified
- Provide for all 'Products' requirements as specified
- Provide for all 'Execution' requirements as specified
- All manufactured wall panel and column cover work associated with contract alternates G1-G5
- Provide for all MEP and other penetrations as shown on contract drawings, as coordinated on shop drawings
- Provide for all applicable manufactured wall panel and column cover work per detail manual (B7.01 thru B7.73, B8.01 thru B8.56) as required except as specifically noted (see noted Exclusions)

15

- Furnish, deliver, ~~install wall air barrier~~, rubberized flashing, and prefinished drip edge as specified, as detailed (reference B8.26)
- Touch-up painting as specified, as required
- ~~Furnish, deliver, install firestopping adjacent to manufactured wall panel and column cover~~ installation as specified, ~~as required~~
- Multiple mobilizations as required for specified phased sequence of work
- Provide temporary bracing of metal wall panel work as required as work progresses
- Provide layout from control by others
- Flagging as required for equipment, trucking entering and exiting to/from project site
- Daily clean-up to dumpsters provided by others
- Furnish, place, maintain all site safety requirements per the latest OSHA standards for all manufactured panel and column cover related work
- Provide for all on-site storage of metal wall panel materials as required
- Provide for all on-site storage, security of tools, materials, and equipment on a daily basis
- Provide for all unloading, hoisting, handling of materials, equipment related to metal wall panel work as required

**Exclusions:**

- Applicable taxes
- Structural Steel
- Roofing work not associated with manufactured wall panel installation
- Gravel stop with PT wood blocking (i.e. B7.21)
- Gravel stop, cleat (i.e. 1/B7.18)
- Aluminum storefront panels (i.e. 14/A7.11)

16

# SCHEDULE B

**CONTRACT DOCUMENTS:**

| | |
|---|---|
| Specifications | October 4, 1999 |
| Addendum No. One | November 23, 1999 |
| Addendum No. Two | December 2, 1999 |

As prepared by **Burnidge Cassell Associates, Inc.**, the Contract Documents consist of:

## VOLUME 1

### General
| | |
|---|---|
| G-1A | Cover Sheet |
| G-2 | Notes |

### Civil
| | |
|---|---|
| C1 | Existing Conditions/Demo Plan, R |
| C2 | Utility Plan, R |
| C3 | Grading Plan, R |
| C4 | Existing Conditions/Demo Plan, W |
| C5 | Utility Plan, W |
| C6 | Grading Plan, W |
| C7 | Detail Sheet |
| C8 | Detail Sheet |
| C9 | General Notes |

### Architectural
| | |
|---|---|
| A2.1 | Lower Level Plan, R |
| A2.2 | Main Floor Plan, R |
| A2.2a | Main Floor Plan, Detail References, R |
| A2.3 | Mezzanine Level Plan, R |
| A2.4 | Mechanical Level plan, R |
| A2.5 | Catwalk Level Plan, R |
| A2.6 | Roof Plan, R |
| A2.7 | Partial Building A Basement Plan, W |
| A2.8 | First Floor Plan, W |
| A2.8a | First Floor Plan, Section, Detail References, W |
| A2.9 | Second Floor Plan, W |
| A2.9a | Second Floor Plan, Section, Detailed References, W |
| A2.10 | Third Floor Plan, W |
| A2.10a | Third Floor Plan, Section, Detailed References, W |
| A2.10 | Roof Plan, W |
| A3.1 | Lower Level Reflected Ceiling Plan, R |
| A3.2 | Main Floor Reflected Ceiling Plan, R |
| A3.3 | Mezzanine Level Reflected Ceiling Plan, R |
| A3.4 | Mechanical Level Reflected Ceiling Plan, R |
| A3.5 | Catwalk Level Reflected Ceiling Plan, R |
| A3.6 | Partial Building A Basement Reflected Ceiling Plan, R |
| A3.7 | First Floor Reflected Ceiling Plan, W |
| A3.8 | Second Floor Reflected Ceiling Plan, W |
| A3.9 | Third Floor Reflected Ceiling Plan, W |

17

**SCHEDULE B continued;**

**VOLUME 1**
**Architectural continued;**

| | |
|---|---|
| A5.1 | North and East Elevations, R |
| A5.2 | South and West Elevations, R |
| A5.3 | Elevations, W |
| A5.4 | Enlarged Elevations |
| A5.5 | Enlarged Elevations |
| A6.1 | Building Sections, R |
| A6.2 | Building Sections, R |
| A6.3 | Building Sections, R |
| A6.4 | Building Sections, W |
| A6.5 | Building Sections, W |
| A7.1 | Wall Sections, W |
| A7.2 | Wall Sections, W |
| A7.3 | Wall Sections, W |
| A7.4 | Wall Sections, W |
| A7.5 | Wall Sections, W |
| A7.6 | Wall Sections, W |
| A7.7 | Wall Sections, W |
| A7.8 | Wall Sections, W |
| A7.9 | Wall Sections, R |
| A7.10 | Wall Sections, R |
| A7.11 | Wall Sections, R |
| A7.12 | Wall Sections, R |
| A8.1 | Enlarged Toilet Plans |
| A9.1 | Enlarged Stair Plans, R |
| A9.2 | Enlarged Plans and Misc. Sections, R |
| A9.3 | Enlarged Stair Plans, W |
| A9.4 | Enlarged Elevator Plans |
| A9.5 | Stair Sections, R |
| A9.6 | Stair Sections, R |
| A9.7 | Stair Sections and Details, W |
| A9.8 | Stair Sections, W |
| A9.9 | Sections, R & W |
| A9.10 | Elevator Sections, R & W |
| A9.11 | Elevator Sections, R |
| A10.1 | Enlarged Plans |
| A10.2 | Geometry Plan |
| A11.1 | Interior Elevations, R |
| A11.2 | Bathroom Elevations, R & W |
| A11.3 | Interior Elevations, R |
| A11.4 | Interior Elevations, W |
| A11.5 | Interior Elevations, W |
| A12.1 | Details |
| A12.2 | Details |
| A12.3 | Details |
| A13.1 | Alternate G-1, W |
| A13.2 | Alternate G-2, R |
| A13.3 | Alternate G-4, R |

18

## SCHEDULE B continued;

### VOLUME 1

### Structural
| | |
|---|---|
| S0.0 | General Notes |
| S1.1 | Foundation & Lower Level Plan, R |
| S1.2 | Main Floor Plan, R |
| S1.3 | Mezzanine Floor Plans, R |
| S1.4 | Mechanical Floor & Low Roof Plans, R |
| S1.5 | Catwalk & Mechanical Room Roof Plans, R |
| S1.6 | Auditorium & Mechanical Room Roof Plans, R |
| S1.7 | Grid Iron & Stage Roof Plans, R |
| S2.1 | Basement & Foundation Plan, W |
| S2.2 | Main Level Plan, W |
| S2.3 | Second Floor Framing Plan, W |
| S2.4 | Third Floor Framing Plan, W |
| S2.5 | Roof Framing Plan, W |
| S3.1 | Column Schedules |
| S3.2 | Bracing Sections & Elevations, R |
| S3.3 | Bracing Sections & Elevations, W |
| S4.1 | Foundation Sections & Details |
| S4.2 | Foundation Sections & Details |
| S4.3 | Slab Sections & Details |
| S4.4 | Concrete Sections & Details |
| S5.1 | Steel Sections & Details |
| S5.2 | Steel Sections & Details |
| S5.3 | Steel Sections & Details, R |
| S5.4 | Steel Sections & Details, W |
| S5.5 | Steel Sections & Details |

### Stage Equipment
| | |
|---|---|
| SE1.1 | Stage Rigging Plan, R |
| SE1.2 | Stage Rigging Section, R |
| SE1.3 | Stage Rigging Fire Curtain Elevation, R |
| SE1.4 | Stage Rigging Lineset Elevation, R |
| SE1.5 | Stage Rigging Proscenium Elevation, R |
| SE2.1 | Platform Details, R |
| SE2.2 | Stage Rigging System Detail, R |
| SE2.3 | Stage Rigging System Detail, W |
| SE2.4 | Gridiron Layout, R |

19

**SCHEDULE B continued;**

**VOLUME 2**

**General**

G-1B          Cover Sheet

**Mechanical - Heating**

| | |
|---|---|
| H1.11 | Main Level Plan-Heating-Performing Arts |
| H1.21 | Mezzanine Level Plan-Heating-Performing Arts |
| H1.31 | Mechanical Level Plan-Heating-Performing Arts |
| H1.41 | Steam Piping Plan-Heating-Performing Arts |
| H1.51 | Piping System Sketch-Heating & Cooling-Performing Arts |
| H1.60 | Large Scale Plan-Heating-Performing Arts |
| H1.61 | Piping Diagrams-Heating-Performing Arts |
| H1.71 | Details-Heating-Performing Arts |
| H1.72 | Details-Heating-Performing Arts |
| H1.73 | Details-Heating-Performing Arts |
| H1.74 | Details-Heating-Performing Arts |
| H1.75 | Details-Heating-Performing Arts |
| H1.81 | Symbols and Abbreviations-Heating-Performing Arts |
| H1.82 | Symbols and Abbreviations-Heating-Performing Arts |
| H1.91 | Schedules-Heating-Performing Arts |
| H1.92 | Schedules-Heating-Performing Arts |
| H2.01 | Basement Plan-Heating-Conference Center |
| H2.11 | First Floor Plan-Heating-Conference Center |
| H2.21 | Second Floor Plan-Heating-Conference Center |
| H2.31 | Third Floor Plan-Heating- Conference Center |
| H2.41 | Piping System Sketch-Heating & Cooling-Conference Center |
| H2.51 | Schedules-Heating-Conference Center |
| H2.52 | Schedules-Heating-Conference Center |
| H2.61 | Notes, Symbols and Abbreviations-Heating-Conference Center |
| H2.62 | Details-Heating-Conference Center |
| H2.63 | Details-Heating-Conference Center |
| H2.64 | Details-Heating-Conference Center |
| H2.65 | Details-Heating-Conference Center |
| H2.66 | Details-Heating-Conference Center |

**Mechanical – Ventilation**

| | |
|---|---|
| V1.01 | Lower Level Plan-Ventilation-Performing Arts |
| V1.11 | Main Level Plan-Ventilation-Performing Arts |
| V1.21 | Mezzanine Level Plan-Ventilation-Performing Arts |
| V1.31 | Mechanical Level Plan-Ventilation-Performing Arts |
| V1.41 | Catwalk Level Plan-Ventilation-Performing Arts |
| V1.51 | Roof Plan-Ventilation-Performing Arts |
| V1.60 | Large Scale Plan-Ventilation-Performing Arts |
| V1.71 | Details-Ventilation-Performing Arts |
| V1.72 | Details-Ventilation-Performing Arts |
| V1.81 | Symbols and Abbreviations-Ventilation-Performing Arts |
| V1.82 | Symbols and Abbreviations -Ventilation-Performing Arts |

20

**SCHEDULE B continued:**

**VOLUME 2**

**Mechanical – Ventilation continued:**

| | |
|---|---|
| V1.91 | Schedules-Ventilation-Performing Arts |
| V1.92 | Schedules-Ventilation-Performing Arts |
| V1.93 | Schedules-Ventilation-Performing Arts |
| V2.01 | Basement Plan-Ventilation-Conference Center |
| V2.11 | First Floor Plan-Ventilation-Conference Center |
| V2.21 | Second Floor Plan-Ventilation-Conference Center |
| V2.31 | Third Floor Plan-Ventilation-Conference Center |
| V2.41 | Partial Floor Plan-Ventilation-Conference Center |
| V2.51 | Schedules-Ventilation-Conference Center |
| V2.52 | Schedules-Ventilation-Conference Center |
| V2.53 | Schedules-Ventilation-Conference Center |
| V2.61 | Notes, Symbols and Abbreviations-Ventilation-Conference Center |
| V2.62 | Details-Ventilation-Conference Center |

**Plumbing**

| | |
|---|---|
| P1.01 | Under Floor Lower Level Plan-Plumbing-Performing Arts |
| P1.02 | Lower Level Plan-Plumbing-Performing Arts |
| P1.11 | Under Floor Main Level Plan-Plumbing-Performing Arts |
| P1.12 | Main Level Plan-Plumbing-Performing Arts |
| P1.21 | Mezzanine Level Plan-Plumbing-Performing Arts |
| P1.31 | Mechanical Level Plan-Plumbing-Performing Arts |
| P1.41 | Catwalk Level Plan-Plumbing-Performing Arts |
| P1.51 | Enlarged Roof Plans-Plumbing-Performing Arts |
| P1.52 | Riser Diagrams-Plumbing-Performing Arts |
| P1.53 | Riser Diagrams-Plumbing-Performing Arts |
| P1.61 | Details-Plumbing-Performing Arts |
| P1.62 | Details-Plumbing-Performing Arts |
| P1.63 | Details-Plumbing-Performing Arts |
| P1.71 | Schedules, Notes, Symbols and Abbreviations-Plumbing-Performing Arts |
| P2.01 | Basement Plan-Plumbing-Conference Center |
| P2.11 | Under Floor First Floor Plan-Plumbing-Conference Center |
| P2.21 | Second Floor Plan-Plumbing-Conference Center |
| P2.31 | Third Floor Plan-Plumbing-Conference Center |
| P2.41 | Enlarged Floor Plans-Plumbing-Conference Center |
| P2.42 | Riser Diagrams-Plumbing-Conference Center |
| P2.43 | Riser Diagrams-Plumbing-Conference Center |
| P2.51 | Details-Plumbing-Conference Center |
| P2.52 | Details-Plumbing-Conference Center |
| P2.61 | Schedules, Notes, Symbols and Abbreviations- Plumbing-Conference Center |

## SCHEDULE  B continued;

## VOLUME 2

### Fire Protection

| | |
|---|---|
| FP1.01 | Lower Level Plan-Fire Protection-Performing Arts |
| FP1.11 | Main Level Plan-Fire Protection-Performing Arts |
| FP1.21 | Mezzanine Level Plan-Fire Protection-Performing Arts |
| FP1.31 | Mechanical Level Plan-Fire Protection-Performing Arts |
| FP1.41 | Catwalk Level Plan-Fire Protection-Performing Arts |
| FP1.51 | Details-Fire Protection-Performing Arts |
| FP1.61 | Notes, Symbols and Abbreviations-Fire Protection-Performing Arts |
| FP2.01 | Basement Plan-Fire Protection-Conference Center |
| FP2.11 | First Floor Plan-Fire Protection-Conference Center |
| FP2.21 | Second Floor Plan-Fire Protection-Conference Center |
| FP2.31 | Third Floor Plan-Fire Protection-Conference Center |
| FP2.41 | Details-Fire Protection-Conference Center |
| FP2.51 | Notes, Symbols and Abbreviations-Fire Protection-Conference Center |

## VOLUME 3

### General

| | |
|---|---|
| G-1C | Cover Sheet |

### Electrical

| | |
|---|---|
| E1.0 | Electrical Site Plan-Performing Arts |
| E1.1 | Lower Level Plan-Power-Performing Arts |
| E1.2 | Main Level Plan-Power-Performing Arts |
| E1.3 | Mezzanine Level Plan-Power-Performing Arts |
| E1.4 | Mechanical Level Plan-Power-Performing Arts |
| E1.5 | Catwalk Level Plan-Power-Performing Arts |
| E1.6 | Chiller Room (Roof) Plan- Power-Performing Arts |
| E2.1 | Lower Level Plan- Lighting-Performing Arts |
| E2.2 | Main Level Plan- Lighting-Performing Arts |
| E2.3 | Mezzanine Level Plan- Lighting-Performing Arts |
| E2.4 | Mechanical Level Plan- Lighting-Performing Arts |
| E2.5 | Catwalk Level Plan-Lighting-Performing Arts |
| E3.1 * | Floor Plan-Power-Art Gallery |
| E3.2 * | Floor Plan-Lighting-Art Gallery |
| E4.1 | Symbol List-Performing Arts |
| E4.2 | Light Fixture Schedule-Performing Arts |
| E4.3 | Electrical One-Line Diagram-Performing Arts |
| E4.4 | Diagrams-Performing Arts |
| E4.5 | Panels-Performing Arts |
| E4.6 | Panels-Performing Arts |
| E4.7 | Details-Performing Arts |
| E4.8 | Details-Performing Arts |
| E4.9 | Distribution Panels-Performing Arts |
| E4.10 | Panels-Performing Arts |
| E4.11 | Panels-Performing Arts |
| E4.12 | AVV System Diagram-Performing Arts |

22

SCHEDULE B continued;

**VOLUME 3**

**Electrical continued;**

| | |
|---|---|
| E5.0 | Electrical Site Plan-Conference Center |
| E5.1 | Basement Plan-Power-Conference Center |
| E5.2 | First Floor Plan-Power-Conference Center |
| E5.3 | Second Floor Plan-Power-Conference Center |
| E5.4 | Third Floor Plan-Power-Conference Center |
| E6.1 | Basement Plan-Lighting-Conference Center |
| E6.2 | First Floor Plan-Lighting-Conference Center |
| E6.3 | Third Floor Plan-Lighting-Conference Center |
| E6.4 | Symbol List-Conference Center |
| E7.1 | Second Floor Plan-Lighting-Conference Center |
| E7.2 | Light Fixture Schedule-Conference Center |
| E7.3 | Electrical One-Line Diagram-Conference Center |
| E7.4 | Diagrams-Conference Center |
| E7.5 | Panels-Conference Center |
| E7.6 | Panels-Conference Center |
| E7.7 | Details-Conference Center |
| E7.8 | Details-Conference Center |
| E7.9 | Distribution Panels-Conference Center |
| E7.10 | Panels-Conference Center |
| E7.11 | Panels-Conference Center |
| E7.12 | AVV System Diagram-Conference Center |

**Communications**

| | |
|---|---|
| COM1.0 | Tunnel-Communications-Performing Arts |
| COM1.1 | Lower Level Plan-Communications-Performing Arts |
| COM1.2 | Main Level Plan-Communications-Performing Arts |
| COM1.3 | Mezzanine Level Plan-Communications-Performing Arts |
| COM1.4 | Mechanical Level Plan-Communications-Performing Arts |
| COM1.5 | Catwalk Level Plan-Communications-Performing Arts |
| COM2.1 | Floor Plan-Communications-Art Gallery |
| COM3.1 | Symbol List-Performing Arts |
| COM3.2 | Details-Performing Arts |
| COM3.3 | Details-Performing Arts |
| COM4.0 | Tunnel Plan-Communications-Conference Center |
| COM4.1 | Basement Plan Communications-Conference Center |
| COM4.2 | First Floor Plan-Communications-Conference Center |
| COM4.3 | Second Floor Plan- Communications-Conference Center |
| COM4.4 | Third Floor Plan- Communications-Conference Center |
| COM5.1 | Symbol List-Conference Center |
| COM5.2 | Details-Conference Center |
| COM5.3 | Details-Conference Center |

**Detail Book**

See Detail Book for Referenced Details
All drawings dated October 4, 1999

23

From: Marilyn Rad At: Insurance Resource Consultants FaxID: Insurance Resource C To: Michelle Letofsky Date: JUN-20-2007 14:13 AM Page: 35 of 41

Case 1:08-cv-02991    Document 1-3    Filed 05/22/2008    Page 35 of 41

## SCHEDULE  C

**PAYMENT SCHEDULE:**

Item                                          Base Contract Amount (including addenda, if applicable)

Metal Wall Panel and Manufactured Column Covers.....................................$280,000.00

24

From: Marilyn Rao  At: Insurance Resource Consultants  Fax#: Insurance Resource C

**SCHEDULE D**

**INSURANCE:**

Before commencing work under this contract, the **Subcontractor** shall procure and maintain insurance covering all operations under this Agreement, whether performed by the **Subcontractor** or **Subcontractor's** third tier subcontractors. All insurers shall be licensed by the State of Illinois and rated A-10 or better by A.M. Best or Comparable rating service. **Subcontractor** shall submit a Certificate of Insurance in accordance with requirements listed below and as per sample certificate.

- Certificate shall evidence the CDB project number and CDB contract number of the project.
- Certificate shall evidence F.H. Paschen/S.N. Nielsen, Inc., CDB and the Using Agency are included as additional insured for the occurrence's arising, in the whole or in part, out of the work and operations performed. Coverage provides that the additional insured shall be on a primary non-contributory basis. (This does not apply to Worker's Compensation.)
- Certificate shall evidence that the policies will not be canceled, changed or altered until at least ten (30) calendar days prior written notice has been given to F.H. Paschen/S.N. Nielsen, Inc. and the CDB unless the same is stated in the policy provision.
- Certificate shall evidence that "The coverage and limits conform to the minimums required by Para. 00650.7 and Article 00655 of CDB's Standard Documents for Construction". Any exception or deviation shall be brought to the attention of CDB for a ruling on acceptability.
- Certificate shall evidence that The Worker Compensation Insurer Waives its Right of Subrogation to F.H. Paschen/S.N. Nielsen, Inc. The CDB and the Using Agency.

1. Worker's Compensation and Employers' Liability insurance affording compensation benefits for all employees as required by law and employers' liability insurance with limits of One Million and 00/100 Dollars, ($500,000.00) for accident or disease. Worker's Compensation Insurer shall waive its right of subrogation.

2. Commercial General Liability Insurance with a combined single limit of One Million and 00/100 Dollars, ($2,000,000.00) per occurrence for personal injury, (including wrongful death), and property damage liability. Coverage shall include Contractual Liability to cover the "Hold Harmless" clause of this contract. Policy shall include coverage for claims due to explosion, collapse, or damage to underground utilities or property. Policy shall include Personal Injury with the Employee Exclusion deleted, Broad Form Property Damage coverage, Independent Contractors coverage and Products / Completed Operations coverage. Subcontractor shall provide continuous Products/Completed Operations coverage for two years after Final Acceptance of the completed work by the Commission. Policy shall also contain a Severability of Interests clause for all Additional Insureds, with no cross liability suits exclusion.

3. Commercial Automobile Liability Insurance with a combined single limit of One Million and 00/100 Dollars, ($1,000,000.00) per accident for bodily injury, (including wrongful death), and property damage liability arising from owned, non-owned and hired automobiles.

4. Umbrella or Excess Liability Insurance with limits not less than Two Million Dollars, ($2,000,000.00) per occurrence which will provide additional limits for employers' general liability and automobile liability insurance.

JUN-20-2007  14:14          Insurance Resource C               91%                    P.39

## SCHEDULE D continued:

5.  F.H. Paschen/S.N. Nielsen, Inc.  shall provide All Risk Property Insurance for this project.  This insurance shall be subject to a per occurrence deductible.  It shall be the responsibility of the covered subcontractor to bear the expense of the deductible as it may apply to their covered loss.  If a loss involves more than one insured, the deductible shall be pro-rated among the claimants based upon the percentage their loss bears to the entire eligible loss.  All payments for loss under the Builders Risk policy shall be subject to the terms and conditions of the policy.  Copies of the coverage will be provided upon written request of the Subcontractor.

6.  "The All Risk Property Insurance shall not cover any tools, apparatus, machinery, scaffolding, hoists, forms, staging, shoring and other similar items commonly referred to as construction equipment, which may be on the Project site and the capital value of which is not included in the Work.  Subcontractor shall make their own arrangements for any insurance they may require on such construction equipment."

7.  Professional Liability.   When any architects, engineers or consulting firms perform work in connection with the subcontract, Professional Liability insurance shall be maintained with limits of $1,000,000.  The policy shall have an extended reporting period of two years.  When policies are renewed or replaced, the policy retroactive date must coincide with, or precede, start of work pursuant to the contract.

8.  If Subcontractor's work includes cleanup, removal, storage or otherwise handling of hazardous or toxic chemicals, materials, substances, or any other pollutants the Subcontractor shall provide at their expense Contractor Pollution Liability Insurance appropriate to cover such activities in an amount not less than $1,000,000 Combined Single Limit per occurrence / aggregate for bodily injury, property damage and remediation. Claims Made policies will include an extended reporting period of two (2) years.  The policy for this insurance shall include Contractual Liability coverage.  Such policy shall be endorsed to specifically provide for Work performed under the Contract, and shall extend to all third tier subcontractors engaged in hazardous material work.  **THE OWNER AND CONTRACTOR**, are to be named on a primary, non-contributory basis.

9.  Subcontractor shall have its general liability insurance endorsed to provide that  **F.H. Paschen / S.N. Nielsen, Inc. , CDB and the Using Agency,** are to be covered as Additional Insureds with respect to liability arising out of activities performed by or on behalf of the Subcontractor;  products and completed operations of the Subcontractor; and automobiles owned , hired, leased, or borrowed by the Subcontractor.  The coverage shall contain no special limitations on the scope of protection afforded to Additional Insureds. The insurance afforded the Additional Insureds shall be primary over any other valid or collectible insurance that the Additional Insureds may have with respect to loss under this policy.  Other insurance of any Additional Insured applicable to loss is excess over this endorsement, and the amount of the Company's liability under this policy shall not be reduced by the existence of such other insurance, provided, however, that this paragraph does not apply (I) to loss caused solely by the negligence of such Additional Insureds, or (ii) to liability of the Architects, Consultants and Engineers, and their agents or employees arising out of (1) the preparation or approval of maps, drawings, opinions, reports, surveys, change orders, designs, or specifications; or (2) the giving of or the failure to give directions or instructions by the Architect, its agents or employees provided such giving or failure to give is the primary cause of the injury or damage.

Subcontractor hereby waives all of its rights of subrogation against the Additional Insureds.

26

## SCHEDULE E

**AFFIRMATIVE ACTION:** F.H. Paschen/SN Nielsen, Inc. is an equal opportunity employer and does not discriminate against any citizen with regard to race, creed, color, religion, ancestry, national origin, physical handicap, medical condition, martial status, Vietnam Era Veterans status, or gender. We agree to put forth the maximum effort to achieve the goals set forth by the Federal Government. Each subcontractor is to cooperate with our efforts at all times. All Federal, State, City, County and Local Agency Laws, Rules and Regulations, and Executive Orders pertaining to Equal Opportunity and Minority Utilization, that may be applicable to this project are herein incorporated by reference, and this Subcontractor agrees to be bound by same, to the extent that such Laws, Rules and Regulations apply. Per Executive Order No. 10925, all subcontractors shall not discriminate against any worker, employee, or applicant for employment because of race, creed, color, or national origin. The Subcontractor's attention is directed to *the Civil Rights Act of 1964 (P.L.88-352);* provisions of Executive Order No. 10925 of March 6, 1961, as amended, and of the rules, regulations and relevant orders of *the President's Committee on Equal Employment Opportunity* created thereby; *the Illinois Human Rights Act,* as amended (775 ILCS 5/1-101 et seq.); the *Chicago Human Rights Ordinance* (Municipal Code of Chicago Sec. 2-160-010 et seq.); and *the Commission on Human Relations* created by ordinance passed December 12, 1947, as amended, (Municipal Code of Chicago Sec. 2-120-480 et seq.); *the American Disabilities Act of 1990, 42 U.S.C. 12010 et seq.*

**Fair Employment Practices (FEP)** Capitol Development Board (CDB) encourages minority and female tradeworker participation on this project. In an effort to monitor their participation, it is necessary for each Subcontractor to submit a "Daily Jobsite Workforce Form". The Daily Jobsite Workforce Form, together with your Weekly Certified Payroll, must be received by the FHP/SNN no later than (5) days following the payroll weekending date. In the event a subcontractor is unable to achieve the goals established for this project, Karen Howell, EEO Compliance Officer for FHP/SNN, is available to provide assistance in identifying recruitment sources as well as the proper documentation of any "good faith efforts" undertaken. The minority and female tradeworker participation goals for this project are specified in **Attachment No. 2** for this Subcontract Agreement.

**Weekly Certified Payroll Reports** - (US Department of Labor Form WH-346 or equivalent) Weekly Certified Payroll Reports must be submitted in triplicate to the F.H. Paschen/SN Nielsen, Inc. Weekly Certified Payrolls must contain all information required by the Owner. The first time that the employee's name appears on a payroll, note the date that the company hired the employee, clearly identify the actual residence of every employee including zip code. Be sure to include consecutive payroll numbers, as well as week ending dates. "No Work" payrolls must also be submitted for any week work is not performed on the project. The last payroll must indicate FINAL. The Subcontractor shall maintain all relevant personnel data for a period of at least three (3) years after final acceptance of the work.

**Monthly Manpower Utilization Report Form (MMUR)** – The MMUR is used to report the number of employees and the hours worked on the jobsite. The left side of the form is used to report the total number of employees by trade category and ethnicity/gender. On the right side of the form, the total number of hours worked by all employees by trade category should be reported in the total hour's column. Minority/female employee hours should be deducted from the total hours and reported under the appropriate heading by trade category. On the backside of the form, please identify in the upper right corner, your firm name and mailing address. Also, please identify each subcontractor who performed work during the reporting period.

27

## SCHEDULE F

ADDITIONAL PROVISIONS:

- All Subcontractors agree to comply with all Harper College Security Requirements.

- All deliveries must be scheduled in advance with F.H. Paschen/SN Nielsen field personnel.

- The nature and complexity of this project may require multiple mobilizations of crews, materials, and equipment. It is each Subcontractor's specific responsibility to review their scope of work and provide the appropriate planning and preparation necessary to coordinate their work with that of the other trade subcontractors involved with this project. All costs associated with this planning and coordination have been included in this subcontract agreement. All contract interim milestone dates as established in writing by Contractor and agreed to by subcontractor are contractually binding. Failure to complete the work by the published date carries the same penalties set forth in the contract documents for final completion.

- All utility shutdowns of existing Harper College facilities must be approved by the Owner in writing. Subcontractor may be required to provide a shutdown request on forms provided by the Contractor or Owner.

- Upon approval by the Owner, the formal project schedule will be incorporated as part of the terms and conditions of this subcontract agreement.

- The subcontractor agrees to provide all hoisting related to the completion of their scope of work. The subcontractor also agrees to provide secured storage of their tools, equipment, and materials on a daily basis. Ensuring new materials and equipment delivered to the jobsite, but not yet installed, are kept free from damage, theft, or vandalism is the responsibility of each subcontractor.

- This project, like any other construction project, will require each subcontractor to coordinate and cooperate with many other trades on a daily basis as their particular scope of work is performed. Subcontractor personnel working on this project are required to be courteous, cooperative, and respectful at all times to all FHP/SNN employees, architect/engineer representatives, and other subcontractor personnel. FHP/SNN reserves the right to remove/dismiss subcontractor personnel from the project who demonstrate an inability to remain courteous and cooperate with others as this project progresses.

- The Subcontractor/Material Supplier agrees to provide complete submittals, shop drawings, samples, mock-ups, or any other item requiring approval, within two weeks from the issue date of this subcontract agreement. Some exceptions may be anticipated based on Subcontractor's specific scope of work.

- All Subcontractors and Material Suppliers agree to comply with all local codes, including, but not limited to those listed in Specification Section 01060, Regulatory Requirements.

28

## SCHEDULE F continued;

-   In accordance with Division 1 - General Requirements – Sections 01340, 01730, 01740, extensive submittal and closeout documentation is required as part of this subcontract. This includes all specified product submittal data, samples, shop drawings, reproducible "Mylar" copies of shop drawings, as-built drawings, operation & maintenance manuals, product warranties & bonds, spare parts, and closeout submittals. As-built drawings must be corrected to reflect actual as-built conditions. At the discretion of the Contractor, computer-aided-design (CAD) disks/compact discs may be an added requirement for certain as built and shop drawing submittals. Neither final payment, nor reduction in retention less than 5% will be made until all requirements have been satisfied.

-   In the event that liquidated damages or similar monetary penalties are assessed on this project, each subcontractor found to not be in compliance with their contractual requirements will be responsible for their appropriate share of damages assessed.

-   This subcontract agreement represents the complete agreement between the Contractor and the Subcontractor, and the Subcontractor acknowledges that there exists no other agreement or understanding between the two parties which varies in any manner from the requirement of the Subcontract as stated herein.

-   Any shop drawings, descriptive literature, or request for changes not submitted in accordance with the procedures outlined by the specifications will be rejected and the subcontractor will be required to furnish and install equipment and/or materials as originally specified.

-   All Federal, State, City, County and Local Agency Laws, Rules and Regulations, and Executive Orders pertaining to Equal Opportunity and Minority Utilization, that may be applicable to this project are herein incorporated by reference, and this Subcontractor agrees to be bound by same, to the extent that such Laws, Rules and Regulations apply.

-   All Subcontractors shall be required to provide all forms and information as required by the Contract Documents. Failure to provide such documents in a timely manner shall be cause for the withholding of progress payments.

-   Subcontractors are required to clean up daily. The project site shall be maintained in a neat, safe, and orderly manner and kept free and clear of accumulation of waste materials and rubbish during the entire construction period.

-   Daily work reports indicating scope of work performed and number of employees on site are required of all subcontractors each day. Failure to provide such documentation in a timely manner shall be cause for the withholding of progress payments.

-   Subcontractor shall be required to submit for each trade all written guarantees, warranties, statements of application and bonds per Contract Documents for the work being performed under this agreement.

-   All Subcontractor procedures, as well as the required CDB forms, are included in the *"Subcontractor's Administrative Procedures"* ( Attachment No. 1)

29

## ACCEPTANCE OF SUBCONTRACT AGREEMENT
### CONTRACT NUMBER 353-015

The parties, for themselves, their heirs, executors, administrators, successors and assigns, do hereby agree to the full performance of all terms and provisions herein contained.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year written below.

**TUSCHALL ENGINEERING , INC.**
Subcontractor

Witness:

By: _____
Representative of Subcontractor
Authorized to Execute Subcontract

Dated: 8/16/00

Title    Vice President

Federal ID # 36 2738797

**F. H. PASCHEN/SN NIELSEN, INC.**
Contractor

Witness:

By: _____

Title: Vice President

Dated: 9/6/00

30

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| HOMELAND CENTRAL INSURANCE COMPANY F/K/A HAWKEYE SECURITY INSURANCE COMPANY (IA) AS TRANSFEREE OF WESTERN STATES INSURANCE COMPANY, BY ITS TRANSFEREE ONEBEACON INSURANCE COMPANY, | ) ) ) ) ) ) ) | No.: |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| TUSCHALL ENGINEERING COMPANY, INC., F.H. PASCHEN, S.N. NIELSEN, INC., | ) ) ) | |
| Defendants. | ) ) ) ) | |

**EXHIBIT "B" – PART 2**

**TO COMPLAINT FOR DECLARATORY RELIEF**

From: Marilyn Rad  At: Insurance Resource Consultants  FaxID: Insurance Resource C  To: Michelle Leconey  Date: 06/20/07  11:55 AM  Page: 45 of 87

Case 1:08-cv-02991     Document 1-4     Filed 05/22/2008     Page 2 of 44

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| BOARD OF TRUSTEES OF WILLIAM RAINEY HARPER COLLEGE NO. 512, and ILLINOIS CAPITAL DEVELOPMENT BOARD, for the use and benefit of BOARD OF TRUSTEES OF WILLIAM RAINEY HARPER COLLEGE NO. 512, | ) ) ) )—— ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. ) |
| BURNIDGE, CASSELL AND ASSOCIATES, INC., | ) ) ) |
| Serve:  Charles H. Burnidge Burnidge-Cassell Assoc. 2425 Royal Blvd. Elgin, IL 60123 | ) ) ) ) ) |
| and | ) |
| F.H. PASCHEN, S.N. NIELSEN, INC., | ) ) |
| Serve:  Edward J. Burke Burke Burns & Pinelli, Ltd. 3 1st National Plaza Suite 4300 Chicago, IL 60602 | ) ) ) ) ) ) |
| Defendants. | ) ) |

```
2006L005812
CALENDAR/ROOM Y
TIME 00:00
Breach of Contract
```

## COMPLAINT

NOW COME Plaintiffs, Board of Trustees of William Rainey Harper College No.

512, a body politic and corporate, and the Illinois Capital Development Board, an agency

of the State of Illinois, by their attorneys, Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd.,

**EXHIBIT**
**B**

1

From: Marilyn Rad At: Insurance Resource Consultants  FaxID: Insurance Resource C  To: Michelle Leconey          Date: 06/20/07 11:55 AM  Page: 46 of 87

Case 1:08-cv-02991     Document 1-4     Filed 05/22/2008     Page 3 of 44

and for their Complaint against Defendants, state as follows:

## ALLEGATIONS COMMON TO ALL COUNTS

1.    Plaintiff, Board of Trustees of William Rainey Harper College No. 512 ("Harper College"), is a body politic and corporate under the laws of the State of Illinois.

2.    Plaintiff, the Illinois Capital Development Board (the "CDB" and together with Harper College, "Plaintiffs"), is a body politic and corporate organized under the laws of Illinois, and has the statutory authority to enter into contracts for the construction of State agency facilities, including but not limited to those for the Board of Trustees of William Rainey Harper College No. 512, and to exercise all powers necessary to accomplish the purposes thereof.

3.    Defendant Burnidge, Cassell and Associates, Inc. ("Burnidge") is an Illinois corporation engaged in the business of performing architectural design and related construction services.

4.    Defendant F.H. Paschen, S.N. Nielsen, Inc. ("Paschen" and together with Burnidge, "Defendants") is an Illinois corporation engaged in the business of general construction contracting and other construction related services.

5.    On or about February 14, 1996, Burnidge entered into an agreement with the CDB under which it was to prepare plans and specifications for the construction of the Wojcik Conference Center and Performing Arts Center on the Harper College Campus (the "Project") and to provide full time project representation for the Project on the job site (the "Design Contract").  A copy of said agreement is attached hereto and incorporated by reference as Exhibit A.

2

From: Marilyn Rad At: Insurance Resource Consultants FaxID: Insurance Resource C To: Michelle Leconey    Date: 06/20/07 11:55 AM Page: 47 of 87

Case 1:08-cv-02991    Document 1-4    Filed 05/22/2008    Page 4 of 44

6.    At all relevant times, Harper College was identified as the user agency in the Design Contract and was intended by the parties to be a direct intended third party beneficiarry of the Design Contract.

7.    The Design Contract incorporated an alternative dispute resolution clause, which provides in part:

> Each party to any dispute over $50,000 agrees, upon the request of any other party to the dispute, to submit the matter to ADR, in a form to be determined by agreement of the parties.  The parties shall first confer informally with one another to attempt to resolve the dispute.  In the event that the assistance of an unbiased neutral is required, the parties shall meet and come to an agreement as to what form the ADR should take and who the unbiased neutral should be.  Forms of ADR that may be utilized include, but are not limited to, mediation and mini-trials, but do not include formal arbitration.  (*See* Section 00715 of Appendix E to Design Contract, attached as **Exhibit A.**)

8.    On or about March 28, 2000, the CDB entered into a contract with Paschen to construct the Project in strict accordance with the plans and specifications prepared by Burnidge (the "Construction Contract").  A true and correct copy of the Construction Contract is attached hereto and incorporated by reference herein as **Exhibit B**.  Copies of the plans and specifications which are part of the contract documents are too voluminous to attach hereto and will be supplied upon a reasonable production request.

9.    At all relevant times, Harper College was identified as the user agency in the Construction Contract and was intended by the parties to be a direct intended third party beneficiary of the Construction Contract.

10.    The Construction Contract incorporated an alternative dispute resolution clause, which provides:

> Each party to any dispute of more than $50,000 agrees upon the request of any other party to the dispute, to submit the matter to ADR, in a form to be

3

From: Marilyn Rad At: Insurance Resource Consultants FaxID: Insurance Resource C To: Michelle Leconey    Date: 06/20/07  11:55 AM  Page: 48 of 67

Case 1:08-cv-02991    Document 1-4    Filed 05/22/2008    Page 5 of 44

determined by agreement of the parties. The parties shall first confer informally with one another to attempt to resolve the dispute. In the event that the assistance of an unbiased neutral is required, the parties shall meet and come to an agreement as to what form the ADR should take and who the unbiased neutral should be. Forms of ADR that may be utilized include, but [are] not limited to, mediation and mini-trials, but do not include formal arbitration. (See Standard Documents for Construction, attached as **Exhibit B**, which are incorporated into the Construction Contract.)

11.    Prior to commencing this action, Harper College, through its attorneys, sent a letter to Burnidge and Paschen, requesting their participation in the process of alternative dispute resolution of the claims in this action, in accordance with the terms of the Design Contract and Construction Contract. (See **Exhibit C**.)

12.    To date, neither Burnidge nor Paschen have responded to Harper College's aforesaid request for alternative dispute resolution.

13.    Plaintiffs have observed various symptoms of problems that occurred in connection with the Project.

14.    In response to these symptoms, Plaintiffs commenced discussions with Burnidge and Paschen, during which Plaintiffs notified Burnidge and Paschen of the above-referenced symptoms, and in response to which Burnidge and/or Paschen investigated these occurrences in an effort to identify the root causes of the symptoms and propose various solutions.

15.    Burnidge and Paschen continued to attempt to identify the root causes of these occurrences and to propose solutions to Plaintiffs throughout the course of the construction of the Project and until late 2004, at which time Plaintiffs engaged the firm of Wiss, Janney, Elstner Associates, Inc. (herein after referred to as "Wiss, Janney") to

4

From: Marilyn Rad At: Insurance Resource Consultants  FaxID: Insurance Resource C  To: Michelle Leconey          Date: 06/20/07  11:55 AM  Page: 49 of 87

Case 1:08-cv-02991     Document 1-4     Filed 05/22/2008     Page 6 of 44

conduct an independent review and field investigation of the above-referenced symptoms and make specific recommendations to remedy the symptoms Plaintiffs had experienced.

16.     On or about December 13, 2004, Wiss, Janney submitted a written report to Harper College (hereinafter referred to as the "Wiss Janney Report"), detailing its observations of the symptoms previously recognized by Plaintiffs and its theories of their root causes.

17.     The Wiss Janney Report implied for the first time that the symptoms were caused by breaches of the Design and Construction Contracts committed respectively by Burnidge and Paschen, as more fully described in Counts I and II of this Complaint.

18.     Plaintiffs did not know and could not have reasonably known until late December 2004, when they received and reviewed the Wiss Janney Report, that the above-referenced symptoms were caused by Burnidge's and Paschen's respective breaches of the Design and Construction Contracts.

19.     After learning that the above-referenced symptoms were due to Burnidge's and Paschen's respective breaches of the Design and Construction Contracts, Plaintiffs commenced good-faith settlement discussions with Burnidge and Paschen, during which time Burnidge and Paschen represented to Plaintiffs on multiple occasions their willingness to work with Plaintiffs to resolve the issues arising from the symptoms exhibited in the construction of the Project, and indicated to Plaintiffs that both were willing to participate in mediation in accordance with the ADR provisions of the Design and Construction Contracts.

20.     Despite repeated attempts by Plaintiffs, Defendants subsequently failed to follow through with their promises and participate in mediation.

From: Marilyn Rad At: Insurance Resource Consultants FaxID: Insurance Resource C To: Michelle Leroney    Date: 06/20/07  P 09 AM  Page 50 of 67

21.    Accordingly, Defendants are estopped from defending this action on the ground that the causes of action alleged in Counts I and II of this Complaint are barred by the statute of limitations or by any conditions precedent.

22.    Venue of this action is proper in this Court pursuant to 735 ILCS 5/2-101(2), because the Design and Construction Contracts were performed and a substantial part of the events giving rise to this action occurred in Cook County, Illinois.

## COUNT I
### (Breach of Contract - Burnidge, Cassell and Associates, Inc.)

23.    Plaintiffs incorporate the allegations contained in Paragraphs 1 through 22 of their Allegations Common to All Counts as if stated fully herein.

24.    At all relevant times, Burnidge held itself out and represented that it had the requisite skill and expertise to provide architectural, structural, mechanical, and engineering services, including the preparation of architectural, structural, mechanical and civil drawings, project manuals, specifications, bid packages, and addenda, to review and approve shop drawings and submittals as well as to provide contract administration services and full-time on-site Project representation and inspection of the construction, which included, but was not limited to, verification of the constructed Project's conformance with the contract documents.

25.    Burnidge had a contractual duty to exercise the requisite care and skill of a professional to design and provide full-time observation of the construction of the Project in accordance with industry standards.

26.    Burnidge had a statutory duty to exercise the requisite care and skill of a professional architect in the performance of its obligations under the Design Contract.

6

From: Marilyn Rado At: Insurance Resource Consultants FaxID: Insurance Resource C To: Michelle Leconey        Date: 06/20/07 11:55 AM Page: 51 of 87

Case 1:08-cv-02991    Document 1-4    Filed 05/22/2008    Page 8 of 44

27.    Burnidge had a contractual duty to exercise reasonable care to make revisions to the contract documents during construction of the Project to conform to industry standards, and to correct errors, ambiguities, or omissions in its drawings and specifications.

28.    Burnidge, as full-time Project representative, had a duty to observe the construction of the Project to guard and protect the interests of Harper College and the CDB and to assure Harper College and the CDB of conformance of construction with the contract plans and specifications.

29.    During design and construction of the Project, Burnidge materially breached its statutory, express, and implied duties and obligations to Harper College and the CDB in the following manners:

    a.    the architectural drawings prepared by Burnidge do not indicate any specific type of material to be used for the exterior soffit near the dinning room, and no control joints were indicated on the drawings, and accordingly the aforesaid soffit is apparently constructed of painted gypsum sheathing without all necessary joints;

    b.    the dining room roof was defectively designed such that there is ponding and leakage;

    c.    portions of the roof membrane over the performing arts center exhibit blisters and ridges;

    d.    a recessed floor slab in the auditorium near a wheelchair lift is constructed of insufficient thickness, allowing water intrusion and rusting of bolts;

7

From: Marilyn Rad At: Insurance Resource Consultants FaxID: Insurance Resource C To: Michelle Leconey    Date: 06/20/07 11:55 AM Page: 52 of 87

Case 1:08-cv-02991    Document 1-4    Filed 05/22/2008    Page 9 of 44

e.   the masonry wall is constructed without sufficient expansion joints, and as a result cracking has occurred, which has resulted in water infiltration;

f.   the coatings on the performing arts center fly tower walls has been misapplied such that the coating does not adequately bond to the concrete surface;

g.   the conference center curtain walls leak;

h.   the performing arts center sidewalk is constructed without sufficient control joints; and

i.   by causing other design defects in the Project.

30.   As a direct and proximate result of Burnidge's aforesaid material breaches of contract, Harper College and the CDB have been damaged in an amount to be determined at trial in excess of Fifty Thousand Dollars ($50,000).

31.   The CDB, and Harper College as the intended third party beneficiary of the Design Contract between the CDB and Burnidge, have fully performed all of their obligations under the Design Contract.

WHEREFORE, Plaintiffs Board of Trustees of William Rainey Harper College No. 512 and the Illinois Capital Development Board pray for entry of a judgment in their favor and against Defendant Burnidge, Cassell and Associates, Inc. in an amount in excess of Fifty Thousand Dollars ($50,000), together with attorneys' fees and costs, and for such other and further relief as this Court deems just and proper in the circumstances.

<u>COUNT II</u>
(Breach of Contract - F.H. Paschen, S.N. Nielsen, Inc.)

8

From: Marilyn Rad At: Insurance Resource Consultants FaxID: Insurance Resource C To: Michelle Leconey          Date: 06/20/07  7:55 AM  Page: 53 of 67

32.    Plaintiffs incorporate the allegations contained in Paragraphs 1 through 22 of their Allegations Common to All Counts as if stated fully herein.

33.    At all relevant times, Paschen held itself out and represented that it had the requisite skill and expertise to comply with the contract plans and specifications.

34.    Paschen had an express and implied contractual duty to strictly conform to the Construction Contract prepared by Burnidge.

35.    Paschen materially breached its express and implied contract obligations and duties in the following manner:

a.    a recessed floor slab in the auditorium near a wheelchair lift is constructed of insufficient thickness, allowing water intrusion and rusting of bolts;

b.    the exterior soffit near the dining room is constructed without sufficient control joints;

c.    the masonry wall is constructed without sufficient expansion joints, and as a result cracking as occurred, which has resulted in water infiltration;

d.    the roof membrane over the performing arts center exhibits blistering and ridges;

e.    the coatings on the performing arts center fly tower walls has been misapplied such that the coating does not adequately bond to the concrete surface;

f.    the conference center curtain walls leak;

9

From: Marilyn Rad. At: Insurance Resource Consultants  FaxID: Insurance Resource C  To: Michelle Leconey          Date: 6/20/07  11:55 AM  Page: 54 of 67

Case 1:08-cv-02991     Document 1-4     Filed 05/22/2008     Page 11 of 44

g.    the performing arts center sidewalk is constructed without sufficient control joints; and

h.    there is ponding and leakage in the dining room roof.

36.    Each of the aforesaid defects is a material breach of the Construction Contract.

37.    Harper College and the CDB have been damaged by the aforesaid material breaches of contract because the defective work must be replaced and/or has diminished the value of the Project.

38.    As a direct and proximate result of Paschen's aforesaid material breaches of contract, Harper College and the CDB have been damaged in an amount to be determined at trial in excess of Fifty Thousand Dollars ($50,000).

39.    The CDB, and Harper College as the intended third party beneficiary of the Construction Contract between the CDB and Paschen, have fully performed all of their obligations under the Construction Contract.

WHEREFORE, Plaintiffs Board of Trustees of William Rainey Harper College No. 512 and the Illinois Capital Development Board pray for the entry of a judgment in their favor and against Defendant Burnidge, Cassell and Associates, Inc. in an amount in excess of Fifty Thousand Dollars ($50,000), together with attorneys' fees and costs, and for such other and further relief as this Court deems just and proper in the circumstances.

One of the Attorneys for Board of Trustees
of William Rainey Harper College No. 512
and the Illinois Capital Development Board

10

From: Marilyn Rad At: Insurance Resource Consultants FaxID: Insurance Resource C  To: Michelle Leconey          Date: 06/20/07  11:55 AM  Page: 55 of 87

Kenneth M. Florey
Scott A. Strange
ROBBINS, SCHWARTZ, NICHOLAS,
 LIFTON & TAYLOR, LTD.
20 N. Clark Street, Suite 900
Chicago, Illinois 60602
(312) 332-7760
I.D. No. 115190

11

From: Marilyn Rad At Insurance Resource Consultants FaxID: Insurance Resource C To: Michelle Leconey    Date: 06/20/07 11:55 AM Page: 56 of 87

Case 1:08-cv-02991    Document 1-4    Filed 05/22/2008    Page 13 of 44

ROBBINS SCHWARTZ NICHOLAS LIFTON & TAYLOR LTD.



20 North Clark Street

Suite 900

Chicago, IL 60602-4115

312.332.7760 tel

312.332.7768 fax

www.rsnlt.com

Kenneth M. Florey
kflorey@rsnlt.com

1110.61093

VIA U.S. MAIL AND FACSIMILE

<u>CONFIDENTIAL SETTLEMENT OFFER</u>
<u>FOR SETTLEMENT PURPOSES ONLY</u>

April 12, 2007

Ms. Ellen B. Epstein
Burke Burns & Pinelli, Ltd.
Three First National Plaza
70 W. Madison, Suite 4300
Chicago, Illinois 60602
(312) 541-8603 (fax)

Ms. Laurie Randolph
Donald A. O'Brien
Hinshaw & Culbertson, LLP
222 N. LaSalle St., Ste. 300
Chicago, IL 60601-1081
(312) 704-3001 (fax)

Re:    <u>Settlement Proposal and Notice of Destructive Remedial Work</u>

*Harper College, et al., v. Burnidge, Cassell and Associates, Inc., et al.*
Cook County Circuit Court Case No. 06 L 5812
Judge Ronald F. Bartkowicz

Dear Counsel:

In accordance with Ms. Epstein's request, we have compiled and itemized the actual and estimated costs of repairing and/or replacing the defectively designed and/or constructed portions of the work associated with Harper College's Wojcik Conference Center and Performing Arts Center Project (the "Project"). The following figures are for settlement purposes only, and shall not be admissible in this action, or in any other action or proceeding, for any purpose:



EXHIBIT

C

CHICAGO · DECATUR · COLLINSVILLE · JOLIET

From: Marilyn Rad At: Insurance Resource Consultants  FaxID: Insurance Resource C  To: Michelle Leconey    Date: 06/25/07  11:55 AM  Page: 57 of 67

Case 1:08-cv-02991     Document 1-4     Filed 05/22/2008     Page 14 of 44

ROBBINS  SCHWARTZ  NICHOLAS  LIFTON  &  TAYLOR  LTD.

Attorneys Epstein, Randolph and O'Brien
*Harper College v. Burnidge, et al.*
April 12, 2007
Page 2

### Harper College's Performing Arts Center

| | | |
|---|---|---|
| 1. | Replacement of Entryway Sidewalk | $3,000 |
| 2. | Correction of Overflow Roof Drains | $500 |
| 3. | Correction of Roof Leak Near West Side Lobby | $50,000 |
| 4. | Repair or Replacement of Blistered and Ridged Parapet Roof Membrane | $250,000 |
| 5. | Correction of Rusting and Paint Peeling on Canopy | $20,000 |
| 6. | Correction of Peeling and Discoloration of Coating on Fly Tower Wall | $201,968 |
| 7. | Correction of Disruptively Loud Chilled-Water Loop | $435,000 |
| 8. | Correction of Seating Height in Auditorium | $24,793 |
| 9. | Reconfiguration to Make Mechanical Room Accessible | $49,406 |

### Harper College's Wojcik Conference Center

| | | |
|---|---|---|
| 10. | Repair and/or Replacement of Cracked Soffits on Exterior of Dining Room | $3,500 |
| 11. | Sealing of Bare Masonry on Third Floor Mechanical Space | $2,000 |
| 12. | Correction of Improperly Installed and Improperly Sloped Roof Above East Revolving Door Entrance | $2,500 |
| 13. | Correction of Standing Water on Dining Room Roof and Bent Coping Around Roof Perimeter | $225,000 |
| 14. | Correction of Rusting and Paint Peeling on Canopy | $20,000 |
| 15. | Replacement of Leaking Curtain Wall | $963,900 |

### Incidental Damages

| | | |
|---|---|---|
| 16. | A/E Services to Determine Sources of Above-Referenced Problems | $29,727 |
| | **TOTAL** | **$2,281,294** |

From: Marilyn Rad At: Insurance Resource Consultants  FaxID: Insurance Resource C  To: Michelle Leconey          Date: 06/20/07  11:55 AM  Page: 58 of 67

Case 1:08-cv-02991     Document 1-4     Filed 05/22/2008     Page 15 of 44

ROBBINS  SCHWARTZ  NICHOLAS  LIFTON  &  TAYLOR  LTD.

Attorneys Epstein, Randolph and O'Brien
*Harper College v. Burnidge, et al.*
April 12, 2007
Page 3

We are authorized by Harper College and the Capital Development Board to extend the following settlement offer: upon Defendants' prompt payment to Plaintiffs in the amount of $2,281,294, and upon our receipt from both Defendants of pre-approved, full and unconditional releases of all claims, Plaintiffs shall dismiss this action with prejudice. Please indicate your acceptance or rejection of this settlement offer by April 27, 2007. If we do not receive your acceptance or rejection by that date, this offer is revoked.

Please be advised that Harper College requested bids for the work identified in Item 15 of the above-list (Replacement of Leaking Curtain Wall), and received two contractors' bids on April 3, 2007. (A bid package for this work was tendered to Defendant Paschen Neilsen by Harper College's administration.) The dollar figure associated with Item 15 ($963,900) reflects the price of the low bid received. Harper College intends to award the contract for this work in the next few weeks. The work is expected to commence on May 21, 2007 and is expected to be substantially complete by August 27, 2007. Accordingly, we wish to expedite an agreement as to: (1) the allocation of responsibility for Item 15; and (2) the amount of damages associated with Item 15.

Moreover, if either Defendant wishes to examine, test, and/or observe the demolition of the existing curtain wall identified in Item 15, and/or the construction and installation of the replacement work associated with Item 15, please contact me at your earliest convenience to make arrangements.

Lastly, in response to Burnidge's interrogatories and document requests to Plaintiffs, and in light of our intention of mediating this action before continuing with further litigation, we will make all non-privileged Project documents in Plaintiffs' possession available to both Defendants for inspection and copying, upon reasonable notice. We suggest putting all other discovery requests on hold, pending the outcome of mediation.

To facilitate an in-depth discussion of these issues, and to discuss the possibility of mediating this action, we propose a meeting between counsel for each party and representatives from each party with full settlement authority. We will call you by April 23, 2007 to discuss these issues. In the meantime, please feel free to call me with any questions.

Very truly yours,

ROBBINS, SCHWARTZ, NICHOLAS,
   LIFTON & TAYLOR, LTD.

Kenneth M. Florey
cc:     Robert A. Getz, Harper College
        Fred Hahn, Illinois Capital Development Board
        G:\KMF\HARPER\Harper v. Bunudge\Correspondence\Ltr re itemized settlement offer to defendants 041207.wpd

From: Marilyn Rad. At: Insurance Resource Consultants  FaxID: insurance Resource C  To: Michelle Leconey    Date: 06/2b/07  11:55 AM  Page: 59 of 67

Case 1:08-cv-02991    Document 1-4    Filed 05/22/2008    Page 16 of 44



**F.H. PASCHEN, SN NIELSEN, INC.**
GENERAL CONTRACTORS

FILE COPY

DEC - 6 2000

## SUBCONTRACT AGREEMENT
### CONTRACT NUMBER  353-036

NOV 16 2000

**Date:** August 29, 2000

**Contractor:**
F.H. Paschen/SN Nielsen, Inc.
701 Lee Street, Suite 550
Des Plaines, IL 60016

**Project:**
Performing Arts Center (JC11R) & Instructional Conference Center (JC11W)
William Rainey Harper College
1200 West Algonquin, Palatine, Cook County, Illinois 60067
CDB Project No. 810-032-016 / CDB Contract No. 50-0735-81

**Owner:**
State of Illinois, Capital Development Board
William G. Stratton Building, Third Floor
401 South Spring Street
Springfield, Illinois 62706-4050

**Architect:**
Burnidge Cassell Associates
2425 Royal Boulevard
Elgin, Illinois 60123

**Subcontractor:**
**Underland Architectural Systems, Inc.**
**20318 S. Torrence**
**Lynwood, Illinois 60411**
**Contact: Dave Clark**
**Phone: (708) 889-9826       Fax: (708) 889-9834**

**Subcontract Price:**
$545,000.00
**Five Hundred Forty Five Thousand Dollars and 00/100**

**General Contract Dated:**      February 29, 2000

**Performance Bond and Payment Bond:**      Not required

**Retainage Percentage:**      10%

This Agreement, including the Schedules attached hereto and incorporated herein, is made this 29th day of AUGUST, 2000, by and between **F.H. PASCHEN/SN NIELSEN, INC.** (hereinafter the "Contractor") and **UNDERLAND ARCHITECTURAL SYSTEMS, INC.** (hereinafter the "Subcontractor").

For the consideration hereinafter set forth, Subcontractor covenants and agrees with Contractor as follows:

**EXHIBIT**
**D**

From: Marilyn Rad At: Insurance Resource Consultants FaxID: insurance Resource C To: Michelle Leconey     Date: 06/20/07 11:55 AM Page: 60 of 67

Case 1:08-cv-02991     Document 1-4     Filed 05/22/2008     Page 17 of 44

1.    **DESCRIPTION OF WORK**

Subcontractor shall perform and furnish all the work, labor, supervision, services, plant equipment, tools, scaffolds, appliances, materials, and all other things necessary for the incorporation into the Project of the work described in Schedule A (hereinafter the "Work"). The Work shall be performed in accordance with this Agreement and the Contract Documents identified in Schedule B, and the Additional Provisions, if any, set forth in Schedule E to this Agreement.

2.    **CONTRACT DOCUMENTS**

Subcontractor represents and agrees that it has examined and understands this Agreement and the other Contract Documents, has investigated the nature, locality and site of the Work and the conditions and difficulties under which the Work is to be performed, and that it enters into this Agreement on the basis of its own examination, investigation and evaluation of all such matters and not in reliance upon any opinions or representations of Contractor, or of Owner or Architect, or of any of their respective officers, agents, servants, or employees.

It is further agreed that the provisions of the contract between the Contractor and the Owner (hereinafter the "General Contract") including but not limited to, the General and Supplementary Conditions, the Plans and Specifications, all Contract Requirements, and the particular Specifications relating to the Work of Subcontractor, insofar as they are applicable, are hereby incorporated herein by this reference and are binding upon the Subcontractor. A copy of the General Contract is on file at the Contractor's office and has been inspected by Subcontractor.

3.    **RELATIONSHIPS**

The Work to be performed pursuant to this Agreement is a portion of the work to be provided by Contractor to Owner under the General Contract and is to be performed and furnished to the satisfaction of the Contractor, Architect, and Owner. The decision of the Owner or the Owner's designated representative as to the true construction, meaning and intent of the Plans and Specifications shall be final and binding upon the parties hereto. Contractor will furnish to Subcontractor such additional information and Plans as may be prepared by Architect to further describe the Work to be performed and furnished by Subcontractor, and Subcontractor shall conform to and abide by same.

The Contractor and Subcontractor shall be mutually bound by the terms of this Agreement and, to the extent that provisions of the General Contract apply to the Work of the Subcontractor, the Contractor shall assume toward the Subcontractor all obligations and responsibilities that the Owner, under the General Contract, assumes toward the Contractor, and the Subcontractor shall assume toward the Contractor all obligations and responsibilities which the Contractor, under the General Contract, assumes toward the Owner and Architect.

In addition to the rights and powers set forth in this Agreement, Contractor shall have the benefit of all rights, remedies and redress against Subcontractor which the Owner, by the Contract Documents, has against Contractor. If any provision of this Agreement is inconsistent or conflicts with any provision of the General or Supplementary Conditions of the Contract Documents, the provision in this Agreement shall control. In the event there is a conflict between any provision of this Agreement and any provision of the Special Conditions or the Plans and Specifications, the provision in the Special Conditions or the Plans and Specifications, as the case may be, shall govern.

From: Marilyn Rad At: Insurance Resource Consultants FaxID: Insurance Resource C To: Michelle Leconey        Date: 06/20/07 11:55 AM Page: 61 of 87

Case 1:08-cv-02991    Document 1-4    Filed 05/22/2008    Page 18 of 44

4.    **SUBCONTRACT PRICE**

The sum to be paid Subcontractor for the satisfactory and timely performance and completion of the Work and of all the duties, obligations and responsibilities of Subcontractor under this Agreement and the other Contract Documents shall be the price set forth above (hereinafter the "Subcontract Price") which shall be paid subject to the conditions stated herein, except that if all or a portion of the Work is to be performed on a unit price basis, then the Subcontract Price shall be deemed an estimated total price for the Work and the actual Subcontract Price shall be computed in accordance with the lump sum prices, if any, and the unit prices set forth in Schedule C, based on actual quantities determined in accordance with the Contract Documents. Receipt of payment from the Owner to the Contractor for Subcontractor's Work is an absolute condition precedent to the Subcontractor's right to payment.

5.    **PROGRESS PAYMENTS**

a)    As a condition to filing a request for payment, or at any time upon request by the Contractor, Subcontractor shall submit a schedule of values of the various portions of the Work, including quantities, if required by the Contractor. On or before the Progress Estimate Date, Subcontractor shall submit to Contractor, in the form required, a written progress estimate showing the proportionate value of the Work installed to the date, from which shall be deducted the current retainage, all previous payments, and all charges for services, materials, equipment and other items furnished by Contractor to or chargeable to Subcontractor. The "Progress Estimate Date" shall be the first business day of the month, unless otherwise designated by the Contractor in writing to the Subcontractor. Subcontractor agrees that it shall furnish a release of liens and such information, evidence and substantiation with respect to the nature and extent of all obligations incurred by Subcontractor for or in connection with the Work, all payments made by Subcontractor thereon and the amounts remaining unpaid, to whom and the reasons therefore.

Contractor shall pay to Subcontractor, upon receipt of payment from the Owner, an amount equal to the value of Subcontractor's completed Work, to the extent allowed and paid by Owner to Contractor on account of Subcontractor's Work, less all previous payments and less the amount of current retainage. The term "previous payments" shall include all amounts already paid on account of the Work, all charges for materials or services furnished by Contractor and properly chargeable to Subcontractor and all costs incurred by Contractor properly chargeable to Subcontractor as obligations of Subcontractor. The term "current retainage" shall be calculated in accordance with the Retainage Percentage set forth above. Receipt of Progress Payments from the Owner to Contractor is an absolute condition precedent to the Subcontractor's right to payment.

b)    Subcontractor shall be required to file daily subcontractor work reports on the form provided by Contractor. Failure of Subcontractor to provide Contractor with such reports in a timely manner shall be cause for the withholding of Progress Payments.

6.    **FINAL PAYMENT**

A final payment, including the unpaid balance of the Subcontract Price and retention to the extent allowed and paid by Owner to Contractor on account of Subcontractor's Work, shall be made within sixty (60) days after the last of the following to occur: a) full completion of the Work by Subcontractor, b) final acceptance thereof by Architect and Owner, c) final payment by

From: Marilyn Rad At: Insurance Resource Consultants FaxID: Insurance Resource C. To: Michelle Leconey    Date: 06/26/07 1:55 AM  Page: 62 of 67

Case 1:08-cv-02991    Document 1-4    Filed 05/22/2008    Page 19 of 44

Owner to Contractor on account of Subcontractor's work, d) the furnishing of satisfactory
evidence by Subcontractor that Subcontractor has paid in full all persons furnishing labor or
materials in connection with the Work including any taxes or governmental charges with respect
thereto or with respect to the Work, and that neither Subcontractor nor any persons claiming
under or through Subcontractor has filed or has the right to maintain a lien or other claim against
Owner, Contractor, Contractor's Surety, if any, on the Project and e) the delivery of all
guarantees, warranties, bonds, instruction manuals, performance charts, diagrams, as-built
drawings and similar items required of Subcontractor or its suppliers with respect to the Work.

7.    **NO LIENS**

a)    As often as required by Contractor, Subcontractor shall furnish an affidavit showing the
names and addresses of all persons who shall have furnished labor or materials for the Work and
the amount due or to become due to each such person.  Progress payments may be made in the
form of checks payable jointly to Subcontractor and any of the Subcontractor's equipment
lessors, material suppliers, or anyone else to whom the Subcontractor owes money for this
Project.    The Contractor will not be under any obligation, however, to issue joint payment
checks, but may do so in the event that there is a reasonable likelihood that such obligations of
the Subcontractor, as described above, may not be timely paid by the Subcontractor and/or could
become the obligation of the Contractor under any surety bond issued by the Contractor or under
the applicable mechanic's lien law.

b)    Subcontractor, for itself and for its subcontractors, laborers and materialmen and all other
directly or indirectly acting for, through or under it or any of them covenants and agrees that no
liens for or on account of any work, labor, services, materials, equipment or other items
performed or furnished for or on account of the Project will be filed.  Subcontractor, for itself
and its subcontractors, laborers and materialmen and all others above mentioned does hereby
expressly waive, release and relinquish all rights to file or maintain such liens and further agrees
that this waiver of the right to file or maintain such liens shall be an independent covenant and
shall apply as well to work, labor and services performed and materials, equipment and their
items furnished under any change order or supplemental agreement for extra or additional work
in connection with the Project as well as to the original Work covered by this Agreement.
Subcontractor shall, as often as requested by Contractor, furnish a separate release of lien for
itself, its subcontractors and suppliers.  Subcontractor shall indemnify (including the payment of
reasonable attorneys fees), defend and hold harmless Contractor from Subcontractor's failure to
properly pay any laborer, supplier, subcontractor and/or equipment lessor for work, materials,
and/or equipment supplied to the Project.

8.    **PAYMENTS WITHHELD**

a)    Contractor's right to withhold money, shall include, but shall not be limited to, money
withheld because of 1) a claim being made or lien being filed with or against Contractor, its
Surety, if any, the Owner, the Project or the premises upon which the Project is located, by any
person claiming that Subcontractor or any subcontractor or other person under it has failed to
make payment for any labor, services, materials, equipment, taxes or other items or obligations
furnished or incurred for in connection with the Work, 2) Subcontractor or any subcontractor or
other person under it has caused damage to the Work or to any other work on the Project, or
3) the Subcontractor has failed to perform or is otherwise in default under any of the terms or
provisions of this Agreement.

From: Marilyn Rad  At: Insurance Resource Consultants  FaxID: Insurance Resource C  To: Michelle Leconey     Date 06/20/07  11:55 AM  Page. 63 of 87

Case 1:08-cv-02991     Document 1-4     Filed 05/22/2008     Page 20 of 44

Contractor may apply and charge against the Subcontractor so much of the amount withheld as may be required to satisfy any of the foregoing purposes. If the amount withheld is insufficient to fully satisfy said purposes, Subcontractor shall be liable to the Contractor for the difference.

b)      If for any reason the Contractor deems it necessary under the terms and conditions of this Agreement to withhold from the Subcontractor money retained or any other money claimed by the Subcontractor, then the Contractor shall not be liable for the payment of interest on said money.

9.      TIMELY EXECUTION OF THE WORK

It is understood that completion of the Work and its several parts within the time allotted is of the essence. Subcontractor agrees to: a) provide a schedule and, upon request, revised schedules of the Work to Contractor for its use in scheduling the Project, b) provide at the Project site the materials, equipment, laborers and supervision necessary to begin the Work upon the Contractor's order to do so, and to furnish sufficient forces, supervision, equipment and materials, at such other times and for such other periods as Contractor may direct, and c) perform the Work and all parts thereof, promptly, diligently, and in such order and sequence as Contractor may direct to assure the efficient, expeditious and timely prosecution of the entire work for the Project. Contractor reserves the right to modify any progress schedule with respect to the required sequence or duration of the Work or any portion thereof, and Contractor makes no representation that Subcontractor will be able to commence, prosecute, or complete the Work in accordance with any progress schedule.

Subcontractor shall cooperate and coordinate with others participating in the construction of the Project and shall not delay, impede or otherwise impair their work. Subcontractor shall use its best efforts to diligently pursue its work in order to permit Contractor to meet the dates for Subcontractor's Work as they relate to its own work and the work of others and to achieve the completion dates established in the schedule for the overall project.

Should Subcontractor or any of its officers, agents, servants, or employees fail to begin, continue or complete the Work as herein provided, or otherwise unreasonably delay the progress of the Work so as to cause any additional cost, expense, liability, or damage to Contractor or Owner, Subcontractor shall and does hereby agree to compensate Contractor or Owner for and indemnify them against all costs, expenses, damages, and liability.

Contractor may direct Subcontractor, upon forty-eight (48) hours prior written notice, to provide additional labor and supervision or to work overtime and if so directed, Subcontractor shall work said overtime or provide such additional labor and supervision. Provided that Subcontractor is not in default under any of the terms or provisions of this Agreement or of any of the other Contract Documents, and further providing that the progress of the Work has not been delayed by Subcontractor or any of its officers, agents, servants or employees, then Subcontractor will be paid the premium time rate for any such overtime or additional labor, if any, at rates which have been previously approved by the Contractor in writing, plus taxes imposed by law on such premium wages if required to be paid by Subcontractor. If, however, the progress of the Work or of the Project has been delayed by the Subcontractor, then the Subcontractor shall, at its own cost and expense, work such overtime or provide such additional labor and supervision as may be necessary to make up for all time lost and to avoid delay in the completion of the Work and of the Project.

From: Marilyn Rad At: Insurance Resource Consultants FaxID: Insurance Resource C To: Michelle Leconey    Date: 06/20/07  11:55 AM  Page: 64 of 87

Case 1:08-cv-02991    Document 1-4    Filed 05/22/2008    Page 21 of 44

10.   **LIQUIDATED DAMAGES**

In the event that Subcontractor shall fail in the performance of the Work to be performed under this Subcontract by and at the time or times referred to, or agreed to in the progress schedule or the Subcontractor is otherwise responsible for the late completion of the Project, and a time extension has not been issued either by the Owner or the Contractor, Subcontractor shall pay to Contractor, as damages, all such actual damages or liquidated damages suffered by Contractor by reason of such default; including, but not limited to, damages assessed by the Owner pursuant to any applicable provisions of the General Contractor or other Contract Documents. The Contractor shall have the right to deduct from any monies otherwise due or to become due to Subcontractor or to sue for and recover compensation or damages for the non-performance of this Agreement at the time or times stipulated or provided for herein.

11.   **EXTENSIONS OF TIME/DELAY CLAIMS**

a)    Should Subcontractor be delayed in the commencement, prosecution or completion of the Work by the act, omission, neglect or default of Contractor, Owner, and/or of anyone employed by Contractor, Owner, or of any other contractor or subcontractor on the Project, or by any damage caused by fire or other casualty or by the combined action of workmen in no way chargeable to Subcontractor's control and not due to any fault, neglect, act or omission on its part, then Subcontractor may be entitled to an extension of time in which to complete its Work. Such extension may be for a period equivalent to the time lost by reason of any and all of the aforesaid causes, as determined by Contractor. It is expressly agreed, however, that the Contractor shall not be liable to the Subcontractor for any delays whether caused by the Contractor, its other subcontractors, the Owner or other independent contractors of the Owner unless an extension of time for such delays is first granted to the Contractor by the Owner and, except to the extent and amount that the Contractor is actually paid therefore by the Owner, subcontractor or others for the specific use and payment of Subcontractor's claim arising from said delays.

b)    If the Subcontractor is delayed in the prosecution of its Work due to the acts of the Owner and/or its agents and the Subcontractor suffers delay damages therefrom, the Contractor agrees to transmit to the Owner any claims submitted to it by the Subcontractor. The Owner's decision regarding such claims will be final and binding upon Subcontractor. It is agreed that in no event will the Contractor be liable for Subcontractor's claims for delay; the Contractor under this provision merely acts as a conduit to provide the Subcontractor access to the Owner to seek reimbursement for damages incurred for delays caused by the Owner and/or its agents.

12.   **CHANGE ORDERS/EXTRAS**

Subcontractor shall not make any changes, additions or deletions in the Work, except upon written order of Contractor. Contractor shall have the right to make changes, additions and/or deletions in the Work, upon written order to Subcontractor. The value of the Work as changed, added, or deleted shall be stated in the written order, approved by Contractor, and the Subcontract Price shall be adjusted as provided in the Contract Documents or as hereinafter provided. No extra work or changes from Plans and Specifications or from this Agreement will be recognized or paid for unless agreed to in writing before the extra work is started or the changes made. All such orders must be signed by an authorized representative of the Contractor.

From: Marilyn Rad At: Insurance Resource Consultants FaxID: Insurance Resource C To: Michelle Leconey          Date: 06/20/07 11:55 AM Page: 65 of 67

Case 1:08-cv-02991     Document 1-4     Filed 05/22/2008     Page 22 of 44

Should the parties be unable to agree on the amount of the addition or the reduction from the Subcontract Price, Subcontractor shall proceed with the Work, as changed, added or deleted, promptly upon the written order of Contractor from which order the stated value of such Work shall be omitted, and the determination of the amount of such addition or reduction by the Owner as provided in the General Contract shall be binding on the Subcontractor and the Contractor.

It is understood and agreed that any claims for extras demanded by the Subcontractor arising from omissions and/or discrepancies in the Plans or Specifications shall not be binding upon the Contractor or honored by the Contractor except to the extent previously approved and the extent actually paid for by the Owner. In case of Work omitted by the Subcontractor, Contractor shall have the right to withhold from payments due or to become due the Subcontractor an amount which, in the Contractor's opinion, is equal to the value of such Work until such time as the value thereof is determined by agreement or by equitable adjustment upon completion of the Work.

All changes, additions or deletions in the Work ordered in writing by Contractor shall be deemed to be a part of the Work hereunder and shall be performed and furnished in accordance with all the terms and provisions of this Agreement and the other Contract Documents.

Any change which will affect work performed by another Subcontractor shall be specifically brought to the attention of the Contractor. Failure to convey such notification shall cause the Subcontractor who originates the change to bear any additional cost which may result from such change or modification.

13.    **GUARANTEE**

Subcontractor guarantees that the Work, including any materials or equipment furnished in connection therewith, shall be free from defects in material and workmanship and shall conform to and meet the requirements of this Agreement, the General Contract, the Contract Documents and any Additional Provisions, if any. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. Subcontractor shall furnish any separate guarantee for the Work or portions thereof as required under any of the applicable Contract Documents.

Subcontractor's guarantee shall be in addition to any other warranty or remedy required by law or by this Agreement.

14.    **DETAILS OF THE WORK**

Notwithstanding the dimensions given on the Plans, Specifications and other Contract Documents, it shall be the obligation and responsibility of Subcontractor to take such measurements as will insure the proper matching and fitting of the Work with contiguous work.

Subcontractor shall prepare and submit to Contractor such shop drawings as required to describe completely the details and construction of the Work. Approval of shop drawings shall not relieve Subcontractor of its obligations to perform the Work in strict accordance with the Plans, Specifications, Additional Provisions, if any, and the other Contract Documents, nor of its responsibility for the proper matching and fitting of the Work with contiguous work. Prior approval of equipment and/or material in connection with a previous project shall not be construed by Subcontractor as giving an approval for use on this Project.

Should the proper and accurate performance of the Work hereunder depend upon the proper and accurate performance of other work not covered by this Agreement, Subcontractor shall carefully examine such other work, determine whether it is fit, ready and in suitable condition for the proper and accurate performance of the Work hereunder, use all reasonable means necessary to discover any defects in such other work, and before proceeding with the Work hereunder, report promptly any such improper conditions and defects to Contractor in writing and allow a reasonable time to have such improper conditions and defects remedied.

15. **INSPECTION AND DEFECTIVE WORK**

Subcontractor shall provide sufficient, safe and proper facilities at all times for the inspection of the Work by Contractor, Owner and Architect and their authorized representatives. Subcontractor shall, within forty-eight (48) hours after receiving written notice from Contractor, remove all materials, whether worked or unworked, and take down and rebuild all portions of the Work condemned by Architect or Contractor as unsound, defective or improper or as in any way failing to conform to the Contract Documents. Subcontractor, at its own expense and cost, shall replace same with proper and satisfactory work and materials and make good all work damaged or destroyed by or as a result of such unsound, defective, improper or non-conforming work or materials or by the taking down, removal or replacement thereof.

Subcontractor agrees and understands that neither Contractor nor Architect will provide continuous or exhaustive inspection of Subcontractor's Work and that Subcontractor is fully responsible for the materials, procedures, methods and techniques utilized and for providing completed Work to the full satisfaction of the Contractor and Architect. Neither failure to inspect the Work nor, upon inspection, failure to uncover defects in the Work shall be deemed acceptance of the Work by Contractor or Architect.

16. **SUBCONTRACTOR**

The Subcontractor warrants that it is sufficiently fiscally responsible to carry out the work as provided in this Agreement, together with all other work it may have on hand or undertake whether it be with the Contractor or others. Should the Subcontractor's financial condition change in any manner from that at the time of entering into this Agreement, it shall immediately notify the Contractor so that procedures may be instituted to help safeguard the performance by the Subcontractor hereunder.

The Contractor may, at any time, make inquiries as to the financial condition of the Subcontractor including, but not necessarily limited to, lower-tier subcontractors, suppliers, etc. that are supplying material and/or services to the Project, any other creditors, and Subcontractor's banker, Certified Public Accountant, and Surety, if any.

The Contractor may institute such financial and other measures, including those provided elsewhere in this Agreement, when, in Contractor's sole determination, the best interests of the Project would be served thereby.

From: Marilyn Rad At: Insurance Resource Consultants FaxID: Insurance Resource C To: Michelle LeConey     Date: 06/26/07  7:55 AM  Page: 61 of 67

Case 1:08-cv-02991     Document 1-4     Filed 05/22/2008     Page 24 of 44

## 17.    SECOND TIER SUBCONTRACTORS

Subcontractor shall not sublet the work to be performed under this Agreement either in whole or in part without the prior, express, and written consent of Contractor. All subcontracts under this Agreement shall be subject to the provisions of the General Contract and this Agreement but shall create no contractual relationship with Contractor.

## 18.    COMPLIANCE WITH LAW AND PERMITS

Subcontractor shall obtain and pay for all necessary permits, patents and licenses pertaining to the Work and shall comply with all Federal, State, Municipal and local laws, ordinances, rules, regulations, standards, orders, notices, and requirements as may be applicable to the Project, including, among others, those relating to safety, utilization of minority employees, discrimination in employment, and fair employment or equal opportunity. Subcontractor shall be responsible for all damages and penalties and shall indemnify and hold harmless the Contractor from and against all damages, penalties and liability which may arise out of Subcontractor's failure to secure and pay for any such licenses and permits or its failure to comply fully with any and all applicable laws, ordinances, rules and regulations. Subcontractor shall furnish, upon demand, such proof as Contractor or Owner may require showing compliance with applicable laws and regulations and/or the correction of any violation.

## 19.    SAFETY

a)    Subcontractor shall take reasonable safety precautions with respect to its Work and shall comply with all safety measures initiated by Contractor and the Owner and with all applicable laws, ordinances, rules, regulations and orders of any public authority for the safety of persons or property, including, but not limited to, applicable OSHA Standards. Subcontractor shall report within three (3) days to Contractor any injury to any of the Subcontractor's employees at the Project site.

b)    Subcontractor understands and agrees that neither Contractor nor Architect will make continuous or exhaustive inspections to assure Subcontractor's compliance with applicable safety rules, regulations or requirements. Subcontractor shall be solely responsible to assure the safety of its own equipment, appliances, material, and working conditions, techniques, and procedures, and Contractor is not responsible in any manner for the safety of Subcontractor's Work. If the Subcontractor fails to correct unsafe procedures, acts or conditions within a reasonable time of notification by Contractor, however, Contractor may (but has no contractual obligation to do so ) correct the unsafe practice and backcharge the Subcontractor for these costs. Repeated failures to correct unsafe practices may result in the termination of this Agreement. In the event Contractor receives a penalty from OSHA as a result of a violation of OSHA by Subcontractor and Contractor is cited under the multi-employer worksite rule, Subcontractor agrees to defend, indemnify and hold harmless Contractor for the imposition of any fines and/or penalties.

From: Marilyn Rad  At: Insurance Resource Consultants  FaxID: Insurance Resource C. To: Michelle Lechney        Date: 06/20/07  11:55 AM  Page: 68 of 87

Case 1:08-cv-02991   Document 1-4   Filed 05/22/2008   Page 25 of 44

c)     Subcontractor agrees that all applicable Material Safety Data Sheets (MSDS) required pursuant to the Hazardous Communication Standards (29 CFR § 1915.1200) for the proper performance of the Subcontractor's obligation, are to be provided by the Subcontractor. All MSDS forms shall be mailed to the Project Job Site address and should reference this Agreement and the Project name and number. Subcontractor shall indemnify and hold harmless the Contractor from any liability, claim, loss or expense arising out of or in connection with Subcontractor's failure to abide by this requirement.

## 20.   CLEAN-UP

a)     Subcontractor shall, at its own cost and expense (1) keep the premises free at all times from all waste materials, packing materials and other rubbish generated by Subcontractor in locations or containers as designated by Contractor, 2) clean and remove from its own Work and from all contiguous work areas any soiling, staining, mortar, plaster, concrete, or dirt resulting from the execution of its Work in each area, 3) perform such cleaning as may be required to leave the Work area "broom clean" and 4) at the completion of its Work, remove all of its tools, equipment, scaffolds, shanties, and surplus materials and perform final clean-up as required by Contractor.

b)     If the Subcontractor is lax in its cleaning, the Contractor will give notice to the Subcontractor's field personnel and written notice to the Subcontractor that the cleaning is not being kept current. If after twenty four hours (24) notice, Subcontractor has failed to abide with clean up requirements, Contractor shall perform the Subcontractor's cleaning and backcharge the Subcontractor for the costs.

## 21.   LABOR

a)     Subcontractor agrees that in the preparation of the material and the performance of the Work, it will employ only such workers as will work in harmony with the other workers employed by Contractor or the other Subcontractors, and Subcontractor further agrees that it will, at the request of Contractor, discharge and remove from the Project premises, any person designated by the Contractor as being detrimental to the Project. The right of the Contractor to request the discharge of any workers employed by Subcontractor shall not be construed to constitute the Contractor as the employer of any workers employed by the Subcontractor.

b)     Subcontractor agrees that all disputes as to jurisdiction of trades shall be adjusted in accordance with any plan for the settlement of jurisdictional disputes which may be in effect either nationally or in the locality in which the Work is being done and that it shall be bound and abide by all such adjustments and settlements of jurisdictional disputes, provided that the provisions of this paragraph shall not be in violation of or in conflict with any provisions of law applicable to the settlement of such disputes. Should Subcontractor fail to carry out or comply with any of the foregoing provisions, Contractor shall have the right, in addition to any other remedies provided by this Agreement or other Contract Documents or by law, upon forty-eight (48) hours written notice to Subcontractor, for all or any portion of the Work and, for the purpose of completing the Work, to enter upon the Project premises and take possession, in the same manner, to the same extent and upon the same terms and conditions applicable for failure to prosecute the Work.

From: Marilyn Rad At: Insurance Resource Consultants  FaxID: Insurance Resource C  To: Michelle Leconey       Date: 06/20/07  11:55 AM  Page: 69 of 87

Case 1:08-cv-02991     Document 1-4     Filed 05/22/2008     Page 26 of 44

c)    Subcontractor agrees to adhere strictly to all laws and regulations in connection with employment of labor, including, but not limited to, those contained in the specifications, bulletins and all subsequent amendments and modifications thereof, which are part of the General Contract and which form a part of this Agreement. Subcontractor further agrees that any penalty imposed upon Contractor due to any infraction of these requirements or violations thereof by Subcontractor shall be charged to and borne by Subcontractor.

## 22.    GENERAL INDEMNIFICATION

Subcontractor hereby assumes the entire responsibility for any and all damage or injury of any kind or nature whatsoever (including death resulting therefrom), to all persons, whether employees of the Subcontractor or otherwise, and to all property caused by, resulting from, arising out of or occurring in connection with the execution of the Work; and if any claims for such damage or injury (including death resulting therefrom) be made or asserted, Subcontractor agrees to indemnify and save harmless Contractor, and Owner, their officers, agents, servants, and employees from and against any and all such claims, and further from and against any and all loss, cost, expenses, liability, damage or injury, including legal fees and disbursements Contractor, Owner, their officers, agents, servants, or employees may directly or indirectly sustain, suffer or incur as a result of Subcontractor's work. Subcontractor further agrees to and does hereby assume, on behalf of Contractor, and Owner, their officers, agents, servants and employees, the defense of any action at law or in equity which may be brought against Contractor or Owner, their officers, agents, servants, or employees upon or by reason of such claims. The Subcontractor agrees to pay on behalf of Contractor, or Owner, their officers, agents, servants, and employees the amount of any judgment so entered, upon proof of judgment and submission of evidence or finding by a court of competent jurisdiction that such judgment arose out of or occurred in connection with the execution of the work of Subcontractor.

## 23.    RENTED OR LOANED EQUIPMENT

In the event Contractor rents or loans equipment, machines, and/or tools to Subcontractor, and whether or not such rental or loan includes the providing of Contractor's operator, Subcontractor hereby agrees to make no claim whatsoever against Contractor for any personal injuries or property damages caused in the course of carrying out Subcontractor's request for the rental or loaned equipment. It is further understood and agreed that in the event that such equipment is operated by employees or agents of Contractor that such operators shall for the purpose of this Agreement, and for such purpose only, by considered subject to the direction and control of Subcontractor so that Subcontractor, as between Contractor and Subcontractor, shall be considered as being liable for any and all negligent acts or omissions of such operators.

Subcontractor hereby agrees to defend, indemnify and hold harmless the Contractor against any and all claims, loss or damages, including reasonable attorneys fees, that may arise from Contractor's complying with or attempt to comply with Subcontractor's request for rented or loaned equipment. This indemnification shall apply regardless of whether or not such personal injuries or property damages may be the result of the negligence, in whole or in part, of Contractor or its employees or otherwise due to the fault of Contractor or its employees.

From: Marilyn Rad At Insurance Resource Consultants FaxID: Insurance Resource C  To: Michelle Leconey          Date: 06/20/07  11:55 AM  Page: 70 of 87

Case 1:08-cv-02991    Document 1-4    Filed 05/22/2008    Page 27 of 44

24.   **DEFAULT**

It shall be considered an event of default under this Agreement if Subcontractor should: 1) refuse or neglect to supply sufficient workmen or materials of the proper quality and quantity, 2) fail in any respect to prosecute the Work with promptness and diligence, or cause the stoppage, delay, interference with, or damage to the work of Contractor and Owner or any other contractors or subcontractors on the Project, 3) fail to perform in accordance with any of the terms or provisions of this Agreement or of the other Contract Documents, 4) allow a petition in bankruptcy or for an arrangement or reorganization to be filed by or against it, 5) become insolvent or be adjudicated as bankrupt or go into liquidation, either voluntarily or involuntarily or under court order, or made a general assignment for the benefit of creditors, or 6) the Architect shall have determined that the Work or any portion thereof is not being performed in accordance with the Contract Documents.

Upon the occurrence of an event of default, Contractor shall have the right, in addition to any other remedies provided by this Agreement and the other Contract Documents or by law, after forty-eight (48) hours notice to Subcontractor a) to perform and furnish any such labor and materials for the Work and to deduct the cost thereof from any moneys due or to become due to Subcontractor under this Agreement, and/or b) terminate the employment of Subcontractor, for all or any portion of the Work, enter upon the premises and take possession, for the purpose of completing the Work, of all materials, equipment, scaffolds, tools, appliances and other items thereon, all of which Subcontractor hereby transfers and assigns to Contractor for such limited purpose and for whatever period of time is necessary for completion of the Work.

In case of such termination of the employment of Subcontractor, Subcontractor shall not be entitled to receive any further payment under this Agreement until the Work shall be wholly completed to the satisfaction of Contractor, Owner, and Architect, and shall have been accepted by them, at which time, if the unpaid balance of the amount to be paid under this Agreement shall exceed the cost and expense incurred by Contractor and/or Owner in completing the Work, such excess shall be paid by Contractor to the Subcontractor; provided, however, that if such cost and expense shall exceed such unpaid balance, the Subcontractor shall pay the difference to the Contractor. Such cost and expense shall include, not only the cost of completing the Work to the satisfaction of the Contractor, Owner and Architect, but also all other damages incurred or suffered by reason of or resulting from Subcontractor's default. In the event it becomes necessary for the Contractor to collect any deficiency from the Subcontractor by legal action, the Subcontractor agrees to reimburse Contractor for all of its reasonable attorney's fees and costs incurred in connection with such action.

25.   **COOPERATION**

Subcontractor and its subcontractors, if any, shall cooperate with Contractor and other subcontractors on the Project premises and shall so carry on their work so that other cooperating subcontractors shall not be hindered, delayed or interfered with in the progress of their work and so that all of such work shall be a finished and completed in accordance with the Project schedule.

From: Marilyn Rad At: Insurance Resource Consultants FaxID: Insurance Resource C To: Michelle Leconey    Date: 06/20/07 11:55 AM Page: 71 of 87

Case 1:08-cv-02991    Document 1-4    Filed 05/22/2008    Page 28 of 44

26. **DISPUTES**

Should any dispute arise between the parties respecting the true construction or interpretation of the Plans, Specifications and/or the Contract Requirements, the decision of the Owner or the Owner's designated representative as set forth in the General Contract shall be final. In the event of any such dispute, the Subcontractor shall proceed, without interruption, with the Work in such manner as directed by the Contractor, pending the decision of the Owner or its representative as set forth in the General Contract. It is further agreed that in the event of any dispute arising between the Subcontractor and Contractor as to the scope and/or intent of this Agreement, the Subcontractor shall proceed with its work without interruption pending settlement thereof.

27. **TERMINATION**

Contractor shall have the right at any time by written notice to Subcontractor to terminate this Agreement and require Subcontractor to cease work hereunder, in which case, provided the Subcontractor be not then in default, Subcontractor shall be entitled to the value of the work performed and materials furnished. In the event of termination, Subcontractor shall not be entitled to anticipated profits on work unperformed or on materials or equipment unfurnished.

In lieu of termination of Subcontractor's suppliers and subcontractors, Subcontractor shall, at Contractor's election, assign its contracts or subcontracts, as the case may be, to Contractor within ten (10) days of notice to do so.

Subcontractor's payment after termination shall become due and payable sixty (60) days after assignment of contracts or subcontracts or settlement of accounts, whichever occurs later, and the Subcontractor's compliance with any conditions to final payment that may be applicable to the termination.

28. **COMPENSATION AND LIABILITY INSURANCE**

Before commencing the Work, Subcontractor shall procure and shall thereafter maintain, at its own expense, until completion and final acceptance of the Work the types and minimum limits of insurance set forth in Schedule D.

29. **BONDS**

Before commencing the Work Subcontractor shall furnish to Contractor, at its expense, a performance bond and a separate payment bond in the amount set forth and in the form and content and from such Surety or Sureties as are satisfactory to Contractor and Owner.

30. **CHOICE OF LAW**

The performance of this Agreement and all of its terms and conditions shall be interpreted and governed by the laws of the State of Illinois.

From: Marilyn Rad At: Insurance Resource Consultants FaxID: Insurance Resource C To: Michele Leconey    Date 06/20/07 11:55 AM Page: 72 of 87

Case 1:08-cv-02991    Document 1-4    Filed 05/22/2008    Page 29 of 44

31. **NO WAIVER**

The failure of either party to this Agreement to insist upon the performance of any of the terms and conditions of this Agreement, or the waiver of any breach of any of the terms and conditions of this Agreement, shall not be construed as thereafter waiving any such terms and conditions, but such terms and conditions shall continue and remain in full force and effect as if no such forbearance or waiver had occurred.

32. **SEVERABILITY**

If any one or more of the provisions contained in this Agreement, for any reason, are held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

33. **OWNER APPROVAL/ SUCCESSION OF INTERESTS**

Subcontractor understands and agrees that the Owner has the right to approve or disapprove the employment of this Subcontractor and in the event that the Owner does not approve this Subcontractor, this Agreement shall become null and void.

This Agreement shall be binding upon and inure to the benefit of the respective heirs, executors, administrators, successors and permitted assigns of the parties hereto, but no third party benefits are created by this Agreement.

34. **MISCELLANEOUS**

a)    All previous oral or written promises negotiations, representations or agreements relating to the subject matter of this Agreement are hereby declared to be null and void, it being expressly agreed that the terms of this Agreement shall constitute the full and complete agreement between the parties hereto.

b)    This Agreement may not be changed in any way unless such changes are in writing and signed or initialed by both parties to this Agreement, and no term or provision of this Agreement may be waived by Contractor except in writing signed or initialed by its duly authorized officer or agent.   Subcontractor shall not sell, assign, sublet, transfer, or otherwise dispose of this subcontract Agreement, or any part thereof, nor assign any moneys due or to become due hereunder, except with the prior written consent of the Contractor.

c)    The titles or headings of any term or provision of this Agreement are for convenience only and shall in no way affect the interpretation of this Agreement.

From: Marilyn Rad At: Insurance Resource Consultants FaxID: Insurance Resource C To: Michelle Leconey          Date: 06/20/07  11:55 AM  Page: 73 of 87

Case 1:08-cv-02991     Document 1-4     Filed 05/22/2008     Page 30 of 44

## SCHEDULE A

**WORK:**   The Aluminum Windows, Entrances, Storefront, Revolving Entrance Doors, and Glass and Glazing work shall consist of all supervision, labor, material, and equipment necessary to complete the project in accordance with the Contract Plans and Specifications including but not limited to the following:

### Specification Sections

- **Division 1 - General Requirements (as applicable)**
- **07900 – Joint Sealers**
- **08410 – Aluminum Entrances and Storefronts**
- **08470 – Revolving Entrance Doors**
- **08520 – Aluminum Windows**
- **08800 – Glass and Glazing**

- Furnish, deliver, install aluminum entrances and storefronts as indicated, as specified
- Furnish, deliver, install revolving entrance doors as indicated, as specified
- Furnish, deliver, install all aluminum windows as indicated, as specified
- Furnish, deliver, install all glass and glazing as indicated, as specified
- Provide for all 'Quality Assurance' requirements as specified
- Provide for all 'System Performance Requirements' as specified
- Provide for all 'Submittals' requirements as specified
- Provide for all 'Delivery, Storage, and Handling' requirements as specified
- Provide for all warranty requirements as specified
- Provide for all 'Products' requirements as specified
- Field measurements, coordination as required
- Provide for all layout with control lines provided by others
- Furnish, deliver, install automatic door operators as specified
- Furnish and install spandrel glass (3/A7.9 typical) as indicated
- Furnish and install all glazing at hollow metal doors
- Provide joint sealers as required for all work performed as part of this subcontract
- Furnish, deliver, install all hardware for aluminum entrances as indicated, as required
- Furnish, deliver, install aluminum panels (14/A7.11 typical) as indicated
- Furnish, deliver, install laminated safety glass in rooms as indicated
- Furnish, deliver, install all mirrors not specified in 10800
- Provide wood blocking as required for all work performed as part of this subcontract
- Provide installation of acoustical windows as required
- Daily clean-up to dumpsters provided by others
- Provide for all applicable aluminum storefront related work associated with contract alternates #G1 through G5
- Furnish, place, maintain all site safety requirements per the latest OSHA standards for all work performed as part of this subcontract
- Provide for all on-site storage, security of tools, materials, and equipment on a daily basis
- Provide for all unloading, hoisting, handling of materials, equipment for all work performed as part of this subcontract

**Exclusions:**
- Cylinders for aluminum entrance hardware
- Hollow metal frames

From: Marilyn Rad At: Insurance Resource Consultants  FaxID: Insurance Resource C  To: Michelle Leroney      Date: 06/20/07  11:55 AM  Page: 74 of 87

Case 1:08-cv-02991   Document 1-4   Filed 05/22/2008   Page 31 of 44

SCHEDULE B

**CONTRACT DOCUMENTS:**

| | |
|---|---|
| Specifications | October 4, 1999 |
| Addendum No. One | November 23, 1999 |
| Addendum No. Two | December 2, 1999 |

As prepared by **Burnidge Cassell Associates, Inc.**, the Contract Documents consist of:

**VOLUME 1**

**General**

| | |
|---|---|
| G-1A | Cover Sheet |
| G-2 | Notes |

**Civil**

| | |
|---|---|
| C1 | Existing Conditions/Demo Plan, R |
| C2 | Utility Plan, R |
| C3 | Grading Plan, R |
| C4 | Existing Conditions/Demo Plan, W |
| C5 | Utility Plan, W |
| C6 | Grading Plan, W |
| C7 | Detail Sheet |
| C8 | Detail Sheet |
| C9 | General Notes |

**Architectural**

| | |
|---|---|
| A2.1 | Lower Level Plan, R |
| A2.2 | Main Floor Plan, R |
| A2.2a | Main Floor Plan, Detail References, R |
| A2.3 | Mezzanine Level Plan, R |
| A2.4 | Mechanical Level plan, R |
| A2.5 | Catwalk Level Plan, R |
| A2.6 | Roof Plan, R |
| A2.7 | Partial Building A Basement Plan, W |
| A2.8 | First Floor Plan, W |
| A2.8a | First Floor Plan, Section, Detail References, W |
| A2.9 | Second Floor Plan, W |
| A2.9a | Second Floor Plan, Section, Detailed References, W |
| A2.10 | Third Floor Plan, W |
| A2.10a | Third Floor Plan, Section, Detailed References, W |
| A2.10 | Roof Plan, W |
| A3.1 | Lower Level Reflected Ceiling Plan, R |
| A3.2 | Main Floor Reflected Ceiling Plan, R |
| A3.3 | Mezzanine Level Reflected Ceiling Plan, R |
| A3.4 | Mechanical Level Reflected Ceiling Plan, R |
| A3.5 | Catwalk Level Reflected Ceiling Plan, R |
| A3.6 | Partial Building A Basement Reflected Ceiling Plan, R |
| A3.7 | First Floor Reflected Ceiling Plan, W |
| A3.8 | Second Floor Reflected Ceiling Plan, W |
| A3.9 | Third Floor Reflected Ceiling Plan, W |

16

From: Marilyn Rad At: Insurance Resource Consultants  FaxID: Insurance Resource C  To: Michelle Leconey          Date: 06/26/37  11.55 AM  Page: 75 of 87

Case 1:08-cv-02991     Document 1-4     Filed 05/22/2008     Page 32 of 44

<u>SCHEDULE B continued;</u>

**VOLUME 1**
<u>Architectural continued;</u>

| | |
|---|---|
| A5.1 | North and East Elevations, R |
| A5.2 | South and West Elevations, R |
| A5.3 | Elevations, W |
| A5.4 | Enlarged Elevations |
| A5.5 | Enlarged Elevations |
| A6.1 | Building Sections, R |
| A6.2 | Building Sections, R |
| A6.3 | Building Sections, R |
| A6.4 | Building Sections, W |
| A6.5 | Building Sections, W |
| A7.1 | Wall Sections, W |
| A7.2 | Wall Sections, W |
| A7.3 | Wall Sections, W |
| A7.4 | Wall Sections, W |
| A7.5 | Wall Sections, W |
| A7.6 | Wall Sections, W |
| A7.7 | Wall Sections, W |
| A7.8 | Wall Sections, W |
| A7.9 | Wall Sections, R |
| A7.10 | Wall Sections, R |
| A7.11 | Wall Sections, R |
| A7.12 | Wall Sections, R |
| A8.1 | Enlarged Toilet Plans |
| A9.1 | Enlarged Stair Plans, R |
| A9.2 | Enlarged Plans and Misc. Sections, R |
| A9.3 | Enlarged Stair Plans, W |
| A9.4 | Enlarged Elevator Plans |
| A9.5 | Stair Sections, R |
| A9.6 | Stair Sections, R |
| A9.7 | Stair Sections and Details, W |
| A9.8 | Stair Sections, W |
| A9.9 | Sections, R & W |
| A9.10 | Elevator Sections, R & W |
| A9.11 | Elevator Sections, R |
| A10.1 | Enlarged Plans |
| A10.2 | Geometry Plan |
| A11.1 | Interior Elevations, R |
| A11.2 | Bathroom Elevations, R & W |
| A11.3 | Interior Elevations, R |
| A11.4 | Interior Elevations, W |
| A11.5 | Interior Elevations, W |
| A12.1 | Details |
| A12.2 | Details |
| A12.3 | Details |
| A13.1 | Alternate G-1, W |
| A13.2 | Alternate G-2, R |
| A13.3 | Alternate G-4, R |

From: Marilyn Rad, At: Insurance Resource Consultants  FaxID: Insurance Resource C  To: Michelle Leconey  Date: 06/20/07  11:55 AM  Page: 76 of 87

Case 1:08-cv-02991   Document 1-4   Filed 05/22/2008   Page 33 of 44

## SCHEDULE B continued:

### VOLUME 1

#### Structural

| | |
|---|---|
| S0.0 | General Notes |
| S1.1 | Foundation & Lower Level Plan, R |
| S1.2 | Main Floor Plan, R |
| S1.3 | Mezzanine Floor Plans, R |
| S1.4 | Mechanical Floor & Low Roof Plans, R |
| S1.5 | Catwalk & Mechanical Room Roof Plans, R |
| S1.6 | Auditorium & Mechanical Room Roof Plans, R |
| S1.7 | Grid Iron & Stage Roof Plans, R |
| S2.1 | Basement & Foundation Plan, W |
| S2.2 | Main Level Plan, W |
| S2.3 | Second Floor Framing Plan, W |
| S2.4 | Third Floor Framing Plan, W |
| S2.5 | Roof Framing Plan, W |
| S3.1 | Column Schedules |
| S3.2 | Bracing Sections & Elevations, R |
| S3.3 | Bracing Sections & Elevations, W |
| S4.1 | Foundation Sections & Details |
| S4.2 | Foundation Sections & Details |
| S4.3 | Slab Sections & Details |
| S4.4 | Concrete Sections & Details |
| S5.1 | Steel Sections & Details |
| S5.2 | Steel Sections & Details |
| S5.3 | Steel Sections & Details, R |
| S5.4 | Steel Sections & Details, W |
| S5.5 | Steel Sections & Details |

#### Stage Equipment

| | |
|---|---|
| SE1.1 | Stage Rigging Plan, R |
| SE1.2 | Stage Rigging Section, R |
| SE1.3 | Stage Rigging Fire Curtain Elevation, R |
| SE1.4 | Stage Rigging Lineset Elevation, R |
| SE1.5 | Stage Rigging Proscenium Elevation, R |
| SE2.1 | Platform Details, R |
| SE2.2 | Stage Rigging System Detail, R |
| SE2.3 | Stage Rigging System Detail, W |
| SE2.4 | Gridiron Layout, R |

From: Marilyn Rad At: Insurance Resource Consultants FaxID: Insurance Resource C To: Michelle Leconey    Date: 06/20/07 11:55 AM Page: 77 of 87

Case 1:08-cv-02991    Document 1-4    Filed 05/22/2008    Page 34 of 44

**SCHEDULE B continued;**

**VOLUME 2**

**General**

G-1B            Cover Sheet

**Mechanical - Heating**

| | |
|---|---|
| H1.11 | Main Level Plan-Heating-Performing Arts |
| H1.21 | Mezzanine Level Plan-Heating-Performing Arts |
| H1.31 | Mechanical Level Plan-Heating-Performing Arts |
| H1.41 | Steam Piping Plan-Heating-Performing Arts |
| H1.51 | Piping System Sketch-Heating & Cooling-Performing Arts |
| H1.60 | Large Scale Plan-Heating-Performing Arts |
| H1.61 | Piping Diagrams-Heating-Performing Arts |
| H1.71 | Details-Heating-Performing Arts |
| H1.72 | Details-Heating-Performing Arts |
| H1.73 | Details-Heating-Performing Arts |
| H1.74 | Details-Heating-Performing Arts |
| H1.75 | Details-Heating-Performing Arts |
| H1.81 | Symbols and Abbreviations-Heating-Performing Arts |
| H1.82 | Symbols and Abbreviations-Heating-Performing Arts |
| H1.91 | Schedules-Heating-Performing Arts |
| H1.92 | Schedules-Heating-Performing Arts |
| H2.01 | Basement Plan-Heating-Conference Center |
| H2.11 | First Floor Plan-Heating-Conference Center |
| H2.21 | Second Floor Plan-Heating-Conference Center |
| H2.31 | Third Floor Plan-Heating-Conference Center |
| H2.41 | Piping System Sketch-Heating & Cooling-Conference Center |
| H2.51 | Schedules-Heating-Conference Center |
| H2.52 | Schedules-Heating-Conference Center |
| H2.61 | Notes, Symbols and Abbreviations-Heating-Conference Center |
| H2.62 | Details-Heating-Conference Center |
| H2.63 | Details-Heating-Conference Center |
| H2.64 | Details-Heating-Conference Center |
| H2.65 | Details-Heating-Conference Center |
| H2.66 | Details-Heating-Conference Center |

**Mechanical – Ventilation**

| | |
|---|---|
| V1.01 | Lower Level Plan-Ventilation-Performing Arts |
| V1.11 | Main Level Plan-Ventilation-Performing Arts |
| V1.21 | Mezzanine Level Plan-Ventilation-Performing Arts |
| V1.31 | Mechanical Level Plan-Ventilation-Performing Arts |
| V1.41 | Catwalk Level Plan-Ventilation-Performing Arts |
| V1.51 | Roof Plan-Ventilation-Performing Arts |
| V1.60 | Large Scale Plan-Ventilation-Performing Arts |
| V1.71 | Details-Ventilation-Performing Arts |
| V1.72 | Details-Ventilation-Performing Arts |
| V1.81 | Symbols and Abbreviations-Ventilation-Performing Arts |
| V1.82 | Symbols and Abbreviations -Ventilation-Performing Arts |

19

From: Marilyn Rad At: Insurance Resource Consultants FaxID: Insurance Resource C To: Michelle Leconey    Date: 06/20/07 11:55 AM Page: 78 of 67

Case 1:08-cv-02991    Document 1-4    Filed 05/22/2008    Page 35 of 44

**SCHEDULE B continued;**

**VOLUME 2**

**Mechanical – Ventilation continued;**

V1.91        Schedules-Ventilation-Performing Arts
V1.92        Schedules-Ventilation-Performing Arts
V1.93        Schedules-Ventilation-Performing Arts
V2.01        Basement Plan-Ventilation-Conference Center
V2.11        First Floor Plan-Ventilation-Conference Center
V2.21        Second Floor Plan-Ventilation-Conference Center
V2.31        Third Floor Plan-Ventilation-Conference Center
V2.41        Partial Floor Plan-Ventilation-Conference Center
V2.51        Schedules-Ventilation-Conference Center
V2.52        Schedules-Ventilation-Conference Center
V2.53        Schedules-Ventilation-Conference Center
V2.61        Notes, Symbols and Abbreviations-Ventilation-Conference Center
V2.62        Details-Ventilation-Conference Center

**Plumbing**

P1.01        Under Floor Lower Level Plan-Plumbing-Performing Arts
P1.02        Lower Level Plan-Plumbing-Performing Arts
P1.11        Under Floor Main Level Plan-Plumbing-Performing Arts
P1.12        Main Level Plan-Plumbing-Performing Arts
P1.21        Mezzanine Level Plan-Plumbing-Performing Arts
P1.31        Mechanical Level Plan-Plumbing-Performing Arts
P1.41        Catwalk Level Plan-Plumbing-Performing Arts
P1.51        Enlarged Roof Plans-Plumbing-Performing Arts
P1.52        Riser Diagrams-Plumbing-Performing Arts
P1.53        Riser Diagrams-Plumbing-Performing Arts
P1.61        Details-Plumbing-Performing Arts
P1.62        Details-Plumbing-Performing Arts
P1.63        Details-Plumbing-Performing Arts
P1.71        Schedules, Notes, Symbols and Abbreviations-Plumbing-Performing Arts
P2.01        Basement Plan-Plumbing-Conference Center
P2.11        Under Floor First Floor Plan-Plumbing-Conference Center
P2.21        Second Floor Plan-Plumbing-Conference Center
P2.31        Third Floor Plan-Plumbing-Conference Center
P2.41        Enlarged Floor Plans-Plumbing-Conference Center
P2.42        Riser Diagrams-Plumbing-Conference Center
P2.43        Riser Diagrams-Plumbing-Conference Center
P2.51        Details-Plumbing-Conference Center
P2.52        Details-Plumbing-Conference Center
P2.61        Schedules, Notes, Symbols and Abbreviations- Plumbing-Conference Center

From: Marilyn Rad At: Insurance Resource Consultants  FaxID: Insurance Resource C  To: Michelle Leconey    Date: 06/20/07  11:55 AM  Page: 79 of 87

Case 1:08-cv-02991     Document 1-4     Filed 05/22/2008     Page 36 of 44

## SCHEDULE B continued;

## VOLUME 2

### Fire Protection

| | |
|---|---|
| FP1.01 | Lower Level Plan-Fire Protection-Performing Arts |
| FP1.11 | Main Level Plan-Fire Protection-Performing Arts |
| FP1.21 | Mezzanine Level Plan-Fire Protection-Performing Arts |
| FP1.31 | Mechanical Level Plan-Fire Protection-Performing Arts |
| FP1.41 | Catwalk Level Plan-Fire Protection-Performing Arts |
| FP1.51 | Details-Fire Protection-Performing Arts |
| FP1.61 | Notes, Symbols and Abbreviations-Fire Protection-Performing Arts |
| FP2.01 | Basement Plan-Fire Protection-Conference Center |
| FP2.11 | First Floor Plan-Fire Protection-Conference Center |
| FP2.21 | Second Floor Plan-Fire Protection-Conference Center |
| FP2.31 | Third Floor Plan-Fire Protection-Conference Center |
| FP2.41 | Details-Fire Protection-Conference Center |
| FP2.51 | Notes, Symbols and Abbreviations-Fire Protection-Conference Center |

## VOLUME 3

### General

| | |
|---|---|
| G-1C | Cover Sheet |

### Electrical

| | |
|---|---|
| E1.0 | Electrical Site Plan-Performing Arts |
| E1.1 | Lower Level Plan-Power-Performing Arts |
| E1.2 | Main Level Plan-Power-Performing Arts |
| E1.3 | Mezzanine Level Plan-Power-Performing Arts |
| E1.4 | Mechanical Level Plan-Power-Performing Arts |
| E1.5 | Catwalk Level Plan-Power-Performing Arts |
| E1.6 | Chiller Room (Roof) Plan- Power-Performing Arts |
| E2.1 | Lower Level Plan- Lighting-Performing Arts |
| E2.2 | Main Level Plan- Lighting-Performing Arts |
| E2.3 | Mezzanine Level Plan- Lighting-Performing Arts |
| E2.4 | Mechanical Level Plan- Lighting-Performing Arts |
| E2.5 | Catwalk Level Plan-Lighting-Performing Arts |
| E3.1 * | Floor Plan-Power-Art Gallery |
| E3.2 * | Floor Plan-Lighting-Art Gallery |
| E4.1 | Symbol List-Performing Arts |
| E4.2 | Light Fixture Schedule-Performing Arts |
| E4.3 | Electrical One-Line Diagram-Performing Arts |
| E4.4 | Diagrams-Performing Arts |
| E4.5 | Panels-Performing Arts |
| E4.6 | Panels-Performing Arts |
| E4.7 | Details-Performing Arts |
| E4.8 | Details-Performing Arts |
| E4.9 | Distribution Panels-Performing Arts |
| E4.10 | Panels-Performing Arts |
| E4.11 | Panels-Performing Arts |
| E4.12 | AVV System Diagram-Performing Arts |

From: Marilyn Rad At: Insurance Resource Consultants  FaxID: Insurance Resource C  To: Michelle Lettoney          Date: 06/20/07 11:55 AM Page: 80 of 87

Case 1:08-cv-02991    Document 1-4    Filed 05/22/2008    Page 37 of 44

**SCHEDULE  B continued;**

**VOLUME 3**

**Electrical continued;**

| | |
|---|---|
| E5.0 | Electrical Site Plan-Conference Center |
| E5.1 | Basement Plan-Power-Conference Center |
| E5.2 | First Floor Plan-Power-Conference Center |
| E5.3 | Second Floor Plan-Power-Conference Center |
| E5.4 | Third Floor Plan-Power-Conference Center |
| E6.1 | Basement Plan-Lighting-Conference Center |
| E6.2 | First Floor Plan-Lighting-Conference Center |
| E6.3 | Third Floor Plan-Lighting-Conference Center |
| E6.4 | Symbol List-Conference Center |
| E7.1 | Second Floor Plan-Lighting-Conference Center |
| E7.2 | Light Fixture Schedule-Conference Center |
| E7.3 | Electrical One-Line Diagram-Conference Center |
| E7.4 | Diagrams-Conference Center |
| E7.5 | Panels-Conference Center |
| E7.6 | Panels-Conference Center |
| E7.7 | Details-Conference Center |
| E7.8 | Details-Conference Center |
| E7.9 | Distribution Panels-Conference Center |
| E7.10 | Panels-Conference Center |
| E7.11 | Panels-Conference Center |
| E7.12 | AVV System Diagram-Conference Center |

**Communications**

| | |
|---|---|
| COM1.0 | Tunnel-Communications-Performing Arts |
| COM1.1 | Lower Level Plan-Communications-Performing Arts |
| COM1.2 | Main Level Plan-Communications-Performing Arts |
| COM1.3 | Mezzanine Level Plan-Communications-Performing Arts |
| COM1.4 | Mechanical Level Plan-Communications-Performing Arts |
| COM1.5 | Catwalk Level Plan-Communications-Performing Arts |
| COM2.1 | Floor Plan-Communications-Art Gallery |
| COM3.1 | Symbol List-Performing Arts |
| COM3.2 | Details-Performing Arts |
| COM3.3 | Details-Performing Arts |
| COM4.0 | Tunnel Plan-Communications-Conference Center |
| COM4.1 | Basement Plan Communications-Conference Center |
| COM4.2 | First Floor Plan-Communications-Conference Center |
| COM4.3 | Second Floor Plan- Communications-Conference Center |
| COM4.4 | Third Floor Plan- Communications-Conference Center |
| COM5.1 | Symbol List-Conference Center |
| COM5.2 | Details-Conference Center |
| COM5.3 | Details-Conference Center |

**Detail Book**
See Detail Book for Referenced Details
All drawings dated October 4, 1999

22

From: Marilyn Rad At: Insurance Resource Consultants FaxID: Insurance Resource C To: Michelle Leconey        Date: 06/20/0. 11:55 AM Page: 81 of 87

Case 1:08-cv-02991      Document 1-4      Filed 05/22/2008      Page 38 of 44

## SCHEDULE C

### PAYMENT SCHEDULE:

Item _____ Base Contract Amount (including addenda, if applicable)

**Aluminum Windows, Entrances, Storefront,
Revolving Entrance Doors, and Glass and Glazing ..............................................$545,000.00**

From: Marilyn Rad At: Insurance Resource Consultants FaxID: Insurance Resource C To: Michelle Leconey    Date: 06/20/07, 11:55 AM Page: 82 of 87

Case 1:08-cv-02991    Document 1-4    Filed 05/22/2008    Page 39 of 44

## SCHEDULE D

**INSURANCE:**

Before commencing work under this contract, the **Subcontractor** shall procure and maintain insurance covering all operations under this Agreement, whether performed by the **Subcontractor** or **Subcontractor's** third tier subcontractors. All insurers shall be licensed by the State of Illinois and rated A-10 or better by A.M. Best or Comparable rating service. **Subcontractor** shall submit a Certificate of Insurance in accordance with requirements listed below and as per sample certificate.

- Certificate shall evidence the CDB project number and CDB contract number of the project.
- Certificate shall evidence F.H. Paschen/S.N. Nielsen, Inc., CDB and the Using Agency are included as additional insured for the occurrence's arising, in the whole or in part, out of the work and operations performed. Coverage provides that the additional insured shall be on a primary non-contributory basis. (This does not apply to Worker's Compensation.)
- Certificate shall evidence that the policies will not be canceled, changed or altered until at least ten (30) calendar days prior written notice has been given to F.H. Paschen/S.N. Nielsen, Inc. and the CDB unless the same is stated in the policy provision.
- Certificate shall evidence that "The coverage and limits conform to the minimums required by Para. 00650.7 and Article 00655 of CDB's Standard Documents for Construction". Any exception or deviation shall be brought to the attention of CDB for a ruling on acceptability.
- Certificate shall evidence that The Worker Compensation Insurer Waives its Right of Subrogation to F.H. Paschen/S.N. Nielsen, Inc. The CDB and the Using Agency.

1. Worker's Compensation and Employers' Liability insurance affording compensation benefits for all employees as required by law and employers' liability insurance with limits of One Million and 00/100 Dollars, ($500,000.00) for accident or disease. Worker's Compensation Insurer shall waive its right of subrogation.

2. Commercial General Liability Insurance with a combined single limit of One Million and 00/100 Dollars, ($2,000,000.00) per occurrence for personal injury, (including wrongful death), and property damage liability. Coverage shall include Contractual Liability to cover the "Hold Harmless" clause of this contract. Policy shall include coverage for claims due to explosion, collapse, or damage to underground utilities or property. Policy shall include Personal Injury with the Employee Exclusion deleted, Broad Form Property Damage coverage, Independent Contractors coverage and Products / Completed Operations coverage. **Subcontractor** shall provide continuous Products/Completed Operations coverage for two years after Final Acceptance of the completed work by the Commission. Policy shall also contain a Severability of Interests clause for all Additional Insureds, with no cross liability suits exclusion.

3. Commercial Automobile Liability Insurance with a combined single limit of One Million and 00/100 Dollars, ($1,000,000.00) per accident for bodily injury, (including wrongful death), and property damage liability arising from owned, non-owned and hired automobiles.

4. Umbrella or Excess Liability Insurance with limits not less than Two Million Dollars, ($2,000,000.00) per occurrence which will provide additional limits for employers' general liability and automobile liability insurance.

From: Marilyn Rad At: Insurance Resource Consultants FaxID: Insurance Resource C To: Michelle Leconey    Date: 06/20/07 11:55 AM Page: 83 of 87

Case 1:08-cv-02991     Document 1-4     Filed 05/22/2008     Page 40 of 44

## SCHEDULE D continued;

5.  F.H. Paschen/S.N. Nielsen, Inc. shall provide All Risk Property Insurance for this project. This insurance shall be subject to a per occurrence deductible. It shall be the responsibility of the covered subcontractor to bear the expense of the deductible as it may apply to their covered loss. If a loss involves more than one insured, the deductible shall be pro-rated among the claimants based upon the percentage their loss bears to the entire eligible loss. All payments for loss under the Builders Risk policy shall be subject to the terms and conditions of the policy. Copies of the coverage will be provided upon written request of the Subcontractor.

6.  "The All Risk Property Insurance shall not cover any tools, apparatus, machinery, scaffolding, hoists, forms, staging, shoring and other similar items commonly referred to as construction equipment, which may be on the Project site and the capital value of which is not included in the Work. Subcontractor shall make their own arrangements for any insurance they may require on such construction equipment."

7.  Professional Liability. When any architects, engineers or consulting firms perform work in connection with the subcontract, Professional Liability insurance shall be maintained with limits of **$1,000,000**. The policy shall have an extended reporting period of two years. When policies are renewed or replaced, the policy retroactive date must coincide with, or precede, start of work pursuant to the contract.

8.  If Subcontractor's work includes cleanup, removal, storage or otherwise handling of hazardous or toxic chemicals, materials, substances, or any other pollutants the Subcontractor shall provide at their expense Contractor Pollution Liability Insurance appropriate to cover such activities in an amount not less than **$1,000,000** Combined Single Limit per occurrence / aggregate for bodily injury, property damage and remediation. Claims Made policies will include an extended reporting period of two (2) years. The policy for this insurance shall include Contractual Liability coverage. Such policy shall be endorsed to specifically provide for Work performed under the Contract, and shall extend to all third tier subcontractors engaged in hazardous material work. **THE OWNER AND CONTRACTOR**, are to be named on a primary, non-contributory basis.

9.  Subcontractor shall have its general liability insurance endorsed to provide that **F.H. Paschen / S.N. Nielsen, Inc. , CDB and the Using Agency**, are to be covered as Additional Insureds with respect to liability arising out of activities performed by or on behalf of the Subcontractor; products and completed operations of the Subcontractor; and automobiles owned , hired, leased, or borrowed by the Subcontractor. The coverage shall contain no special limitations on the scope of protection afforded to Additional Insureds. The insurance afforded the Additional Insureds shall be primary over any other valid or collectible insurance that the Additional Insureds may have with respect to loss under this policy. Other insurance of any Additional Insured applicable to loss is excess over this endorsement, and the amount of the Company's liability under this policy shall not be reduced by the existence of such other insurance, provided, however, that this paragraph does not apply (I) to loss caused solely by the negligence of such Additional Insureds, or (ii) to liability of the Architects, Consultants and Engineers, and their agents or employees arising out of (1) the preparation or approval of maps, drawings, opinions, reports, surveys, change orders, designs, or specifications; or (2) the giving of or the failure to give directions or instructions by the Architect, its agents or employees provided such giving or failure to give is the primary cause of the injury or damage.

Subcontractor hereby waives all of its rights of subrogation against the Additional Insureds.

From: Marilyn Rad At: Insurance Resource Consultants  FaxID: Insurance Resource C  To: Michelle Leconey     Date: 05/20/07  11:55 AM  Page: 84 of 87

Case 1:08-cv-02991     Document 1-4     Filed 05/22/2008     Page 41 of 44

## SCHEDULE E

**AFFIRMATIVE ACTION:** F.H. Paschen/SN Nielsen, Inc. is an equal opportunity employer and does not discriminate against any citizen with regard to race, creed, color, religion, ancestry, national origin, physical handicap, medical condition, martial status, Vietnam Era Veterans status, or gender. We agree to put forth the maximum effort to achieve the goals set forth by the Federal Government. Each subcontractor is to cooperate with our efforts at all times. All Federal, State, City, County and Local Agency Laws, Rules and Regulations, and Executive Orders pertaining to Equal Opportunity and Minority Utilization, that may be applicable to this project are herein incorporated by reference, and this Subcontractor agrees to be bound by same, to the extent that such Laws, Rules and Regulations apply. Per Executive Order No. 10925, all subcontractors shall not discriminate against any worker, employee, or applicant for employment because of race, creed, color, or national origin. The Subcontractor's attention is directed to *the Civil Rights Act of 1964 (P.L.88-352);* provisions of Executive Order No. 10925 of March 6, 1961, as amended, and of the rules, regulations and relevant orders of *the President's Committee on Equal Employment Opportunity* created thereby; *the Illinois Human Rights Act,* as amended (775 ILCS 5/1-101 et seq.); the *Chicago Human Rights Ordinance* (Municipal Code of Chicago Sec. 2-160-010 et seq.); and the *Commission on Human Relations* created by ordinance passed December 12, 1947, as amended, (Municipal Code of Chicago Sec. 2-120-480 et seq.); *the American Disabilities Act of 1990, 42 U.S.C. 12010 et seq.*

- **Fair Employment Practices (FEP)** Capitol Development Board (CDB) encourages minority and female tradeworker participation on this project. In an effort to monitor their participation, it is necessary for each Subcontractor to submit a "Daily Jobsite Workforce Form". The Daily Jobsite Workforce Form, together with your Weekly Certified Payroll, must be received by the FHP/SNN no later than (5) days following the payroll weekending date. In the event a subcontractor is unable to achieve the goals established for this project, Karen Howell, EEO Compliance Officer for FHP/SNN, is available to provide assistance in identifying recruitment sources as well as the proper documentation of any "good faith efforts" undertaken. The minority and female tradeworker participation goals for this project are specified in  **Attachment No. 2** for this Subcontract Agreement.

- **Weekly Certified Payroll Reports** - (US Department of Labor Form WH-346 or equivalent) Weekly Certified Payroll Reports must be submitted in triplicate to the F.H. Paschen/SN Nielsen, Inc. Weekly Certified Payrolls must contain all information required by the Owner. The first time that the employee's name appears on a payroll, note the date that the company hired the employee, clearly identify the actual residence of every employee including zip code. Be sure to include consecutive payroll numbers, as well as week ending dates. "No Work" payrolls must also be submitted for any week work is not performed on the project. The last payroll must indicate FINAL. The Subcontractor shall maintain all relevant personnel data for a period of at least three (3) years after final acceptance of the work.

- **Monthly Manpower Utilization Report Form (MMUR)** – The MMUR is used to report the number of employees and the hours worked on the jobsite. The left side of the form is used to report the total number of employees by trade category and ethnicity/gender. On the right side of the form, the total number of hours worked by **all** employees by trade category should be reported in the total hour's column. Minority/female employee hours should be deducted from the total hours and reported under the appropriate heading by trade category. On the backside of the form, please identify in the upper right corner, your firm name and mailing address. Also, please identify each subcontractor who performed work during the reporting period.

26

From: Marilyn Rad At Insurance Resource Consultants FaxID: Insurance Resource C To: Michelle Leconey          Date: 06/20/07 11:55 AM Page: 85 of 87

Case 1:08-cv-02991     Document 1-4     Filed 05/22/2008     Page 42 of 44

## SCHEDULE F

<u>ADDITIONAL PROVISIONS:</u>

-   All Subcontractors agree to comply with all Harper College Security Requirements.

-   All deliveries must be scheduled in advance with F.H. Paschen/SN Nielsen field personnel.

-   The nature and complexity of this project may require multiple mobilizations of crews, materials, and equipment. It is each Subcontractor's specific responsibility to review their scope of work and provide the appropriate planning and preparation necessary to coordinate their work with that of the other trade subcontractors involved with this project. All costs associated with this planning and coordination have been included in this subcontract agreement. All contract interim milestone dates as established in writing by Contractor and agreed to by subcontractor are contractually binding. Failure to complete the work by the published date carries the same penalties set forth in the contract documents for final completion.

-   All utility shutdowns of existing Harper College facilities must be approved by the Owner in writing. Subcontractor may be required to provide a shutdown request on forms provided by the Contractor or Owner.

-   Upon approval by the Owner, the formal project schedule will be incorporated as part of the terms and conditions of this subcontract agreement.

-   The subcontractor agrees to provide all hoisting related to the completion of their scope of work. The subcontractor also agrees to provide secured storage of their tools, equipment, and materials on a daily basis. Ensuring new materials and equipment delivered to the jobsite, but not yet installed, are kept free from damage, theft, or vandalism is the responsibility of each subcontractor.

-   This project, like any other construction project, will require each subcontractor to coordinate and cooperate with many other trades on a daily basis as their particular scope of work is performed. Subcontractor personnel working on this project are required to be courteous, cooperative, and respectful at all times to all FHP/SNN employees, architect/engineer representatives, and other subcontractor personnel. FHP/SNN reserves the right to remove/dismiss subcontractor personnel from the project who demonstrate an inability to remain courteous and cooperate with others as this project progresses.

-   The Subcontractor/Material Supplier agrees to provide <u>complete</u> submittals, shop drawings, samples, mock-ups, or any other item requiring approval, within two weeks from the issue date of this subcontract agreement. Some exceptions may be anticipated based on Subcontractor's specific scope of work.

-   All Subcontractors and Material Suppliers agree to comply with all local codes, including, but not limited to those listed in Specification Section 01060, Regulatory Requirements.

From: Marilyn Rad At: Insurance Resource Consultants FaxID: Insurance Resource C   To: Michelle Leconey     Date: 06/20/07  11:55 AM  Page: 86 of 87

Case 1:08-cv-02991     Document 1-4     Filed 05/22/2008     Page 43 of 44

## SCHEDULE F continued:

-    In accordance with Division 1 - General Requirements – Sections 01340, 01730, 01740, extensive submittal and closeout documentation is required as part of this subcontract. This includes all specified product submittal data, samples, shop drawings, reproducible "Mylar" copies of shop drawings, as-built drawings, operation & maintenance manuals, product warranties & bonds, spare parts, and closeout submittals. As-built drawings must be corrected to reflect actual as-built conditions. At the discretion of the Contractor, computer-aided-design (CAD) disks/compact discs may be an added requirement for certain as built and shop drawing submittals. Neither final payment, nor reduction in retention less than 5% will be made until all requirements have been satisfied.

-    In the event that liquidated damages or similar monetary penalties are assessed on this project, each subcontractor found to not be in compliance with their contractual requirements will be responsible for their appropriate share of damages assessed.

-    This subcontract agreement represents the complete agreement between the Contractor and the Subcontractor, and the Subcontractor acknowledges that there exists no other agreement or understanding between the two parties which varies in any manner from the requirement of the Subcontract as stated herein.

-    Any shop drawings, descriptive literature, or request for changes not submitted in accordance with the procedures outlined by the specifications will be rejected and the subcontractor will be required to furnish and install equipment and/or materials as originally specified.

-    All Federal, State, City, County and Local Agency Laws, Rules and Regulations, and Executive Orders pertaining to Equal Opportunity and Minority Utilization, that may be applicable to this project are herein incorporated by reference, and this Subcontractor agrees to be bound by same, to the extent that such Laws, Rules and Regulations apply.

-    All Subcontractors shall be required to provide all forms and information as required by the Contract Documents. Failure to provide such documents in a timely manner shall be cause for the withholding of progress payments.

-    Subcontractors are required to clean up daily. The project site shall be maintained in a neat, safe, and orderly manner and kept free and clear of accumulation of waste materials and rubbish during the entire construction period.

-    Daily work reports indicating scope of work performed and number of employees on site are required of all subcontractors each day. Failure to provide such documentation in a timely manner shall be cause for the withholding of progress payments.

-    Subcontractor shall be required to submit for each trade all written guarantees, warranties, statements of application and bonds per Contract Documents for the work being performed under this agreement.

-    All Subcontractor procedures, as well as the required CDB forms, are included in the *"Subcontractor's Administrative Procedures"* ( Attachment No. 1)

From: Marilyn Rad At Insurance Resource Consultants FaxID: Insurance Resource C To: Michelle Leconey    Date: 06/20/07 11:55 AM Page: 87 of 87

Case 1:08-cv-02991    Document 1-4    Filed 05/22/2008    Page 44 of 44

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that a true and correct copy of the foregoing

THIRD PARTY COMPLAINT OF DEFENDANT/THIRD-PARTY PLAINTIFF F.H.

PASCHEN, S.N. NIELSEN, INC.was served upon:

     Kenneth M. Florey
     Samuel A. Cavnar
     Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd.
     20 North Clark Street
     Suite 900
     Chicago, Illinois 60602
     (312) 332-7760
     (312) 332-7768(fax)
     Attorneys for Plaintiffs

     Laurie Randolph
     Donald A. O'Brien
     Hinshaw Culbertson, LLP
     222 North LaSalle Street
     Suite 300
     Chicago, Illinois 60601
     (312) 704-3000
     (312) 704-3001 (fax)
     Attorneys for Burnidge, Cassell

by placing same in a properly addressed stamped envelope and causing same to be mailed via United

States mail on this 5th day of June, 2007.



                            Ellen B. Epstein

08CV2991 EDA
JUDGE GUZMAN
MAGISTRATE JUDGE BROWN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

HOMELAND CENTRAL INSURANCE              )
COMPANY F/K/A HAWKEYE SECURITY          )
INSURANCE COMPANY (IA) AS               )
TRANSFEREE OF WESTERN STATES            )
INSURANCE COMPANY, BY ITS               )
TRANSFEREE ONEBEACON INSURANCE          )
COMPANY,                                )        No.:
                                        )
            Plaintiff,                  )
                                        )
vs.                                     )
                                        )
TUSCHALL ENGINEERING COMPANY,           )
INC., F.H. PASCHEN, S.N. NIELSEN, INC., )
                                        )
            Defendants.                 )
                                        )
                                        )

## EXHIBIT "C" – PART 1

## TO COMPLAINT FOR DECLARATORY RELIEF

121214502v1 886033

04-0076-00

**RENEWAL PERIOD:** 12:01 A.M. standard time at the address of the named insured as stated herein

01-23-2001 **TO** 01-23-2002

**ESTERN STATES INSURANCE COMPANY**
P O BOX 860
FREEPORT IL 61032-0860

**GENERAL LIABILITY**
**RENEWAL CERTIFICATE**

**POLICY NUMBER**
WAL2-054489-12
AGENCY BILL

**EFFECTIVE**
01-23-2001

**ATTACH THIS RENEWAL CERTIFICATE TO YOUR POLICY**

COMMERCIAL GENERAL LIABILITY COVERAGE PART
RENEWAL CERTIFICATE

**ITEM ONE**

| **NAMED INSURED AND MAILING ADDRESS** | **AGENT** | **PHONE:** 847/498-6600 |
|---|---|---|

TUSCHALL ENGINEERING CO INC
15W700 79TH STREET
BURR RIDGE, IL 60521

INSURANCE RESOURCE CONSULTANTS
60 REVERE DR STE 360
NORTHBROOK, IL 60062

TYPE OF BUSINESS: METAL SIDING CONTRACTOR
FORM OF BUSINESS: CORPORATION

**COMPANY USE**

94 150 102 340 38 1 1 17 AB R

Prior Policy Number  R-054489

In return for the payment of the renewal premium, and subject to all the terms of this policy, including forms and endorsements listed below, we agree with you to provide the insurance in the renewal certificate for the renewal period shown above.

## Limits of Insurance

| | | |
|---|---|---|
| General Aggregate Limit - Other than Products / Completed Operations | $ | 2000,000 |
| Aggregate Limit - Products / Completed Operations | $ | 1000,000 |
| Personal and / or Advertising Injury Limit | $ | 1000,000 |
| Each Occurrence Limit | $ | 1000,000 |
| Fire Damage Limit (Any one fire) | $ | 100,000 |
| Medical Expense Limit (Any one person) | $ | 5,000 |

## Coverages Provided

**PREMIUM**

| | | |
|---|---|---|
| Products / Completed Operations | $ | 1,140.00 |
| Other than Products / Completed Operations | $ | 2,015.00 |
| Total Estimated Policy Premium | $ | 3,155.00 |

★ ★   SEE ATTACHED SCHEDULE FOR LOCATION OF ALL PREMISES   ★ ★
★ ★             OWNED, RENTED OR OCCUPIED             ★ ★

Policywide forms and endorsements:   SEE IL 9 00 93 10 94

DATE ISSUED: 11-30-2000          COUNTERSIGNED BY: _____

CG 2 00 92 05 95

MLP/PM

WAL2-054489-12

**INTERLINE**
**IL 9 00 93 10 94**

## COMMERCIAL INSURANCE COVERAGE
## SCHEDULE OF FORMS AND ENDORSEMENTS

The following forms and endorsements are applicable to this policy:

| FORM/ENDORSEMENT | DESCRIPTION |
|---|---|
| CG 04 31 09 98 | YEAR 2000 COMPUTER-RELATED AND OTHER ELECTRONIC PROBLEMS-LIMITED COVERAGE OPTIONS |
| CG 20 32 07 98 | ADDITIONAL INSURED-ENGINEERS, ARCHITECTS OR SURVEYORS NOT ENGAGED BY THE NAMED INSURED |
| CG 25 03 03 97 | DESIGNATED CONSTRUCTION PROJECT(S) GENERAL AGGREGATE LIMIT |
| IL 9 04 79 10 97 | EMPLOYEE BENEFITS LIABILITY COVERAGE |
| IL 9 12 98 11 97 | AMENDMENT OF THE DECLARATIONS PAGE TO COMPLETE, CORRECT OR CHANGE YOUR NAME AND/OR ADDRESS |
| CG 00 01 07 98 | COMMERCIAL GENERAL LIABILITY COVERAGE FORM  (OCCURRENCE VERSION) |
| CG 02 00 04 87 | ILLINOIS CHANGES - CANCELLATION AND NONRENEWAL |
| CG 2 00 01 01 96 | COMMERCIAL GENERAL LIABILITY POLICY - QUICK REFERENCE |
| CG 20 33 07 98 | ADDITIONAL INSURED-OWNERS, LESSEES OR CONTRACTORS-AUTOMATIC STATUS WHEN REQUIRED IN CONSTRUCTION AGREEMENT W/YOU |
| CG 21 47 07 98 | EMPLOYMENT RELATED PRACTICES EXCLUSION |
| CG 21 50 09 89 | AMENDMENT OF LIQUOR LIABILITY EXCLUSION |
| CG 21 55 07 98 | TOTAL POLLUTION EXCLUSION WITH A HOSTILE FIRE EXCEPTION |
| CG 2 21 60 09 98 | EXCLUSION - YEAR 2000 COMPUTER-RELATED AND OTHER ELECTRONIC PROBLEMS |
| CG 2 21 99 10 86 | ASBESTOS EXCLUSION ENDORSEMENT |
| CG 22 79 07 98 | EXCLUSION - CONTRACTORS-PROFESSIONAL LIABILITY |
| IL 00 03 04 98 | CALCULATION OF PREMIUM |
| IL 00 17 11 98 | COMMON POLICY CONDITIONS |
| IL 9 00 99 03 97 | COMMERCIAL INSURANCE COVERAGES JACKET |
| IL 99 91 11 85 | PUNITIVE OR EXEMPLARY DAMAGES EXCLUSION ENDORSEMENT |

FORMS OR ENDORSEMENTS ATTACHED INDICATE CHANGE

DATE ISSUED:  11-30-2000

**COMMERCIAL INSURANCE COVERAGE**
**SCHEDULE OF FORMS AND ENDORSEMENTS**

The following forms and endorsements are applicable to this policy: (Continued)



| FORM/ENDORSEMENT | DESCRIPTION |
|---|---|

DATE ISSUED:  11-30-2000

IL 9 00 93 10 94

INTERLINE
IL 9 00 99 03 97

A B C D E
F G H I J
K L M N O

**Hawkeye-Security** ₁ **United Security** ₁ **Western States**
**Insurance Companies**

P.O. Box 1848
Des Moines, IA 50306-1848

P.O. Box 860
Freeport, IL 61032-0860



# *COMMERCIAL*
## *INSURANCE COVERAGES*

If this policy's declarations shows that coverage is provided by Hawkeye-Security Insurance Company, the complete Home Office mailing address is:

Hawkeye-Security Insurance Company
P.O. Box 1848
Des Moines, Iowa 50306-1848

If this policy's declarations show that coverage is provided by United Security Insurance Company, the complete Home Office mailing address is:

United Security Insurance Company
P.O. Box 1848
Des Moines, Iowa 50306-1848

If this policy's declarations show that coverage is provided by Western States Insurance Company, the complete Home Office mailing address is:

Western States Insurance Company
P.O. Box 860
Freeport, Illinois 61032-0860

---

The Declarations Page and all the forms and endorsements listed on it and included with it complete this policy. Coverage under this policy is provided by the Company named in the declarations (a stock company). In witness whereof we have executed and attested this policy, but this policy is not valid unless it has been countersigned by our authorized representative.

A B C D E F G
H I J K L M N
Secretary
Not applicable in Colorado or Wisconsin

A B C D E F
H I J K L M
President
O P Q R S T

---

The Declarations Page and all the forms and endorsements listed on it and included with it complete this policy. Coverage under this policy is provided by the Company named in the declarations (a stock company). In witness whereof we have executed and attested this policy and it has been countersigned.

A B C D E F G
H I J K L M N
Secretary
Applicable in Colorado and Wisconsin only

A B C D E F
H I J K L M
President
O P Q R S T

WAL2–054489/12

COMMERCIAL GENERAL LIABILITY
CG 04 31 09 98

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# YEAR 2000 COMPUTER-RELATED AND OTHER ELECTRONIC PROBLEMS - LIMITED COVERAGE OPTIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULES

---

**SCHEDULE A - COVERAGES TO BE PROVIDED**
**(SUBJECT TO THE DESCRIPTION IN SCHEDULE B)**

Check any one or more of the following:

- [X] Bodily Injury
- [ ] Property Damage
- [ ] Personal and Advertising Injury

---

**SCHEDULE B - DESCRIPTION OF LOCATION,**
**OPERATIONS, PRODUCTS OR SERVICES TO BE COVERED**
**(TO WHICH SCHEDULE A APPLIES)**

Description of location(s), operation(s), product(s) or service(s)

All locations, operations, products or services to which this policy applies.

---

**SCHEDULE C - PREMIUM**

Premium    $ __WAIVED__ , if any.

---

The following exclusion is added to Paragraph **2.**, **Exclusions** of Section I - Coverage A - **Bodily Injury And Property Damage Liability** and Paragraph **2.**, **Exclusions** of Section I - Coverage B - **Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to "bodily injury", "property damage", "personal injury" and "advertising injury" (or "personal and advertising injury" if defined as such in your policy) arising directly or indirectly out of:

Copyright, Insurance Services Office, Inc., 1998

a. Any actual or alleged fa.....re, malfunction or inadequacy of:

(1) Any of the following, whether belonging to any insured or to others:

    (a) Computer hardware, including microprocessors;

    (b) Computer application software;

    (c) Computer operating systems and related software;

    (d) Computer networks;

    (e) Microprocessors (computer chips) not part of any computer system; or

    (f) Any other computerized or electronic equipment or components; or

(2) Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph 2.a.(1) of this endorsement

due to the inability to correctly recognize, process, distinguish, interpret or accept the year 2000 and beyond.

b. Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph 2.a. of this endorsement.

This exclusion does not apply to the types of injury or damage indicated in Schedule A - Coverages To Be Provided of this endorsement arising out of any operations, products or services, or any operations or services at or from any specific location, described in Schedule B - Description Of Location, Operations, Products Or Services To Be Covered of this endorsment.

Copyright, Insurance Services Office, Inc., 1998
CG 04 31 09 98

WAL2—054489/12

**COMMERCIAL GENERAL LIABILITY**
**CG 20 32 07 98**

# ADDITIONAL INSURED - ENGINEERS, ARCHITECTS OR SURVEYORS NOT ENGAGED BY THE NAMED INSURED

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

SCHEDULE

---

**Name Of Engineers, Architects Or Surveyors**
**Not Engaged By The Named Insured:**

   KWASEK ARCHITECTS INC (ARCHITECT)
   EDWIN HANCOCK ENGINEERING COMPANY (ENGINEER)

---

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**A. Section II - Who Is An Insured** is amended to include as an insured the architects, engineers or surveyors shown in the Schedule, but only with respect to liability arising out of your ongoing operations performed by you or on your behalf. Such architects, engineers or surveyors, while not engaged by you, are contractually required to be added as an additional insured to your policy.

**B.** With respect to such architects, engineers or surveyors shown in the Schedule above, the following exclusion is added to Paragraph 2., **Exclusions** of **Section I - Coverage A - Bodliiy Injury And Property Damage Liability** and **Section I - Coverage B - Personal And Advertising Injury Liability:**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or the failure to render any professional services, including:

**1.** The preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; and

**2.** Supervisory, inspection or engineering services.

Copyright, Insurance Services Office, Inc., 1997

COMM. .CIAL GENERAL LIABILITY
CG 25 03 03 97

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# DESIGNATED CONSTRUCTION PROJECT(S) GENERAL AGGREGATE LIMIT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

Designated Construction Projects:

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

A. For all sums which the insured becomes legally obligated to pay as damages caused by @ccurrences[a] under COVERAGE A (SECTION I), and for all medical expenses caused by accidents under COVERAGE C (SECTION I), which can be attributed only to ongoing operations at a single designated construction project shown in the Schedule above:

1. A separate Designated Construction Project General Aggregate Limit applies to each designated construction project, and that limit is equal to the amount of the General Aggregate Limit shown in the Declarations.

2. The Designated Construction Project General Aggregate Limit is the most we will pay for the sum of all damages under COVERAGE A, except damages because of @bodily injury[a] or @property damage[a] included in the @products-completed operations hazard[a], and for medical expenses under COVERAGE C regardless of the number of:

   a. Insureds;

   b. Claims made or @suits[a] brought; or

   c. Persons or organizations making claims or bringing @suits[a].

3. Any payments made under COVERAGE A for damages or under COVERAGE C for medical expenses shall reduce the Designated Construction Project General Aggregate Limit for that designated construction project. Such payments shall not reduce the General Aggregate Limit shown in the Declarations nor shall they reduce any other Designated Construction Project General Aggregate Limit for any other designated construction project shown in the Schedule above.

4. The limits shown in the Declarations for Each Occurrence, Fire Damage and Medical Expense continue to apply. However, instead of being subject to the General Aggregate Limit shown in the Declarations, such limits will be subject to the applicable Designated Construction Project General Aggregate Limit.

B. For all sums which the insured becomes legally obligated to pay as damages caused by @ccurrences[a] under COVERAGE A (SECTION I), and for all medical expenses caused by accidents under COVERAGE C (SECTION I), which cannot be attributed only to ongoing operations at a single designated construction project shown in the Schedule above:

1. Any payments made under COVERAGE A for damages or under COVERAGE C for medical expenses shall reduce the amount available under the General Aggregate Limit or the Products-Completed Operations Aggregate Limit, whichever is applicable; and

 Copyright, Insurance Services Office, Inc., 1996

2. Such payments shall not reduce any Designated Construction Project General Aggregate Limit.

C. When coverage for liability arising out of the "products-completed operations hazard" is provided, any payments for damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard" will reduce the Products-Completed Operations Aggregate Limit, and not reduce the General Aggregate Limit nor the Designated Construction Project General Aggregate Limit.

D. If the applicable designated construction project has been abandoned, delayed, or abandoned and then restarted, or if the authorized contracting parties deviate from plans, blueprints, designs, specifications or timetables, the project will still be deemed to be the same construction project.

E. The provisions of Limits Of Insurance (SECTION III) not otherwise modified by this endorsement shall continue to apply as stipulated.

Copyright, Insurance Services Office, Inc., 1996

CG 25 03 03 97

INTERLINE
IL 9 04 79 10 97

**THIS FORM CHANGES THE POLICY. THIS FORM PROVIDES CLAIMS-MADE COVERAGE. PLEASE READ IT CAREFULLY.**

# EMPLOYEE BENEFITS LIABILITY COVERAGE

When this form is listed on the Declarations of the policy to which this form is attached, **Employee Benefits Liability Coverage** is added as follows:

## SCHEDULE

**Coverage Period:**    From _____    To: _____

**Deductible Each Claim:**    $1,000

**Limit of Liability:** _____

**Retroactive Date:** _____

Coverage under this insurance does not apply to a "Benefit Error" which occurs before the Retroactive Date, if any, stated here: (Enter date or none) _____

**Rating Basis:**

Number of Employees: _____

(If no entry appears above, the information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties, and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we," "us," and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under **WHO IS AN INSURED (SECTION II)**.

Other words and phrases that appear in quotation marks have special meaning. Refer to **DEFINITIONS (SECTION VI)**.

### SECTION I - EMPLOYEE BENEFITS LIABILITY COVERAGE

1. **Insuring Agreement**

   a. We will pay those sums that you become legally obligated to pay as damages to any employee, former employee or their beneficiaries or legal representatives because of a "benefit error" in the "administration" of your "Employee Benefit Programs" to which this insurance applies. However, we will have no duty to defend you against any "suit" seeking damages for a "benefit error" to which this insurance does not apply.

   We will have the right and duty to defend any "suit" seeking those covered damages. But:

   (1) The amount we will pay for damages is limited as described in **Section III - LIMITS OF INSURANCE;**

   (2) We may, at our discretion, investigate any "benefit error" and settle any claim or "suit" that may result; and

(3) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements.

No other obligations or liability to pay sums or perform acts or services is covered unless explicitly provided for under **SUPPLEMENTARY PAYMENTS.**

This insurance does not apply to any "benefit error" which occurred before the Retroactive Date shown, if any, in the Schedule of this Coverage Form or which occurs after the policy period. The "benefit error" must take place in the "coverage territory."

**b.** This insurance applies to a "benefit error" only if a claim for damages is first made in writing against you during the policy period.

(1) A claim by a person or organization seeking damages will be deemed to have been made when written notice of such claim is received by you or by us, whichever comes first.

(2) All claims for damages resulting from the same "benefit error" will be deemed to have been made at the time the first of those claims is made against you. However, if written notice of an incident or "benefit error" is given to us before any resulting claim is first made in writing against you, each such claim shall be deemed to be first made at the time you first gave us written notice of the incident or "benefit error."

## 2. Exclusions

This insurance does not apply to:

**a.** Any liability imposed on you under the Employee Retirement Income Security Act of 1974 (ERISA) and its amendments;

**b.** Any dishonest, fraudulent, criminal, or malicious act or omission;

**c.** "Bodily injury," "property damage," "personal injury" or "advertising injury";

**d.** Claims resulting from the failure of any person or organization to perform a contract under any plan included in the "employee benefit programs";

**e.** Claims resulting from insufficient funds to meet obligations under any plan included in the "employee benefit programs";

**f.** Any claim resulting from your failure to comply with any law concerning workers compensation, unemployment insurance, social security, disability benefits or any similar law;

**g.** Any claim based upon **(1)** failure of investment plans to perform as represented by you or anyone acting on your behalf, or **(2)** advice given by you to an employee to participate or not to participate in stock subscription plans, or **(3)** the appointment of, or the failure to appoint, any investment manager, administrator, trustee, actuary advisor, counsel, accountant, custodian, or consultant;

**h.** Claims resulting from the investment or non-investment of employee benefit funds;

**i.** Claims resulting from the termination of any employee benefit plan;

**j.** Fines, taxes, or penalties imposed by law or other matters which may be uninsurable under law;

**k.** Any claim based on the liability of others which is assumed by the insured under a contract or agreement; or

**l.** Any claim resulting from your refusal to employ, termination of employment, coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or other employment-related practices, policies, acts or omissions.

## 3. Supplementary Payments

We will pay, with respect to any claim or "suit" we defend:

**a.** All expenses we incur.

**b.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**c.** All reasonable expenses incurred by you at our request to assist us in the investigation or defense of the claim or employee benefit suit, including actual loss of earnings up to $100 a day because of time off from work.

**d.** All costs taxed against you in the "suit."

e. Prejudgment interest awarded against you on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

f. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

## SECTION II - WHO IS AN INSURED

1. If you are designated in the Declarations as:

   a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   b. A partnership or joint venture, you are an insured. Your members and your partners and their spouses are also insureds, but only with respect to the conduct of your business.

   c. An organization other than a partnership or joint venture, you are an insured. Your executive officers and directors are insureds, but only with respect to their duties as your officers and directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

2. Each of the following is also an insured:

   a. Your employees that you have authorized to administer your "employee benefit programs," but only for acts within the scope of their authorized duties.

   b. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this coverage form.

3. Any organization you newly acquire or form, other than a partnership or joint venture, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

   b. Coverage does not apply to an "employee benefit error" that occurred before you acquired or formed the organization.

   No person or organization is an insured with respect to the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

## SECTION III - LIMITS OF INSURANCE

1. The Limit of Insurance shown in the Schedule and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits."

2. The Limit of Insurance shown in the Schedule is the most we will pay for all damages incurred as the result of any one claim.

3. Each claim will be subject to the Deductible amount shown in the Schedule of this coverage form. We will pay only the difference between the Deductible amount and the amount shown for Limit of Insurance or the actual amount of the claim, whichever is lower.

4. The Aggregate limit for Employee Benefits Liability Coverage is twice the Limit of Insurance shown in the Declarations and is, subject to the foregoing provisions regarding each claim, the total limit of our liability hereunder for all damages.

5. Your payment of any Deductible amount will not reduce our aggregate limit of liability.

6. We may pay any part of your Deductible to settle any claim or "suit." If we do, we will notify you, and you will promptly reimburse us for whatever portion of your Deductible we have paid.

The limits of this Coverage Form apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the Coverage Period shown in the Schedule

of this Coverage Form, unless the Coverage Period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the limits of insurance.

## SECTION IV - EMPLOYEE BENEFITS LIABILITY CONDITIONS

**1. Bankruptcy**

Bankruptcy or insolvency of you or of your estate will not relieve us of our obligations under this Coverage Form.

**2. Duties in the Event of Incident, "Benefit Error," Claim or "Suit."**

   **a.** You must see to it that we are notified as soon as practicable of an incident or a "benefit error" which may result in a claim. To the extent possible, notice should include:

      **(1)** How, when and where the incident or "benefit error" took place;

      **(2)** The names and address of any persons seeking damages and witnesses; and

      **(3)** The nature and location of any damage arising out of the incident or "benefit error."

   **b.** If a claim is made or "suit" is brought against you, you must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   **c.** You and any other involved insured must:

      **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claims or "suit";

      **(2)** Authorize us to obtain records and other information;

      **(3)** Cooperate with us in the investigation, settlement or defense of the claim or "suit"; and

      **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to you because of a "benefit error" to which this insurance may also apply.

   **d.** No insureds will, except at their own cost, voluntarily make a payment, assume any obligation or incur any expense without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Form:

   **a.** To join us as a party or otherwise bring us into the "suit" asking for damages from you; or

   **b.** To sue us on this Coverage Form unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against you obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Form or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, you and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to you for a loss we cover under this Coverage Form, our obligations are limited as follows:

   **a.** Primary Insurance

   This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **c.** below.

   **b.** Excess Insurance

   This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis that is effective prior to the beginning of the policy period shown in this Coverage Form; and applies to a "benefit error" on other than a claims-made basis, if:

      **(1)** No Retroactive Date is shown in the Schedule of this Coverage Form; or

      **(2)** The other insurance has a policy period which continues after the Retroactive Date shown in the Schedule of this Coverage Form.

When this insurance is ⌐cess, we will have no duty to defend a⌐, ⌐aim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to your rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations.

**c. Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium**

**a.** We will compute all premiums for this Coverage Form in accordance with our rules and rates.

**b.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this Coverage Form, you agree:

**a.** The statements in this Coverage Form are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this Coverage Form in reliance upon your representations.

**7. Separation of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Form to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer of Rights of Recovery Against Others To Us**

If you have rights to recover all or part of any payment we have made under this Coverage Form, those rights are transferred to us. You must do nothing after loss to impair them. At our request, you will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Form, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V - EXTENDED REPORTING PERIODS

**1.** We will provide an automatic Extended Reporting Period as described in paragraph **3** or, if you purchase it, an optional Extended Reporting Period Endorsement as described in paragraphs **4** and **5** only if:

**a.** This Coverage Form is canceled or not renewed for any reason except non-payment of premium;

    **b.** We renew or replace this Coverage Form with other insurance that has a Retroactive Date later than the one shown in this Coverage Form's Schedule; or

    **c.** We replace this Coverage Form with other insurance that applies to a "benefit error" on other than a claims-made basis.

**2.** If we provide the Optional Extended Reporting Period, the following is added to paragraph **1.b.** of **INSURING AGREEMENT - SECTION I:**

    **(3)** A claim first made during the Optional Extended Reporting Period will be deemed to have been made on the last day of the coverage period; provided that the claim is for damages because of a "benefit error" that occurred before the end of the coverage period of this policy (but not before any applicable Retroactive Date).

The Optional Extended Reporting Period will not extend the policy period.

**3.** The Automatic Extended Reporting Period will be for 60 days starting with the end of the coverage period of this policy.

This Automatic Extended Reporting Period applies only if no subsequent insurance you purchase applies to the claim, or would apply but for the exhaustion of its applicable limit of insurance.

This Automatic Extended Reporting Period will not reinstate or increase the Limits of Insurance.

This Automatic Extended Reporting Period may not be canceled.

**4.** If you purchase the Optional Extended Reporting Period Endorsement, the length of the Extended Reporting Period will be indicated on the Endorsement and will start with the end of the Automatic Extended Reporting Period. We will issue that Endorsement if the First Named Insured shown in the Declarations:

    **a.** Makes a written request for it which we receive within 60 days after the end of the policy period; and

    **b.** Promptly pays the additional premium when due.

The Optional Extended Reporting Period Endorsement will not take effect unless the additional premium is paid when due. If the premium is paid when due, the endorsement may not be canceled by the insurer.

**5.** If you purchase the Optional Extended Reporting Period Endorsement, we will provide a separate aggregate limit of insurance described below, but only for claims first received and recorded during the optional Extended Reporting Period.

The separate aggregate limit of insurance will be equal to the Limit of Liability shown in the Schedule, in effect at the end of the policy period.

**6.** We will determine the actual premium for the Optional Extended Reporting Period Endorsement in accordance with our rules and rates. In doing so, we may take into account the following:

    **a.** The exposures insured;

    **b.** Previous types and amounts of insurance;

    **c.** The length of the Extended Reporting Period chosen (one or three years);

    **d.** Limits of Insurance available under this Coverage Form for future payment of damages; and

    **e.** Other related factors

The premium for the Optional Extended Reporting Period Endorsement will not exceed:

    • 100% of the last annual premium for the One Year Extended Reporting Period option; or

    • 200% of the last annual premium for the Three Year Extended Reporting Period option.

# SECTION VI - DEFINITIONS

**1.** **"Administration"** means:

    **a.** Giving counsel to employees with respect to the "employee benefit programs";

    **b.** Interpreting the "employee benefit programs";

    **c.** The handling of records in connection with the "employee benefit programs"; and

    d. Effecting enrollment, termination or cancellation of employees under the "employee benefit programs" provided all such acts are authorized by you.

2. **"Advertising Injury"** means injury arising out of one or more of the following offenses:

    a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    b. Oral or written publication of material that violates a person's right of privacy;

    c. Misappropriation of advertising ideas or style of doing business; or

    d. Infringement of copyright, title or slogan.

3. **"Benefit Error"** means a negligent act, error or omission by you, or other protected persons, in the "administration" of "employee benefit programs."

4. **"Bodily Injury"** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

5. **"Coverage Territory"** means: The United States of America (including its territories and possessions), Puerto Rico and Canada.

6. **"Employee Benefit Programs"** means group life insurance, group accident, group dental or health insurance, profit sharing plans, pension plans, individual retirement account (IRA) plans, salary reduction plans under Internal Revenue Code 401(k) or amendments, employee stock subscription plans, workers compensation insurance, unemployment compensation, social security and disability benefits insurance, and travel, savings or vacation plans, or any similar "employee benefit programs."

7. **"Personal Injury"** means injury, other than "bodily injury" arising out of one or more of the following offenses:

    a. False arrest, detention or imprisonment;

    b. Malicious prosecution;

    c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

    d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

    e. Oral or written publication of material that violates a person's right of privacy.

8. **"Property Damage"** means:

    a. Physical injury to tangible property, including all resulting loss of use of that property; or

    b. Loss of use of tangible property that is not physically injured.

9. **"Suit"** means a civil proceeding in which damages because of a "benefit error" to which this insurance applies are alleged. "Suit" includes:

    a. An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or

    b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

WAL2-054489/12

**INTERLINE**
**IL 9 12 98 11 97**

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AMENDMENT OF THE DECLARATIONS PAGE TO COMPLETE, CORRECT OR CHANGE YOUR NAME AND/OR ADDRESS

This endorsement changes the policy effective on the inception date of the policy, unless another date is indicated below.

| Endorsement effective: | |
|---|---|
| Named Insured:<br>TUSCHALL ENGINEERING CO INC | Countersigned by: |

(Authorized Representative)

It is agreed that the name of the Insured and/or mailing address of the Insured is (are) amended to read:
TUSCHALL ENGINEERING CO INC & FENCO ARCHITECT PRODUCTS INC

IL 9 12 98 11 97

QUICK REFERENCE

# COMMERCIAL GENERAL LIABILITY POLICY

READ YOUR POLICY CAREFULLY

## DECLARATIONS PAGE

Named Insured and Mailing Address
Policy Period
Description of Business and Location
Coverages and Limits of Insurance

## SECTION I – COVERAGES                                    Beginning on Page

Coverage A –                  Insuring Agreement . . . . . . . . .    1
   Bodily Injury
   and Property               Exclusions . . . . . . . . . . . . .    1
   Damage Liability

Coverage B –                  Insuring Agreement . . . . . . . . .    4
   Personal and
   Advertising                Exclusions . . . . . . . . . . . . .    4
   Injury Liability

Coverage C –                  Insuring Agreement . . . . . . . .    5
   Medical Payments           Exclusions . . . . . . . . . . . . .    5

Supplementary Payments – Coverages A and B  . . . . . . . . . . . . . . . . . . . .    5

## SECTION II – WHO IS AN INSURED . . . . . . . . . . . . . . . . . . . . . . .    6

## SECTION III – LIMITS OF INSURANCE . . . . . . . . . . . . . . . . . . . . .    7

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS . . . . . . . . . . .    8

Bankruptcy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8
Duties In The Event of Occurrence, Claim or Suit . . . . . . . . . . . . . . . .    8
Legal Action Against Us . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8
Other Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8
Premium Audit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9
Representations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9
Separation of Insureds . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9
Transfer of Rights of Recovery Against Others To Us . . . . . . . . . . . . . . .    9
When We Do Not Renew . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9

## SECTION V – DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . .   10

## COMMON POLICY CONDITIONS

Cancellation
Changes
Examination of Your Books and Records
Inspections and Surveys
Premiums
Transfer of Your Rights and Duties under this Policy

## ENDORSEMENTS (If Any)

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1982, 1988, 1994

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** - Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** - Definitions.

## SECTION I - COVERAGES

## COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described SECTION **III** - Limits Of Insurance; and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverage **A** and **B**.

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

      (2) The "bodily injury" or "property damage" occurs during the policy period.

   c. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury."

2. **Exclusions**

   This insurance does not apply to:

   a. **Expected or Intended Injury**

      "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

   b. **Contractual Liability**

      "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

      (1) That the insured would have in the absence of the contract or agreement; or

      (2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract," reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage," provided:

         (a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

         (b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

Copyright, Insurance Services Office, Inc., 1997

c. **Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

d. **Workers Compensation and Similar Laws**

Any obligation of the insured under a workers compensation, disability benefits or unemployment compensation law or any similar law.

e. **Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of paragraph **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract."

f. **Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However,

this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot from equipment used to heat that building;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processes as waste by or for any insured or any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment"

Copyright, Insurance Services Office, Inc., 1997

or its part, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractors; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operations and "loading or unloading."

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

   **(a)** Less than 26 feet long; and

   **(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment."

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

 Copyright, Insurance Services Office, Inc., 1997

**j. Damage to Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy;

**(2)** Premises you sell, give away or aban-don, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or sub-contractors working directly or indirect-ly on your behalf are performing opera-tions, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraph **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** - Limits Of In-surance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this ex-clusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

**k. Damage to Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your be-half by a subcontractor.

**m. Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a con-tract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall of Products, Work or Impaired Property**

Damages claimed for any loss, cost or ex-pense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is with-drawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** - Limits Of In-surance.

## COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY

**1. Insuring Agreement.**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and adver-tising injury" to which this insurance ap-plies. We will have the right and duty to defend the insured against any "suit" seek-ing those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion,

investigate any offense and settle any claim or "suit" that may result, But:

(1) The amount we will pay for damages is limited as described in Section III - Limits Of Insurance; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUP-PLEMENTARY PAYMENTS - COVERAGES A AND B.

b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

2. **Exclusions**

This insurance does not apply to:

a. "Personal and advertising injury":

(1) Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

(2) Arising out of oral or written publication of material, of done by or at the direction of the insured with knowledge of its falsity;

(3) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

(4) Arising out of a criminal act committed by or at the direction of any insured;

(5) For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement;

(6) Arising out of a breach of contract, except an implied contract to use another's advertising idea in your advertisement";

(7) Arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement";

(8) Arising out of the wrong description of stated in your "advertisement";

(9) Committed by an insured whose business is advertising, broadcasting, publishing or telecasting. However, this exclusion does not apply to Paragraphs 14.a., b. and c. of "personal and advertising injury" under the Definitions Section; or

(10) Arising out of the actual, alleged or threatened discharge, disperal, seepage, migration, release or escape of "pollutants" at any time.

b. Any loss, cost or expense arising out of any:

(1) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants;" or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants".

## COVERAGE C. MEDICAL PAYMENTS

1. **Insuring Agreement**

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(1) The accident takes place in the "coverage territory" and during the policy period;

(2) The expenses are incurred and reported to us within one year of the date of the accident; and

(3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions.**

We will not pay expenses for "bodily injury":

**a.** To any insured.

**b.** To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c.** To a person injured on that part of premises you own or rent that the person normally occupies.

**d.** To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers compensation or disability benefits law or a similar law.

**e.** To a person injured while taking part in athletics.

**f.** Included within the "products-completed operations hazard."

**g.** Excluded under Coverage A.

**h.** Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

**SUPPLEMENTARY PAYMENTS - COVERAGES A AND B**

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit," including actual loss of earnings up to $250 a day because of time off from work.

**e.** All costs taxed against the insured in the "suit."

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay

any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit," we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

(1) agrees in writing to:

(a) cooperate with us in the investigation, settlement or defense of the "suit";

(b) immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) notify any other insurer whose coverage is available to the indemnitee; and

(d) cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) provides us with written authorization to:

 Copyright, Insurance Services Office, Inc., 1997    CG 00 01 07 98

(a) obtain records and other information related to the "suit"; and

(b) conduct and control the defense of the indemnitee in such "suit."

So long as the above conditions are met, attorneys fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of paragraph **2.b.(2)** of Section I - Coverage **A** - Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys fees and necessary litigation expenses as Supplementary Payments ends when:

**a.** We have used up the applicable limit of insurance in the payment of judgments or settlements; or

**b.** The conditions set forth above, or the terms of the agreement described in paragraph **f.** above, are no longer met.

## SECTION II - WHO IS AN INSURED

1. If you are designated in the Declarations as:

   **a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   **b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   **c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

   **d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers," and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

2. Each of the following is also an insured:

   **a.** Your "employees," other than either your "executive officers," (if you are an organization other than a partnership, joint venture or limited liability company) or your

managers, you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" is an insured for:

(1) "Bodily injury" or "personal and advertising injury":

   (a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while that co-"employee" is either in the course of his or her employment or performing duties related to the conduct of your business;

   (b) To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of paragraph **(1)(a)** above;

   (c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraphs **(1)(a)** or **(b)** above; or

   (d) Arising out of his or her providing or failing to provide professional health care services.

(2) "Property damage" to property:

   (a) Owned, occupied or used by,

   (b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

(1) With respect to liability arising out of the maintenance or use of that property; and

(2) Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

Copyright, Insurance Services Office, Inc., 1997

3. With respect to "mobile equ..,..ment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

   a. "Bodily injury" to a co-"employee" of the person driving the equipment; or

   b. "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

4. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

   b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

   c. Coverage B does not apply to "personal injury" or "advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III - LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits."

2. The General Aggregate Limit is the most we will pay for the sum of:

   a. Medical expenses under Coverage C;

   b. Damages under Coverage A, except damages because of "bodily injury" or "property

damage" ...luded in the "products-completed operations hazard"; and

   c. Damages under Coverage B.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard."

4. Subject to 2. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage A; and

   b. Medical expenses under Coverage C

   because of all "bodily injury" and "property damage" arising out of any one "occurrence."

6. Subject to 5. above, the Fire Damage Limit is the most we will pay under Coverage A for damages because of "property damage" to premises, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit.**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

Copyright, Insurance Services Office, Inc., 1997



## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| HOMELAND CENTRAL INSURANCE COMPANY F/K/A HAWKEYE SECURITY INSURANCE COMPANY (IA) AS TRANSFEREE OF WESTERN STATES INSURANCE COMPANY, BY ITS TRANSFEREE ONEBEACON INSURANCE COMPANY, )))))))) | No.: |
| Plaintiff, )) | |
| vs. )) | |
| TUSCHALL ENGINEERING COMPANY, INC., F.H. PASCHEN, S.N. NIELSEN, INC., ))) | |
| Defendants. )))) | |

## EXHIBIT "C" – PART 2

## TO COMPLAINT FOR DECLARATORY RELIEF

(2) The names and addresses of any injured persons and witnesses; and

(3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

b. If a claim is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

## 3. Legal Action Against Us

No person or organization has a right under this Coverage Part:

a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

## 4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

a. **Primary Insurance**

This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

b. **Excess Insurance**

This insurance is excess over:

(1) Any of the other insurance, whether primary, excess, contingent or on any other basis:

(a) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner; or

(b) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(c) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

(d) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Section I - Coverage A - Bodily Injury And Property Damage Liability.

(2) Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit." If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other in-surance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-in-sured amounts under all that other in-surance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Decla-rations of this Coverage Part.

**c. Method of Sharing**

If all of the other insurance permits con-tribution by equal shares, we will follow this method also. Under this approach each in-surer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not per-mit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and pay-able on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are ac-curate and complete;

**b.** Those statements are based upon repre-sentations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be suffi-cient proof of notice.

## SECTION V - DEFINITIONS

**1.** "Advertisement" means a notice that is broad-cast or published to the general public or specific market segments about your goods, products or services for the purpose of attract-ing customers or supporters.

**2.** "Auto means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equip-ment.  But "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of thses at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in **a.** above; or

**c.** All parts of the world if:

(1) The injury or damage arises out of:

(a) Goods or products made or sold by you in the territory described in **a.** above; or

    Copyright, Insurance Services Office, Inc., 1997    CG 00 01 07 98

**(b)** The activities of a person whose home is in the territory described in **a.** above, but is away for a short time on your business; and

**(2)** The insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in **a.** above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker."

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   **a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   **b.** You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by:

   **a.** The repair, replacement, adjustment or removal of "your product" or "your work"; or

   **b.** Your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

   **a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   **b.** A sidetrack agreement;

   **c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   **d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   **e.** An elevator maintenance agreement;

   **f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for

"bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

   **(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

   **(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

      **(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

      **(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

   **(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker."

11. "Loading or unloading" means the handling of property:

   **a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

   **b.** While it is in or on an aircraft, watercraft or "auto"; or

   **c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

   but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto."

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

   a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   b. Vehicles maintained for use solely on or next to premises you own or rent;

   c. Vehicles that travel on crawler treads;

   d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

      (1) Power cranes, shovels, loaders, diggers or drills; or

      (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

   e. Vehicles not described in a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

      (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

      (2) Cherry pickers and similar devices used to raise or lower workers;

   f. Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

      However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

      (1) Equipment designed primarily for:

         (a) Snow removal;

         (b) Road maintenance, but not construction or resurfacing; or

         (c) Street cleaning;

      (2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

      (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal injury" means injury, other than "bodily injury", arising out of one or more of the following offenses:

   a. False arrest, detention or imprisonment;

   b. Malicious prosecution;

   c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

   d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

   e. Oral or written publication of material that violates a person's right of privacy.

   f. The use of another's advertising idea in your "advertisement"; or

   g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

   a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

      (1) Products that are still in your physical possession; or

      (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

         (a) When all of the work called for in your contract has been completed.

         (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

         (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

      Work that may need service, maintenance, correction, repair or replace-

Copyright, Insurance Services Office, Inc., 1997    CG 00 01 07 98

ment, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury," "property damage," "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**20.** "Your product" means:

**a.** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(1)** You;

**(2)** Others trading under your name; or

**(3)** A person or organization whose business or assets you have acquired; and

**b.** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes:

**a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**b.** The providing of or failure to provide warnings or instructions.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

**21.** "Your work" means:

**a.** Work or operations performed by you or on your behalf; and

**b.** Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

**a.** Warranties, or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**b.** The providing of or failure to provide warnings or instructions.

Copyright, Insurance Services Office, Inc., 1997

COMMERCIAL GENERAL LIABILITY
CG 02 00 04 87

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** CANCELLATION (Common Policy Conditions) is replaced by the following:

CANCELLATION

1. The first Named Insured shown in the Declarations may cancel this policy by mailing to us advance written notice of cancellation.

2. **a.** We may cancel this policy by mailing to you written notice stating the reason for cancellation.

   **b.** If we cancel for nonpayment of premium, we will mail the notice at least 10 days prior to the effective date of cancellation.

   **c.** If we cancel for a reason other than nonpayment of premium, we will mail the notice at least:

      **(1)** 30 days prior to the effective date of cancellation if the policy has been in effect for 60 days or less.

      **(2)** 60 days prior to the effective date of cancellation if the policy has been in effect for more than 60 days.

3. If this policy has been in effect for more than 60 days, we may cancel only for one or more of the following reasons:

   **a.** Nonpayment of premium;

   **b.** The policy was obtained through a material misrepresentation;

   **c.** Any insured has violated any of the terms and conditions of the policy;

   **d.** The risk originally accepted has measurably increased;

   **e.** Certification to the Director of Insurance of the loss of reinsurance by the insurer that provided coverage to us for all or a substantial part of the underlying risk insured; or

   **f.** A determination by the Director of Insurance that the continuation of the policy could place us in violation of the insurance laws of this State.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund will be less than pro rata. The cancellation will be effective even if we have not offered a refund.

**B.** The following is added and supersedes any provision to the contrary:

NONRENEWAL

1. If we decide not to renew this policy, we will mail written notice stating the reason for nonrenewal no less than 60 days before the expiration date to:

   **a.** You; and

   **b.** The broker, if known to us, or the agent of record.

2. Even if we do not comply with these terms, this policy will terminate:

   **a.** On the expiration date if:

      **(1)** You fail to perform any of your obligations in connection with the payment of the premium for the policy, or any installment payment, whether payable directly to us or our agents or indirectly under any premium finance plan or extension of credit; or

      **(2)** We have indicated our willingness to renew this policy to you or your representative; or

CG 02 00 04 87 Copyright, Insurance Services Office, Inc., 1987

**(3)** You have notified us or our agent that you do not want to renew this policy.

**b.** On the effective date of any other insurance replacing this policy.

**C.** Mailing of Notices

We will mail cancellation and nonrenewal notices to you, and the agent or broker, at the last addresses known to us. Proof of mailing will be sufficient proof of notice.

Copyright, Insurance Services Office, Inc., 1987

CG 02 00 04 87

COMM.  .CIAL GENERAL LIABILITY
CG 20 33 07 98

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED - OWNERS, LESSEES OR CONTRACTORS - AUTOMATIC STATUS WHEN REQUIRED IN CONSTRUCTION AGREEMENT WITH YOU

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A. Section II - Who Is An Insured** is amended to include as an insured any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to liability arising out of your ongoing operations performed for that insured. A person's or organization's status as an insured under this endorsement ends when your operations for that insured are completed.

**B.** With respect to the insurance afforded these additional insureds, the following additional exclusion applies:

This insurance does not apply to:

"Bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of, or the failure to render, any professional architectural, engineering or surveying services, including:

**1.** The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and

**2.** Supervisory, inspection, architectural or engineering activities.

Copyright, Insurance Services Office, Inc., 1997

COMMERCIAL GENERAL LIABILITY
CG 21 47 07 98

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to paragraph **2., Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

  **(a)** Refusal to employ that person;

  **(b)** Termination of that person's employment; or

  **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to paragraph **2., Exclusions** of **Section I - Coverage B - Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

  **(1)** A person arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

  **(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

    Copyright, Insurance Services Office, Inc., 1997

COMML..CIAL GENERAL LIABILITY
CG 21 50 09 89

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF LIQUOR LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion c. of COVERAGE A (Section I) is replaced by the following:

c. "Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you:

(1) Manufacture, sell or distribute alcoholic beverages;

(2) Serve or furnish alcoholic beverages for a charge whether or not such activity:

(a) Requires a license;

(b) Is for the purpose of financial gain or livelihood; or

(3) Serve or furnish alcoholic beverages without a charge if a license is required for such activity.

Copyright, Insurance Services Office, Inc., 1988

COMMERCIAL GENERAL LIABILITY
CG 21 55 07 98

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# TOTAL POLLUTION EXCLUSION
# WITH A HOSTILE FIRE EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion f. under Paragraph 2., **Exclusions of Coverage A - Bodily Injury And Property Damage Liability (Section I - Coverages)** is replaced by the following:

This insurance does not apply to:

**f. Pollution**

(1) "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

This exclusion does not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire" unless that hostile fire occurred or originated:

(a) At any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

(b) At any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

Copyright, Insurance Services Office, Inc., 1997

WAL2-054489/12

COMMERCIAL GENERAL LIABILITY
CG 2 21 60 09 98

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - YEAR 2000 COMPUTER-RELATED AND OTHER ELECTRONIC PROBLEMS

This endorsement modifies insurance provided under the following:

EMPLOYEE BENEFITS LIABILITY COVERAGE
VETERINARIANS PROFESSIONAL LIABILITY COVERAGE
REAL ESTATE AGENTS PROFESSIONAL LIABILITY
GENERAL LIABILITY EXTENSION ENDORSEMENT

We will not pay for loss or damages arising directly or indirectly out of:

1. Any actual or alleged failure, malfunction or inadequacy of:

   a. Any of the following, whether belonging to any insured or to others:

      (1) Computer hardware, including micro-processors;

      (2) Computer application software;

      (3) Computer operating systems and related software;

      (4) Computer networks;

      (5) Microprocessors (computer chips) not part of any computer system; or

      (6) Any other computerized or electronic equipment or components; or

   b. Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph **1.a.** of this endorsement

   due to the inability to correctly recognize, process, distinguish, interpret or accept the year 2000 and beyond.

2. Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph **1.** of this endorsement.

COMMERCIAL GENERAL LIABILITY
CG 2 21 99 10 86

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ASBESTOS EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising out of:

    (a) inhalation, ingestion or exposure to asbestos or goods or products containing asbestos; or

    (b) the use of asbestos in the manufacture or construction of any good, product or structure; or

    (c) the removal of asbestos from any good, product or structure; or

    (d) the manufacture, transportation, storage, sale, distribution, use or disposal of asbestos or goods or products containing asbestos.

COMMERCIAL GENERAL LIABILITY
CG 22 79 07 98

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION - CONTRACTORS - PROFESSIONAL LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph 2., Exclusions of **Section I - Coverage A - Bodily Injury And Property Damage Liability** and Paragraph 2., **Exclusions** of Section I - **Coverage B - Personal And Advertising Injury Liability:**

1.  This insurance does not apply to @bodily injury,ª @property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or on your behalf, but only with respect to either or both of the following operations:

    a.  Providing engineering, architectural or surveying services to others in your capacity as an engineer, architect or surveyor; and

    b.  Providing, or hiring independent professionals to provide, engineering, architectural or surveying services in connection with construction work you perform.

2.  Subject to paragraph 3. below, professional services include:

    a.  The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

    b.  Supervisory or inspection activities performed as part of any related architectural or engineering activities.

3.  Professional services do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor.

Copyright, Insurance Services Office, Inc., 1997

**INTERLINE**
**IL 00 03 04 98**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CALCULATION OF PREMIUM

This endorsement modifies insurance provided under the following:

> BOILER AND MACHINERY COVERAGE PART
> BUSINESSOWNERS POLICY
> COMMERCIAL AUTOMOBILE COVERAGE PART
> COMMERCIAL CRIME COVERAGE PART
> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> COMMERCIAL INLAND MARINE COVERAGE PART
> COMMERCIAL PROPERTY COVERAGE PART
> EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
> FARM COVERAGE PART
> LIQUOR LIABILITY COVERAGE PART
> OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
> POLLUTION LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
> PROFESSIONAL LIABILITY COVERAGE PART
> RAILROAD PROTECTIVE LIABILITY COVERAGE PART
> SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY Â NEW YORK

The following is added:

The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation, or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

IL 00 03 04 98          Copyright, Insurance Services Office, Inc., 1997

INTERLINE
IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

    a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

    b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

    a. Make inspections and surveys at any time;

    b. Give you reports on the conditions we find; and

    c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

    a. Are safe or healthful; or

    b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

    Copyright, Insurance Services Office, Inc., 1998

INTERLINE
IL 99 91 11 85

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PUNITIVE OR EXEMPLARY DAMAGES EXCLUSION ENDORSEMENT

Regardless of any other provision of this policy, this policy does not apply to punitive or exemplary damages. We will, however, provide defense for such action when suit involves both compensatory and punitive or exemplary damages.

IL 99 91 11 85